JAQUALIN FRIEND PETERSON (6226)
SOPHIA KING (18448)
Assistant Utah Attorney General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: jfpeterson@agutah.gov
        sophiaking@agutah.gov
*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH, SOUTHERN DIVISION

| | |
|---|---|
| RICHARD BUGG,<br><br>               Plaintiff,<br><br>v.<br><br>MINDY BENSON, KEVIN PRICE, JON ANDERSON, and DOES 1-25,<br><br>               Defendants. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 4:22-cv-00062-DN-PK<br><br>Judge David Nuffer<br>Magistrate Judge Paul Kohler |

Defendants Mindy Benson, Kevin Price, and Jon Anderson (Collectively "Defendants"), by and through their counsel, Jaqualin Friend Peterson and Sophia King, Assistant Utah Attorneys General, pursuant to FRCP 56, hereby submit their Motion for Summary Judgment seeking dismissal of all Plaintiff's claims.

i

# Table of Contents

TABLE OF AUTHORITIES ................................................................................................. iii

I.     JURISDICTION AND STANDARDS OF REVIEW ........................................ 15

    A.    Subject Matter Jurisdiction. ................................................................... 15

    B.    Summary Judgment. ............................................................................... 16

    C.    Declaratory and Prospective Injunctive Relief—State Officers. ............. 17

II.    COURT LACKS SUBJECT MATTER JURISDICTION OVER BENSON ............... 18

    A.    No Standing ............................................................................................ 18

    B.    Plaintiff Is Barred From Bringing Suit Against Benson ........................... 20

III.    NO UNIQUE FIRST AMENDMENT PROTECTION FOR ACADEMIC SPEECH.. 22

IV.    PLAINTIFF'S SPEECH IS NOT PROTECTED BY THE FIRST AMENDMENT .... 23

    A.    Plaintiff's Speech Is Made Pursuant to His Official Duties. ................... 27

    B.    Plaintiffs' Speech Is Not a Matter of Public Concern .............................. 31

    C.    SUU's Interest In Promoting Efficient Public Educational Services Outweighs Any Interest Plaintiff Has In Speech in How He Refers to an Individual. ....................... 36

V.    THE SANCTIONS AND POLICIES ARE NOT OVERBROAD OR VAGUE ........... 41

    A.    Not Overbroad .................................................................................... 42

    B.    Not Vague ............................................................................................ 43

VI.    PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS ............................................. 48

VII.    PLAINTIFF'S FOURTH AND FIFTH COA REQUIRE DISMISSAL ...................... 50

    A.    COA4 & 5 Only Seek Declaratory Relief and so They Are Barred ........................ 50

    B.    COA5 Amounts to An Improper Request for an Advisory Opinion ....................... 53

    C.    No Case or Controversy Over COA4 or COA5 ...................................................... 54

    D.    COA5 Is Not Ripe ................................................................................. 55

CONCLUSION .................................................................................................................. 57

APPENDIX OF  EVIDENCE ................................................................................................ 58

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................. 25

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) ............................................................................................. 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 28

*Beacon Theatres, Inc. v. Westover*,
  359 U.S. 500 (1959) ............................................................................................. 26

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986) ............................................................................................. 52

*Boring v. Buncombe Cnty. Bd. of Educ.*,
  136 F.3d 364 (4th Cir.1998) ................................................................................ 45

*Borough of Duryea, Pa. v. Guarnieri*,
  131 S. Ct. 2488 (2011) ......................................................................................... 46

*Brammer-Hoelter v. Twin Peaks Charter*,
  492 F.3d 1192 (10th Cir.2007) .................................................................. 33, 37, 45

*Brown v. Montoya*,
  662 F.3d 1152 (10th Cir.2011) ............................................................................ 27

*Casey v. West Las Vegas Independent Sch. Dist.*,
  473 F.3d 1323 (10th Cir.2007) ...................................................................... 36, 37

*Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*,
  762 F.3d 1016 (10th Cir.2014) ............................................................................ 64

*Citizens Against Ruining Our Environment v. Jewell*,
  839 F.3d 1276 (10th Cir.2016) ............................................................................ 26

*Colorado Env't Coal. v. Wenker*,
  353 F.3d 1221 (10th Cir.2004) ............................................................................ 24

*Columbian Financial Corp. v. BancInsure, Inc.*,
  650 F.3d 1372 (10th Cir. 2011) ........................................................................... 62

*Connick v. Myers*,
  461 U.S. 138 (1983) .................................................................................. 32, 33, 41

*Couch v. Bd. of Trustees of Mem. Hosp. of Carbon Co.*,
  587 F.3d 1223 (10th Cir.2009) ............................................................................ 40

*Davenport v. Williams*,
  2017 WL 5633109 (D. Utah Nov. 11, 2017) ....................................................... 35

*David v. City and Co. of Denver*,
  101 F.3d 1344 (10th Cir.1996) ............................................................................ 40

*Davis v. Utah*,
  2021 WL 3930277 (10th Cir. Sept. 2, 2021) ....................................................... 35

*Derochers v. City of San Bernardino,*
   572 F.3d 703 (9th Cir.2009) ............................................................ 38
*Dixon v. Kirkpatrick,*
   553 F.3d 1294 (10th Cir.2009) ........................................................ 35
*Dodd v. Richardson,*
   614 F.3d 1185 (10th Cir.2010) ................................................ 28, 62
*Dr. John's, Inc. v. City of Roy,*
   465 F.3d 1150 (10th Cir. 2006) ....................................................... 54
*Elephant Butte Irr. Dist. v. Dept. of Interior,*
   160 F.3d 602 (10th Cir.1998) .......................................................... 60
*Escue v. Northern OK College,*
   450 F.3d 1146 (10th Cir.2006) ........................................................ 48
*Ex parte Young,*
   209 U.S. 123 (1908) .................................................................. 29, 60
*Faustin v. Denver,*
   423 F.3d 1192 (10th Cir.2005) ........................................................ 56
*Fazio v. City & County of San Francisco,*
   125 F.3d 1328 (9th Cir.1997) .......................................................... 25
*Fitzgerald v. Barnstable Sch. Comm.,*
   555 U.S. 246 (2009) ........................................................................ 63
*Flanagan v. Munger,*
   890 F.2d 1557 (10th Cir.1989) ........................................................ 46
*Forum for Academic and Institutional Rights, Inc. v. Rumsfeld,*
   291 F. Supp.2d 269 (D.N.J. 2003) ................................................... 32
*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ................................................................. Passim
*Gardetto v. Mason,*
   100 F.3d 803 (10th Cir. 1998) .................................................. 45, 46
*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ................................................................. 54, 55
*Green v. Board of County Com'rs,*
   472 F.3d 794 (10th Cir.2007) .......................................................... 36
*Green v. Mansour,*
   474 U.S. 64 (1985) .......................................................................... 60
*Gunn v. Minton,*
   568 U.S. 251 (2013) ........................................................................ 24
*Hendrickson v. AFSCME Council 18,*
   992 F.3d 950 (10th Cir.2021) .......................................................... 28
*Hennigh v. City of Shawnee,*
   155 F.3d 1249 (10th Cir.1998) ........................................................ 59
*Hesse v. Town of Jackson,*
   541 F.3d 1240 (10th Cir.2008) ........................................................ 37
*Hill v. Colorado,*
   530 U.S. 703 (2000) ................................................................. 52, 56

iv

*Holbrook v. City of Alpharetta,*
    112 F.3d 1522 (11th Cir. 1997) .................................................................. 45

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ...................................................................................... 53

*Hulen v. Yates,*
    322 F.3d 1229 (10th Cir.2003) .................................................................. 42

*Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31,*
    —— U.S. ——, 138 S.Ct. 2448 (2018) ...................................................... 34

*Jicarilla Apache Nation v. Rio Arriba County,*
    440 F.3d 1202 (10th Cir.2006) .................................................................. 59

*Joritz v. Gray-Little,*
    822 Fed.Appx. 731 (10th Cir.2020) .......................................................... 34

*Kannady v. City of Kiowa,*
    590 F.3d 1161 (10th Cir.2010) .................................................................. 25

*Kansas Penn Gaming, LLC v. Collins,*
    656 F.3d 1210 (10th Cir.2011) .................................................................. 59

*Klein v. University of Kan. Med. Ctr.,*
    975 F. Supp. 1408 (D. Kan.1997) ........................................................ 29, 30

*Lauck v. Campbell County,*
    627 F.3d 805 (10th Cir.2010) .................................................................... 36

*Lauth v. McCollum,*
    424 F.3d 631 (7th Cir.2005) ...................................................................... 58

*Lighton v. Univ. of Utah,*
    209 F.3d 1213 (10th Cir.2000) ............................................................ 34, 42

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................. 27

*Meiners v. Univ. of Kan.,*
    239 F.Supp.2d 1175 (D. Kan.2002) ...................................................... 26, 60

*Melton v. City of Oklahoma City,*
    879 F.2d 706 (10th Cir.1989) .................................................................... 42

*Mills v. City of Evansville, Ind.,*
    452 F.3d 646 (7th Cir.2006) ...................................................................... 36

*Mitchell v. Maynard,*
    80 F.3d 1433 (10th Cir.1996) .................................................................... 28

*Nahno-Lopez v. Houser,*
    625 F.3d 1279 (10th Cir.2010) .................................................................. 25

*New Mexicans for Bill Richardson v. Gonzales,*
    64 F.3d 1495 (10th Cir.1995) .................................................................... 64

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) .................................................................................... 55

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,*
    506 U.S. 139 (1993) ............................................................................ 26, 60

*Papasan v. Allain,*
    478 U.S. 265 (1986) .................................................................................. 60

*Parker v. Levy*,
  417 U.S. 733, (1974) ................................................................................. 51, 55
*Pead v. Ephraim City*,
  2018 WL 6573128 (D.Utah Dec. 13, 2018) ............................................... 37
*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*,
  431 F.3d 1241 (10th Cir.2005) ................................................................. 25
*Peterson v. Williams*,
  2022 WL 1421959 (10th Cir. May 5, 2022) ............................................. 34
*Pickering v. Bd. of Educ.*,
  391 U.S. 563 (1968) ....................................................................... 32, 33, 44
*Prairie Band Potawatomi Nation v. Wagnon*,
  476 F.3d 818 (10th Cir.2007) ................................................................... 26
*Price-Cornelison v. Brooks*,
  524 F.3d 1103 (10th Cir. 2008) ................................................................. 58
*Pub. Serv. Comm. of Utah v. Wycoff*,
  344 U.S. 237 ............................................................................................. 62
*Quinly v. City of Prairie Village*,
  446 F.Supp.2d 1233 (D.Kan.2006) .......................................................... 35
*Rankin v. McPherson*,
  483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) ....................... 45, 46
*Renne v. Geary*,
  501 U.S. 312 (1991) ................................................................................. 65
*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ................................................................................. 34
*Rio Grande Foundation v. Oliver*,
  57 F.4th 1147 (10th Cir.2023) ................................................................. 27
*Rogers v. Riggs*,
  71 F.4th 1256 (10th Cir.2022) ................................................................. 45
*Rohrbough v. Univ. of Colo. Hosp. Auth.*,
  596 F.3d 741 (10th Cir.2010) ............................................................. 34, 36
*Safe Streets All. v. Hickenlooper*,
  859 F.3d 865 (10th Cir.2017) ................................................................. 24
*Schneider v. City of Grand Junction Police Dep't*,
  717 F.3d 760 (10th Cir.2013) ................................................................. 28
*Schrier v. Univ. of Colo.*,
  427 F.3d 1253 (10th Cir.2005) ........................................................... 31, 32
*SECSYS, LLC v. Vigil*,
  666 F.3d 678 (10th Cir. 2012) ................................................................. 58
*Shifrin v. Toll*,
  483 F. App'x 446 (10th Cir.2012) ........................................................... 58
*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) ................................................................................... 27
*Singh v. Cordle*,
  936 F.3d 1022 (10th Cir.2019) ........................................................... 34, 42

*Thompson v. Administrative Office of Courts*,
　2009 WL 961167 (D. Utah Apr. 8, 2009) ................................................ 46
*U.S. v. Hunter*,
　663 F.3d 1136 (10th Cir. 2011) .............................................................. 57
*United States v. Williams*,
　553 U.S. 285 (2008) ................................................................................ 52
*Urofsky v. Gilmore*,
　216 F.3d 401 (4th Cir.2000) ................................................................... 32
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
　455 U.S. 489 (1982) ................................................................................ 52
*Ward v. Rock Against Racism*,
　491 U.S. 781 (1989) ................................................................................ 53
*Ward v. Utah*,
　321 F.3d 1263 (10th Cir.2003) ............................................................... 27
*Weinberger v. Romero–Barcelo*,
　456 U.S. 305 (1982) ................................................................................ 26
*West v. Derby Unified Sch. Dist. No. 260*,
　206 F.3d 1358 (10th Cir.) ....................................................................... 53
*West v Atkins*,
　487 U.S. 42 (1988) .................................................................................. 62
*Whole Woman's Health v. Jackson*,
　595 U.S. 30, 142 S. Ct. 522 (2021) ........................................................ 28
*Wilson v. Glenwood Intermountain Properties, Inc.*,
　98 F.3d 590 (10th Cir.1996) ................................................................... 24
*Woodward v. City of Worland*,
　977 F.2d 1392 (10th Cir. 1992) .............................................................. 40

Statutes

20 U.S.C. §§ 1681 ........................................................................... 13, 14
42 U.S.C. § 1983 ................................................................................... 11
Utah Code 34A-5-106(1) ...................................................................... 54

Rules

Fed. R. Civ. P. 56(a) ........................................................................... 1, 25

Regulations

29 C.F.R. § 1604.11(a) .......................................................................... 54
34 C.F.R. § 106.8 ............................................................................ 15, 49
34 C.F.R. § 106.30 ................................................................................ 54

Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and
   Gender Identity in Light of Bostock v. Clayton County,
   86 FR 32637 (June 22, 2021) ................................................................................ 15

Other Authorities

Fed. Prac. & Proc. § 3524.3 (3d ed., Oct. 2020 update) ............................................... 28

## INTRODUCTION

Southern Utah University ("SUU" or "University") is a public educational institution committed to student success by providing an exceptional learning environment and opportunities which promote excellence at SUU. Learning is the University's primary focus. This case is about how a professor, Plaintiff Richard Bugg ("Plaintiff"), impeded and disrupted SUU's education mission by the way that he referred to a student while performing his teaching duties. His classroom conduct wherein he refused to address the student by their pronouns aligned with their gender identity resulted in two student complaints of sex-based discrimination and harassment being reported to the SUU's Equal Opportunity Office. That Office processed those complaints in accordance with the due process procedures governing sexual misconduct as outlined in SUU Policy 5.60, informed by SUU Policy 5.27. The University adopted Policies 5.27 and 5.60 to comply with its obligations under numerous state and federal laws, including Title IX and its implementing regulations, that require the University to have a process for the "prompt and equitable" resolution of student and employee sexual harassment complaints. In processing these complaints as it did, SUU was not only following its own procedures, it was complying with mandatory requirements in federal and state law.

The Policy 5.60 proceeding, which included a full investigation and an evidentiary hearing before a hearing officer that culminated in a written determination, found that Plaintiff engaged in harassment and discrimination on the basis of gender identity in violation of SUU Policy 5.60. It was *only after* the outcome of this policy proceeding that Plaintiff was sanctioned. The sole aim of the sanctions was to ensure Plaintiff's equal treatment of all students when addressing them, no matter their gender identity, prevent further discriminatory or harassing

treatment of students (since the option offered by Plaintiff would not cure his discriminatory treatment), and restore the University's ability to meet its primary mission of delivering its educational services effectively and efficiently.

By this lawsuit, Plaintiff seeks to have this Court lift those legitimately imposed sanctions. To be clear, Plaintiff does not assert a Free Exercise of Religion claim. He has expressly stated that his objections to the sanctions are *not* motivated by any sincerely held religious belief. He never requested a religious accommodation. Rather, Plaintiff's objections are founded primarily on a difference of opinion in grammar that he claims then violates his right to First Amendment speech.[1] But purely personal perceptions of grammar and what he perceives as a political act while performing his job duties is not a basis for protected speech.

Established First Amendment law does not support any of his legal theories. When a citizen enters government service, the citizen by necessity must accept certain limitations in the context of employment. As the U.S. Supreme Court has made clear in *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), the seminal case followed by the Tenth Circuit in analyzing *all* public employee speech, "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421.

The University is entitled to maintain authority over the general parameters of conduct in the classroom to deliver its educational services effectively and efficiently. Notably, a university

---

[1] As is apparent from Plaintiff's operative Complaint and this briefing, Plaintiff does raise other constitutional claims but all rely on the foundational premise that Plaintiff's speech is protected by the First Amendment.

professor does not have authority to call students whatever the professor desires or based on what the professor assumes about the person or based on the professor's political beliefs. Addressing individual students is a part of a professor's job duties and an area that a university must maintain authority over to ensure its educational mission as it carries out the services students pay the university for. How a professor refers to an individual is not a public concern, especially here, where Plaintiff admits that pronoun use is not relevant to the subject matter of his classes. In such an undisputed context, the university's interests and responsibilities clearly outweigh the professors. Plaintiff's conduct was, in fact, significantly disruptive to students' education environment. Plaintiff's conduct also impeded SUU's primary mission of delivering its educational services effectively and efficiently and in a manner that provided its students with a classroom environment conducive to learning and free from sex-based discrimination and harassment. Indeed, putting this type of conduct outside the University's authority to regulate would create an untenable situation, and not just for SUU, but for all universities.

In sum, Plaintiff's conduct is not constitutionally protected. No declaratory relief or permanent injunction is warranted.

## BASIS FOR DEFENDANTS' MOTION

Defendants move the Court for summary judgment on all claims on grounds that the material undisputed evidence shows that Plaintiff cannot succeed on the merits of any claim. Plaintiff brings six causes of action, two (COA4 & 5) seek only declaratory relief (despite how one is styled) while all others seek declaratory and prospective injunctive relief. All claims are brought pursuant to 42 U.S.C. § 1983. As for the claims that do seek injunctive relief, in total

they allege violations of Plaintiff's First and Fourteenth Amendment rights to free speech, due process (vagueness and overbreadth), and equal protection. All should be dismissed.

First, the Court lacks subject matter jurisdiction over Defendant Mindy Benson, so she must be dismissed from the litigation. The Court also lacks jurisdiction to consider Plaintiff's fourth cause of action seeking a declaration that Plaintiff did not violate SUU's published policies because none of the named Defendants made such a determination, which was solely made by the hearing officer who is not named in this litigation.

Second, Plaintiff's speech is not protected under the First Amendment. This is fatal to Plaintiff's first, second, third and sixth causes of action. In the absence of such constitutional protection, the University maintains discretion and authority over Plaintiff's speech in the context of his job. Nor are the sanctions or policies at issue constitutionally vague or overbroad—they adequately provide notice and are not arbitrarily applied.

Finally, Plaintiff's fourth and fifth causes of action fail because Defendants are immune from suit by virtue of the Eleventh Amendment from claims seeking declaratory relief only. Such actions have other deficiencies (i.e., lack standing, not ripe, seeks an advisory opinion, or fails to state a claim) which also require their dismissal.

Because Defendants are entitled to summary judgment in their favor, Plaintiff's request for declaratory and injunctive relief (he does not seek damages) also fails for want of Plaintiff showing actual success on the merits. The entirety of Plaintiff's case must therefore be dismissed, with prejudice.

4

## MATERIAL UNDISPUTED FACTS

**Plaintiff and His Employment**

1.     Plaintiff Richard Bugg is a professor at Southern Utah University ("SUU" or "the University"), a public four-year state supported university.[2]

2.     Plaintiff is paid to teach acting classes in the Department of Theatre, Dance, and Arts Administration (the "Department").[3]

3.     Plaintiff taught Theater 3123-01 Classic Acting ("Acting 4" or "the Class") at SUU during the 2021 academic school year.[4]

4.     Acting 4 is a required course that all classical acting majors must complete in order to graduate with that major.[5] Likewise, almost every major level class Plaintiff taught was required for students to meet graduation requirements.[6]

**Relationship Between SUU and Title IX**

5.     SUU is a four-year accredited public state-supported university.[7]

6.     SUU receives federal funds.[8]

7.     SUU adopted Policies 5.27 and 5.60 to comply with numerous state and federal laws, including Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, as amended, and its implementing regulations, 34 C.F.R. pt.106.[9]

8.     SUU's statement in Policy 5.60 regarding prohibition on sex discrimination, sexual

---

[2] Doc. 42, 3d Amend. Comp. ¶ 7; Doc. 43, Ans. ¶ 7.
[3] Doc. 42, 3d Amend. Comp. ¶ 29; Doc. 43, Ans. ¶ 29.
[4] Doc. 42, 3d Amend. Comp. ¶ 30; Doc. 43, Ans. ¶ 30; Ex. 1, Hearing Transcript 28:17-21, 133:20-21.
[5] Ex. 1, Hearing Tr. 28:17-21, 133:20-21.
[6] Ex. 2, Written Determination, Ex. D19.
[7] Doc. 42, 3d Amend. Comp. ¶¶ 28, 100; Doc. 43, Ans. ¶ 28, 100.
[8] Doc. 42, 3d Amend. Comp. ¶ 25; Doc. 43, Ans. ¶ 25.
[9] Doc. 42, 3d Amend. Comp. ¶ 90; Doc. 43, Ans. ¶ 90.

harassment and retaliation lists "gender identity" as protected classes.[10]

9.    Policy 5.60 defines sexual harassment as "conduct based on sex" that is "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to University Education Program or Activity."[11]

10.    Policy 5.27 states that "[a] hostile environment includes but is not limited to one in which a reasonable person can establish that he or she is the target of conduct by a supervisor, co-worker, faculty member, staff member, volunteer, campus contractor, or student that is sufficiently severe or pervasive to alter the conditions of his or her employment or education."[12]

11.    Policy 5.27 states that "[s]evere behavior refers to that which is repugnant, that which is extremely offensive to a reasonable person, or that which occurs with indifference to the ordinary sensibilities of a reasonable person."[13]

12.    Policy 5.27 states that "[p]ervasive behavior refers to that which occurs repeatedly or in some pattern over a period of time, having the effect of interfering with a person's working or academic performance or creating a hostile environment."[14]

13.    Title IX prohibits sexual harassment at educational institutions by stating:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.[15]

---

[10] Doc. 42-4, SUU Policy 5.60, Section V; *see also* Section IV.E.
[11] *Id.* Section IV.N.2.
[12] Doc. 42-3, SUU Policy 5.27, Section 3.C.2.d.
[13] *Id.* Section 3.C.2.a.
[14] *Id.* Section 3.C.2.b.
[15] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

14.     Title IX applies to all public and private institutions that receive federal funds.[16]

15.     Schools that receive federal funds must take steps to address hostile environments and sex-based discrimination. Specifically, Title IX's implementing regulations require schools to designate at least one employee to coordinate responsibilities under Title IX, provide notice that they do not discriminate on the basis of sex in their educational programs or activities, and adopt and publish grievance procedures that provide for the "prompt and equitable" resolution of student and employee sexual harassment complaints, which grievance process must comply with the implementing regulations governing formal complaints as defined therein.[17]

16.     On June 22, 2021, the Office of Civil Rights of the Department of Education (OCR) published a Notice of Interpretation to state explicitly that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity, consistent with the Supreme Court's reasoning in *Bostock*.[18]

**Incidents Leading To Complaints Against Plaintiff**

17.     Two students at SUU complained about Plaintiff.[19]

18.     The complainants, referred to here as "C1" and "C2" or "Complainants" collectively, were enrolled in Acting 4 that was taught by Plaintiff.[20]

19.     C1 uses the gender-neutral pronouns "they/them".[21]

---

[16] *Id.*
[17] 34 C.F.R. § 106.8.
[18] Notice of Interpretation—Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 FR 32637 (June 22, 2021) (2021 Bostock Notice of Interpretation), https://www.govinfo.gov/content/pkg/FR-2021-06-22/pdf/2021-13058.pdf.
[19] Doc. 42, 3d Amend. Comp. ¶ 39; Doc. 43, Ans. ¶ 39; Ex. 1, Hearing Tr. 10:14-17, 11:4-7, 23:6-25; Ex. 2, Written Determination, p. 5 & Ex. D38-D48.
[20] Doc. 42, 3d Amend. Comp. ¶ 30; Doc. 43, Ans. ¶ 30; Ex. 1, Hearing Tr. 10:14-17, 74:23-25; Ex. 2, Written Determination, p.5 & Ex. D11-D12.
[21] Ex. 1, Hearing Tr. 74:23-25, 88:25-89:9; Ex. 2, Written Determination, p.5.

20.    On September 9, 2021, the first day of Acting 4, Plaintiff read his syllabus containing his Class Philosophy out loud to the students in the Class.[22]

21.    Plaintiff's Class Philosophy on September 9, 2021 said, in relevant part:

This is a class dedicated to teaching the craft of acting. It is not a forum for social justice causes, nor a microcosm for political action movements. The discussion of all philosophies is welcome here, so long as it is part of our efforts to understand the craft and further the development of the acting characters we are creating. Please do not demand of your classmates any political or social compliance to your particular philosophy. ...[23]

22.    After reading the Class Philosophy, Plaintiff asked C1 to perform a monologue and misgendered C1, at least two times, referring to them using gender-specific pronouns such as "she" and "her" despite being corrected to say "they" and "them".[24]

23.    At the end of class, C1 asked Plaintiff to use "they/them" in referring to C1.[25]

24.    Plaintiff rejected the request of C1 to use "they/them" when referring to them, claiming to do so was a "political act".[26]

25.    Plaintiff informed C1 that he would not address C1 by nonbinary pronouns but would address C1 by name only and avoid the use of pronouns all together.[27]

**Disruption to University Operations and Student Learning Due to Plaintiff's Speech**

26.    C1 had a strong negative response to Plaintiff's refusal to use "they/them" pronouns

---

[22] Ex. 1, Hearing Tr. 21:14-20:1, 77:8-24; Ex. 2, Written Determination, p.5

[23] Ex. 2, Written Determination, p. 5 & Ex. D13, D51. *See also* Ex. 1, Hearing Tr. 264:22-269:13.

[24] Doc. 42, 3d Amend. Comp. ¶ 38; Ex. 1, Hearing Tr. 21:14-20:1, 77:8-24, 185:6-186:22, 202:2-206:21, 230:13-232:24, 245:21-249:4, 262:14-264:21; Ex. 2, Written Determination, p. 5 & Ex. D13, D53.

[25] Doc. 42, 3d Amend. Comp. ¶ 30; Ex.1, Hearing Tr. 77:8-24, 88:25-89:9, 106:17-107:21, 185:6-186:22, 202:2-206:21, 230:13-232:24, 245:21-249:4, 260:21-261:14, 262:14-264:21; 267:18-269:13.

[26] Doc. 42, 3d Amend. Comp. ¶ 37; Ex. 1, Hearing Tr. 68:1-5, 77:8-24, 106-17-108:4; Ex 2, Written Determination, pp. 6, 8 & Ex. D13, D53.

[27] Doc. 42, 3d Amend Comp. ¶ 37; Ex. 1, Hearing Tr. 64:13-21, 88:25-89:22, 90:1-5, 98:12-21, 186:1-8, 187:20-190:20, 198:21-199:10, 221:1-14, 232:2-10, 237:23-238:5, 246:5-20, 263:9-13; Ex.2, Written Determination, p. 6 & Ex. D11.

such that they did not think staying in Acting 4 would be good for their mental health.[28]

27.    Other students in Acting 4 had negative responses to Plaintiff's refusal to use "they/them" pronouns that were strong enough that they were reluctant to stay in the class as they believed they could not find equity, respect or a conducive learning space there.[29]

28.    SUU opened an additional section of Acting 4, which was taught by Professor Peter Sham to create an option for students who did not want to stay in the section of Acting 4 taught by Plaintiff but needed to complete Acting 4 to graduate.[30]

29.    All but one student in the section of Acting 4 taught by Plaintiff dropped the Class entirely or transferred to the additional section.[31]

30.    Additionally, word of this in-class exchange reached other students in the Department. As a result, they viewed participating in Plaintiff's classes as potentially disruptive to their learning and sought to delay taking his courses and/or ask for alternatives from the Department.[32]

**Plaintiff's Speech and Related Interactions With His Supervisors**

31.    Plaintiff has a strong personal belief that gender-neutral pronouns should not be used when referring to an individual. His belief is not religious in nature[33] but is based on his personal

---

[28] Ex. 1, Hearing Tr. 77:25-81:25; Ex. 2, Written Determination, p. 6 & Ex. D11.
[29] Ex. 1, Hearing Tr. 44:15-45:13, 92:14-98:4, 151:17-154:20, 186:6-194:14, 199:17-24, 205:3-11, 208:20-209:10, 214:17-216:25, 249:22-257:19, 269:20-270:6; Ex. 2, Written Determination, p. 6 & Ex. D12, D15-D16, D21, D23-D24, D49-D50.
[30] Ex. 1, Hearing Tr. 147:24-148:9, 151:17-23, 171:3-15, 269:14-270:6; Ex 2, Written Determination, p. 6.
[31] Ex. 1, Hearing Tr. 208:20-209:10, 218:21-25, 226: 9-25, 233:18-235:2, 250:20-251:11; Ex. 2, Written Determination, p. 6 & Ex. D4-D5.
[32] Ex. 2, Written Determination, Ex. D64-D66; *see also* Ex. D17-19
[33] Doc. 42, 3d Amend. Comp. ¶¶ 46, 48; Ex. 1, Hearing Tr. 102:17-104:7; Ex. 2, Written Determination, p. 8 & Ex. D13-D14.

view that this it is grammatically incorrect and a political act.[34]

32.   Plaintiff concedes that he did not request a religious accommodation for his belief.[35]

33.   Plaintiff would not object to referring to a student who appears biologically male, or was born biologically male and transitioned to become female, by using the pronoun "she" if asked to do so.[36]

34.   Plaintiff would not object to referring to a student who appears biologically female, or was born biologically female and transitioned to become male, by using the pronoun "he" if asked to do so.[37]

35.   Plaintiff does not oppose others use of plural pronouns for a singular individual. He only opposes having to use them in this context himself."[38]

36.   Plaintiff admits that the issue of whether gender-neutral pronouns should be used when referring to an individual is not relevant to the subject matter of his classes.[39]

37.   The Department expects faculty to create a classroom environment conducive to learning. The Department's student handbook states:

> **Gender Identify Announcement.** Students have the right to express their gender identity freely. The faculty are committed to creating a safe positive learning environment for each and every student. If a student would prefer that we use a specific gender pronoun, please let faculty know during class introductions, office hours, or by email.[40]

---

[34] Doc. 42, 3d Amend. Comp. ¶¶ 36-37, 48; Ex. 1, Hearing Tr. 68:1-5, 77:8-24, 100:25-, 102:5, 106-17-108, 114:22-115:24; Ex 2, Written Determination, pp. 6, 8 & Ex. D12-15, D53, D55, D61, D81-82.
[35] Ex. 1, Hearing Tr. 102:17-104:7.
[36] *Id.* 110:14-114:3.
[37] *Id.*
[38] *Id.* 100:25-102:16, 106:17-108:4, 109:8-111:21; Ex. 2, Written Determination, p. 10, D15 ("It is not my intent to promulgate my view, nor constrain anyone else to attempt my views of feelings about the use of these pronouns.")
[39] Ex. 1, Hearing Tr. 107:22-108:18.
[40] Ex. 2, Written Determination, Ex. D63 (bold in original).

38.     In 2018, Dean Shauna Mendini spoke to Plaintiff about a Title IX complaint that had

been made against him, which Dean Mendini was able to deescalate by providing supportive

measures in the form of transferring the student to a different professor's class. At that time,

Dean Mendini talked with Plaintiff about the importance of honoring student exchange, student

preferences, and that it is something that is extremely critical to create a welcoming and

accepting learning environment.[41]

39.     In 2019, Chair Brian Swanson sent an email to Plaintiff stating, in part, the following:

"Informal and Formal report on gender identification, we need to make all students feel welcome

with their personal choices."[42]

40.     Also in 2019, both Dean Mendini and Chair Swanson met with Plaintiff and

addressed concerns raised by students regarding his perceived view of transgender students.[43]

41.     Plaintiff admits that it is important for him to create a welcoming environment for all

of the students in his classroom.[44]

**The Hearing and Process Plaintiff Received**

42.     The Complainants' complaint against Plaintiff instigated an internal investigation by

SUU's Equal Opportunity Office under SUU's Policy 5.60.[45]

43.     The investigation culminated in a report drafted by the investigative team.[46]

44.     In addition to receiving the report, Plaintiff received a hearing pursuant to SUU

---

[41] Ex. 1, Hearing Tr. 130:9-146:25; Ex. 2, Written Determination, pp. 7-8, Ex. D17-D18, D55-D56, D67;
[42] Ex. 2, Written Determination, Ex. D57; Ex. 5, Swanson Decl. ¶¶ 1-9.
[43] *Id.* pp. 7-8 Ex. D17-D19; *see also* Ex. D67; Ex. 1, Hearing Tr. 130:9-146:25; Ex. 4, Mendini Decl. ¶¶ 1-13; Ex. 5, Swanson Dec. ¶¶ 1-9.
[44] Ex. 1, Hearing Tr. 124:12-18.
[45] Doc. 42, 3d Amend. Comp. ¶ 50; Ex. 43, Ans. ¶ 50; Ex. 2, Written Determination, pp. 2-3 & Ex. D1-D97.
[46] Doc. 42, 3d Amend. Comp. ¶ 51; Ex. 43, Ans. ¶ 51; Ex. 2, Written Determination, pp. 2-3 & Ex. D1-D97.

Policy 5.60.[47] This hearing was held on March 23, 2022.[48]

45.     The Hearing Officer was Steve Gordon.[49]

46.     At the hearing, Plaintiff was represented by legal counsel. Plaintiff's counsel was able to put on evidence for Plaintiff, including Plaintiff's own testimony, to cross-examine witnesses and argue Plaintiff's case.[50]

47.     On May 4, 2022, after considering all the evidence from the hearing, the Hearing Officer issued a Written Determination finding Plaintiff violated SUU's Policy 5.60 (informed by related definitions found in Policy 5.27), in that he had engaged in harassment and discrimination on the basis of gender identity against a student.[51]

48.     Per SUU Policy 5.60, only the Hearing Officer may issue a Written Determination.[52]

49.     Per SUU Policy 5.60, the designated Responsible University Administrator for "faculty" is the "Director of Human Resources (in consultation with the Provost or designee)."[53] That was, and still is, Defendant Price, who is sued in his official capacity only.[54]

50.     A decision regarding responsibility may be appealed to an Appeal Officer, which per policy, is "the cognizant Vice President or their designee."[55] That was, and still is, Defendant Anderson, who is sued in his official capacity only.[56]

---

[47] Ex. 1, Hearing Tr.
[48] *Id.*, 8:7-21; Doc. 42, 3d Amend. Comp. ¶ 53; Ex. 43, Ans. ¶ 53.
[49] Ex. 1, Hearing Tr., cover & 8:3-6, 9:4-17.
[50] *Id.* 11:14-19, 20:21-21:12, 62:14-70:4, 82:22-92:7, 97:14-98:22, 140:4-146:15; 167:1-181:4, 194:15-200:10, 217:3-226:25, 237:7-241:17, 257:22-270:8, 285:20-292:16.
[51] Ex. 2, Written Determination, pp. 10-15.
[52] Doc. 42-4, SUU Policy 5.60, Section XVI & XVII. *See also* Ex. 1, Hearing Tr. 8:22-25.
[53] Doc. 42-4, SUU Policy 5.60, Section XVII.B.
[54] Doc. 42, 3d Amend. Comp. ¶ 10; Doc. 43, Ans. ¶ 10. *See also* Doc. 42-1.
[55] Doc. 42-4, SUU Policy 5.60, Section XIX.
[56] Doc. 42, 3d Amend. Comp. ¶ 9; Doc. 43, Ans. ¶ 9. *See also* Doc. 42-2.

51.     Anderson's authority only came into play, however, because Plaintiff appealed the sanctions issued by Price.[57] Had Plaintiff not appealed, Anderson also would have had no authority per SUU Policy 5.60 to intervene or alter the sanctions issued by Price. This is because under SUU Policy 5.60, the Responsible University Administrator's sanctions are final absent appeal.[58] If there is an appeal, then the Appeal Officer's decision is final.[59]

**Sanctions Imposed and Plaintiff's Response**

52.     Price imposed sanctions against Plaintiff after the hearing office determined that Plaintiff had violated SUU Policy 5.60. The sanctions imposed by Price included the following:[60]

> 1. Professor Richard Bugg submit to education about current views and opinions of English language and grammar experts and resources that using Gender-Neutral pronouns when referring to an individual is now considered grammatically correct.

> 2. This action and decision stand as a written warning regarding the use of preferred pronouns. If Professor Bugg continues to refuse to make a good faith effort to use preferred pronouns it will be considered an additional violation of policy 5.60 and 5.27 and may result in further sanctions up to and including termination.

> 3. If Professor Bugg refuses to make a good faith effort to use pronouns requested by SUU students, and as a result, students refuse to register for sections of classes he teaches, SUU will open additional sections of those classes and Professor Bugg's pay will be reduced to offset the amounts SUU must pay for the additional sections.

53.     Defendant Anderson upheld the sanctions imposed by Defendant Price, and imposed one additional sanction as follows:[61]

Professor Richard Bugg must review, and edit as necessary, his syllabus language to ensure

---

[57] Doc. 42, 3d Amend. Comp. ¶ 60; Doc. 43, Ans. ¶ 60.
[58] Doc. 42, 3d Amend. Comp. ¶¶ 15-20; Doc. 43, Ans. ¶¶ 15-20; Doc. 42-4, SUU Policy No. 5.60, Section XVII.E.
[59] Doc. 42-4, SUU Policy 5.60, Section XIX.N.
[60] Doc. 42-1.
[61] Doc. 42-2.

it aligns with department guidance related to gender pronouns, and submit the syllabus for approval by the Department Chair two weeks before the start of the Fall 2022 semester.

54.    To comply with the Provost's sanction, Plaintiff initially chose to include the departmental student handbook statement about gender identity and pronouns, *see* SOF 37, in his syllabi for Fall 2022.[62]

55.    The sanctions were clarified on December 21, 2022, as follows:[63]

    a.    Plaintiff can meet the sanction requirement that he align his syllabus by removing his "Class Philosophy" statement.

    b.    Plaintiff can comply with the sanction requirement that he make a good faith effort to use students' preferred pronouns by treating nonbinary and binary students the same in using (or not using) names and/or pronouns that align with their gender identity.

    c.    The sanctions apply only in the context of Plaintiff's job duties.

56.    The clarification reiterated that if Plaintiff has "concerns about the reasonableness of a future request by a student as related to use of preferred names or pronouns," he could direct those concerns to Defendant Price, who remains available to work with Plaintiff on a solution.[64]

57.    To date, Plaintiff has never brought a concern about the reasonableness of a student request related to preferred names or pronouns to Defendant Price.[65]

**President Benson's Lack of Connection to the Events at Issue in This Litigation**

58.    Defendant Mindy Benson is and during the events at issue here was the President of

---

[62] Ex. 3, 12/21/2022 Ltr,.
[63] *Id.*
[64] *Id.*; *see also* Doc. 42-1.
[65] Ex. 6, Price Decl. ¶¶ 3-6.

SUU. She is sued in her official capacity only.[66]

59.    President Benson is the direct supervisor of Provost Anderson, but she does not directly supervise Defendant Price. He reports to a Vice President.[67]

60.    President Benson was made aware of the sanctions imposed on Plaintiff. However, she did not decide the sanctions or write either of the sanction letters, or the clarification letter.[68] Nor in the context in which this matter arose and the sanctions that have been issued, she is not the Responsible University Administrator or the Appeal Officer, who are the designated University administrators with authority to execute or implement under SUU Policy 5.60.[69]

61.    The Office of Responsibility for SUU Policy 5.60 is Title IX Office.[70]

62.    The Office of Responsibility for SUU Policy 5.27 is General Counsel/VP FA.[71]

## ARGUMENT

## I.  JURISDICTION AND STANDARDS OF REVIEW

### A.  Subject Matter Jurisdiction.

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (internal quotation marks omitted). "Federal subject matter jurisdiction is elemental, and must be established in every cause under review in the federal courts." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir.2017) (brackets and internal quotation marks omitted). The party invoking a

---

[66] Doc. 42, 3d Amend. Comp. ¶ 8; Ex. 7, Benson Decl. ¶ 2.
[67] Doc. 42, 3d Amend. Comp. ¶ 11; Doc. 43 Ans. ¶ 11; Ex. 7, Benson Decl. ¶¶ 3, 4.
[68] Ex. 7, Benson Decl. ¶ 5.
[69] *Id*. ¶ 6. *See also* Ex. 1, Hearing Tr. & Ex. 2, Written Determination (showing no involvement).
[70] Doc. 42-4.
[71] Doc. 42-3.

federal court's jurisdiction (here, Plaintiff) bears the burden of establishing subject-matter jurisdiction. *Id.* Further, three elements must be demonstrated to satisfy the minimum constitutional requirements of standing:

> First, the plaintiff must have experienced an injury in fact, that is, an invasion of a legally protected interest that is concrete and particularized and actual or imminent. Second, there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, not speculative, that the injury will be redressed by the trial court's favorable decision.

*Colorado Env't Coal. v. Wenker*, 353 F.3d 1221, 1234 (10th Cir.2004) (citations omitted). The objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by the court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 592–93 (10th Cir.1996). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Id.* (internal quotation marks omitted).

**B.  Summary Judgment.**

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir.2010) (citation and internal quotation marks omitted). However, "the movant need not negate the nonmovant's claim, but

need only point to an absence of evidence to support the nonmovant's claim." *Id.* (alteration in original) (citation omitted). "If the movant carries this initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.* (citation omitted).

While the court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir.2005), "a mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.' " *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir.1997) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party on the issue." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir.2010) (citation and internal quotation marks omitted). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim or defense." *Id.* (citation and internal quotation marks omitted).

### C.  Declaratory and Prospective Injunctive Relief—State Officers.

The Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). Therefore, unless Plaintiff's claim for injunctive relief "has merit and declaratory relief is ancillary to it," Defendants are entitled to immunity from suit on Plaintiff's § 1983 claims for declaratory relief. *Meiners v. Univ. of Kan.*, 239 F.Supp.2d 1175, 1198 (D. Kan.2002), *aff'd*, 359 F.3d 1222, 1232–33 (10th Cir.2004).

Further, "[f]or a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir.2007); *see also Diné Citizens Against Ruining Our Environment v. Jewell,* 839 F.3d 1276, 1282 (10th Cir.2016) ("any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible"). In all, permanent injunctive relief is a severe remedy which should be granted only sparingly and only upon a clear showing that the plaintiff is entitled to such relief. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959).  Further, "in exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982).

## II.  COURT LACKS SUBJECT MATTER JURISDICTION OVER BENSON

This Court does not have subject matter jurisdiction over Defendant Mindy Benson. The Court therefore cannot consider the merits of the claims against her, all of which are brought in her official capacity pursuant to Section 1983. She should be dismissed from the litigation.

### A.  No Standing

Plaintiff lacks standing to seek declaratory and injunctive relief against Benson. Those seeking to invoke the jurisdiction of federal courts must satisfy the case or controversy requirement imposed by Article III of the Constitution. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). For there to be a "case" or "controversy," there must be a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions.

18

*Rio Grande Foundation v. Oliver*, 57 F.4th 1147, 1159 (10th Cir.2023). Specifically, to establish

standing, Plaintiff must demonstrate "that (1) he [] has suffered an injury in fact; (2) there is a

causal connection between the injury and the conduct complained of; and (3) it is likely that the

injury will be redressed by a favorable decision." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th

Cir.2003) (internal quotation marks omitted). Plaintiff cannot satisfy this test.

The record here is devoid of any fairly traceable causal connection between President

Benson and Plaintiff. Fair traceability requires a causal connection between the injury-in-fact

(here, the sanctions or future enforcement of sanctions) and defendant's conduct. *Lujan*, 504 U.S.

at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Further, "Section

1983 does not authorize liability under a theory of respondeat superior." *Brown v. Montoya*, 662

F.3d 1152, 1164 (10th Cir.2011). The "affirmative link between the supervisor and the

constitutional violation" requires "more than 'a supervisor's mere knowledge of his

subordinate's' conduct." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767

(10th Cir.2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). It requires: (1) personal

involvement; (2) sufficient causal connection, and (3) culpable state of mind. *Dodd v.

Richardson*, 614 F.3d 1185, 1195 (10th Cir.2010). *See also Mitchell v. Maynard*, 80 F.3d 1433,

1441 (10th Cir.1996) ("[P]ersonal participation is an essential allegation" that must be proven

before a Plaintiff can recover on a § 1983 claim.)

None are present here. Though President Benson is the direct supervisor of Provost

Anderson, she is not the direct supervisor of Defendant Price, who is supervised by a Vice

President.[72] Further, the undisputed evidence shows that Price and Anderson, alone, were

---

[72] Doc. 42, 3d Amend. Comp. ¶ 11; Doc. 43, Ans. ¶ 11; Ex. 7, Benson Decl. ¶¶ 3, 4.

responsible for the sanctions imposed on Plaintiff.[73] Indeed, as described in more detail below,

per Policy 5.60, only Price and Anderson were authorized to decide Plaintiff's sanctions. So,

while Plaintiff's injury-in-fact is fairly traceable to them, there is nothing to causally connect, or

affirmatively link, such injury to Benson. She was not a witness, party, or decision maker in any

of the complaint proceedings relating to Plaintiff or the imposition of sanctions.[74] *See*

*Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir.2021) (quoting 13 Charles

Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3524.3 (3d ed., Oct. 2020 update) ("[T]he

duty must be more than a mere general duty to enforce the law.")); *see also Whole Woman's*

*Health v. Jackson*, 595 U.S. 30, 142 S. Ct. 522, 534–35 (2021) (finding that the *Ex parte Young*

exception did not apply where the attorney general did not possess any enforcement authority in

connection with the law at issue).

There is also no evidence indicating that Benson is responsible for the policies at issue

here, that she can unilaterally change those policies, or enforce or alter the imposed sanctions. To

the contrary, said policies expressly state which SUU offices are responsible for them, and the

President's office is not among them.[75] Also, this is a case in which only the singular application

of said policies is at issue. The ongoing directive at issue (i.e., the sanctions) stems solely from

the proceedings under SUU Policy 5.60, nothing else. Benson should therefore be dismissed.

### B.  Plaintiff Is Barred From Bringing Suit Against Benson

President Benson is immune from suit. Under the Eleventh Amendment and *Ex parte*

*Young*, 209 U.S. 123 (1908), the Court lacks subject matter jurisdiction over a claim for

---

[73] Doc. 42-3 & Doc. 42-4; *see also* Ex. 3, 12/21/2022 Ltr.
[74] Ex. 7, Benson Decl. ¶ 5. *See also* Ex. 1, Hearing Tr. & Ex. 2, Written Determination (no involvement).
[75] *See* Doc. 42-4 indicating that the "Office of Responsibility" for SUU Policy 5.60 is Title IX and Doc. 42-3 indicating that the "Office of Responsibility" for SUU Policy 5.27 is General Counsel/VP FA.

prospective relief against any individual defendant in their official capacity who cannot provide the prospective relief requested. The Supreme Court held in *Ex parte Young* that:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

*Ex parte Young*, 209 U.S. at 157; *see also Klein v. University of Kan. Med. Ctr.*, 975 F. Supp. 1408, 1417 (D. Kan.1997) ("[T]he state official must have the power to perform the act required in order to overcome the jurisdictional bar of the Eleventh Amendment.").

Here, it is undisputed that Benson cannot provide Plaintiff any relief whatsoever. *See e.g. Klein*, 975 F. Supp. at 1417 (finding that "none of the individuals that [the plaintiff] ha[d] sued ha[d] the power to provide him with the relief he s[ought]—reinstatement" because only the "current Chancellor" of the University had that authority). Plaintiff was sanctioned pursuant to the investigation, disciplinary, and due process procedures governing sexual misconduct as outlined in SUU Policy 5.60, informed by SUU Policy 5.27.[76] Under Policy 5.60, only a "Responsible University Administrator" may decide the sanctions for violation of this policy, and only after there is a finding upon completion of the proceedings that the policy has been violated.[77] The designated Responsible University Administrator for "faculty" is the "Director of Human Resources (in consultation with the Provost or designee)."[78] That was, and still is, Defendant Price.[79] A decision regarding responsibility may be appealed to an Appeal Officer,

---

[76] *See* Ex. 2, Written Determination; Doc. 42-1.
[77] Doc. 42-4, SUU Policy 5.60, Section XVII & XVIII.
[78] *Id.* Section XVII.B.
[79] Doc. 42, 3d Amend. Comp. ¶ 10; Doc. 43, Ans. ¶ 10. *See also* Doc. 42-1.

which per policy, is "the cognizant Vice President or their designee."[80] That was, and still is, Defendant Anderson.[81] Notably, however, Anderson's authority only came into play because Plaintiff appealed the sanctions issued by Price. Had Plaintiff not appealed, Anderson also would have had no authority to intervene or alter the sanctions issued by Price. This is because per Policy 5.60 the Responsible University Administrator's sanctions are final absent appeal.[82] But where, as here, Plaintiff appealed, then the Appeal Officer's decision is final.[83] Nonetheless, it is the Responsible University Administrator that is tasked with ensuring that "any proposed sanctions and remedies are appropriate to end the prohibited conduct, *to prevent further violation of this policy, and remedy the effects of any violation*."[84] Thus, in the context in which this matter arose and the sanction that have been issued, Benson is not the designated University administrator with authority to execute or implement under Policy 5.60. Where a defendant is not acting at all, *Ex parte Young* does not apply. President Benson is immune and should be dismissed.

### III.  NO UNIQUE FIRST AMENDMENT PROTECTION FOR ACADEMIC SPEECH.

As part of COA1, Plaintiff asserts that his freedom of academic speech has been violated. But during the hearing he conceded that whether gender-neutral pronouns should be used when referring to an individual *is not relevant to the subject matter of his classes*.[85] His claim is therefore a red-herring. By his own admission, the speech at issue here does not implicate academic freedom and this claim should be disregarded.

---

[80] Doc. 42-4, SUU Policy 5.60, Section XIX.
[81] Doc. 42, 3d Amend. Comp. ¶ 9; Doc. 43, Ans. ¶ 9. *See also* Doc. 42-2.
[82] Doc. 42, 3d Amend. Comp. ¶¶ 15-20; Doc. 43, Ans. ¶¶ 15-20; Doc. 42-4, SUU Policy No. 5.60, Sections XVII.E.
[83] *Id.* Section XIX.N.
[84] *Id.* Section XVIII (emphasis added.)
[85] Ex.1, Hearing Tr. 107:22-108:18 (emphasis added).

Even if considered, however, it is of no merit. The Tenth Circuit does not treat academic speech and speech protected by the First Amendment the same. The Tenth Circuit has held that "[a]n independent right to academic freedom does not arise under the First Amendment without reference to the attendant right of free expression. Stated another way, the right to academic freedom is not cognizable without a protected free speech or associational right." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1266 (10th Cir.2005). In declining to accept a public university professor's argument regarding a special constitutional right to academic speech, the Tenth Circuit in *Schrier* rejected the idea to construe the First Amendment in a "manner that would promote such inequality among similarly situated citizens." *Id. See also Urofsky v. Gilmore*, 216 F.3d 401, 412 n.3 (4th Cir.2000) (noting the audacity of the plaintiffs claim that the First Amendment provides special protection to academic speakers because under such circumstances, a professor would be entitled to conduct a research project on sexual fetishes while a state employed psychologist could constitutionally be precluded from accessing the very same materials); *Forum for Academic and Institutional Rights, Inc. v. Rumsfeld,* 291 F. Supp.2d 269, 302 (D.N.J. 2003). Academic speech has no special constitutional protection. The determination of whether Defendants impermissibly infringed on Plaintiff's free speech rights, academic or otherwise, must be analyzed in accordance with the *Garcetti/Pickering* test, which applies in all cases where courts in the Tenth Circuit are assessing public employee speech.

## IV.  PLAINTIFF'S SPEECH IS NOT PROTECTED BY THE FIRST AMENDMENT

Plaintiff's speech is not protected by the First Amendment and, thus, there is no constitutional violation. While public employees do not surrender all their First Amendment rights by reason of their employment, *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), "the

State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Connick v. Myers*, 461 U.S. 138, 140 (1983) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). And a public employer has a legitimate interest "'in promoting the efficiency of the public services it performs through its employees.'" *Garcetti*, 547 U.S. at 417 (quoting *Pickering*, 391 U.S. at 568). Public employers "need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418. Thus, "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Id.* at 420 (quoting *Connick*, 461 U.S. at 154).

To balance these competing interests, the court employs the "Garcetti/Pickering analysis," *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir.2007), an analytical approach based on the Supreme Court's twin opinions in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). This analysis is the legal test used for determining whether a government employee's First Amendment free speech rights have been violated, *no matter the nature of the violation.*

At this juncture, it is helpful to identify the impact that the sanctions have on Plaintiff's speech. In addition to sanctioning him because of his speech on September 9, 2021, Plaintiff claims that the sanctions (and student handbook) compel him to speak something to which he objects—i.e., using gender-neutral pronouns when referring to an individual, which he believes

to be both grammatically incorrect and a political act.[86] Defendants Price and Anderson counter that they have made clear, and this is not refuted, that Plaintiff can comply with the sanction requirement that he make a good faith effort to use students' preferred pronouns by simply treating nonbinary and binary students the same in using (or not using) names and/or pronouns that align with their gender identity.[87] To date, however, Plaintiff has not indicated that he would be willing to use names only for all his students, but instead insists that he should be permitted to use pronouns for binary students while addressing non-binary students by their name in lieu of any requested gender-neutral pronoun.[88]

Whether Plaintiff is subject to sanctions in retaliation for speaking his objections or for failing to speak when compelled to do so (one or the other is a component of Plaintiff's COA1, 3 & 6), the analysis remains the same. Indeed, the U.S. Supreme Court has held that while the *Garcetti/Pickering* framework may fit less well where the government compels speech, "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, ––– U.S. –––, 138 S.Ct. 2448, 2473 (2018) (citing *Garcetti*, 547 U.S. at 421–22, 425–26). *See also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988) (noting the difference between compelled speech and compelled silence is a "difference ...

---

[86] Doc. 42, 3d Amend. Comp. ¶¶ 36-37, 48; Ex. 1, Hearing Tr. 68:1-5, 77:8-24, 100:25-, 102:5, 106-17-108, 114:22-115:24; Ex 2, Written Determination, pp. 6, 8 & Ex. D12-15, D53, D55, D61, D81-82.

[87] Ex. 3, 12/21/2022 Letter.

[88] *See e.g.,* Doc. 42, 3d Amend. Comp. ¶ 98.b; Ex. 2, Written Determination, Ex. D81 ("The Professor does not dispute that he has rejected the request of one of his nonbinary students to use plural gender-neutral pronouns when referring to that student in the third person. … However, the Professor has been, and continues to be, more than happy to accommodate any request to refer to an individual in the *first* person merely by the person's name …")

without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say.").

Nor is it of any significance that Plaintiff is a university professor. The Tenth Circuit does not treat professors any differently than other public employees, applying the *Garcetti/Pickering* framework to determine if their speech is protected by the First Amendment. *See e.g., Joritz v. Gray-Little,* 822 Fed.Appx. 731, 738 (10th Cir.2020); *Singh v. Cordle,* 936 F.3d 1022, 1035 (10th Cir.2019); *Rohrbough v. Univ. of Colo. Hosp. Auth.,* 596 F.3d 741, 747 (10th Cir.2010); *Lighton v. Univ. of Utah,* 209 F.3d 1213, 1224 (10th Cir.2000); *Peterson v. Williams,* No. 20-4095, 2022 WL 1421959, at *3 (10th Cir. May 5, 2022). *See also Davenport v. Williams,* No. 2:17-cv-15-CW, 2017 WL 5633109 at *5 (D. Utah Nov. 11, 2017).

In sum, where the claims are dependent on First Amendment rights and the speech is by a public employee the proper test for classifying Plaintiff's speech as "unprotected" or "protected" is the familiar *Garcetti/Pickering* test, which requires the court to consider:

> (1) Whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick,* 553 F.3d 1294, 1302 (10th Cir.2009); *Davis v. Utah,* 2021 WL 3930277, *3 (10th Cir. Sept. 2, 2021) (unreported). To prevail, a plaintiff must establish all five elements. *Id.* Thus, if Plaintiff fails to satisfy even one element, the speech will be unprotected regardless of whether it meets the other elements. *Id.*

Such an outcome will also be fatal to Plaintiff's request for declaratory and injunctive relief. Indeed, this is a case where the outcome as regards Plaintiff's COA1, 2, 3 and 6, turn on whether Plaintiff's speech is constitutionally protected under the First Amendment. When a party seeks an injunction on the basis of a potential First Amendment violation, success on the merits will often be determinative. *See Quinly v. City of Prairie Village*, 446 F.Supp.2d 1233, 1237 (D.Kan.2006). This is because if a First Amendment violation is established, the court will presume the existence of an irremediable injury. If not, then injunctive relief is not warranted because Plaintiff will have failed to satisfy the first prong—actual success on the merits.

Only the first three steps of the *Garcetti/Pickering* analysis are at issue in this Motion. However, the first three steps are issues of law "to be resolved by the district court." *Rohrbough v. University of Colo. Hosp. Authority*, 596 F.3d 741, 745 (10th Cir.2010). Thus, these are all matters that the Court can address here.

### A. Plaintiff's Speech Is Made Pursuant to His Official Duties.

As the starting point, the Court must decide whether Plaintiff is speaking 'as a citizen' or as part of his public job. *See Mills v. City of Evansville, Ind.*, 452 F.3d 646, 647 (7th Cir.2006). "If an employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Lauck v. Campbell County*, 627 F.3d 805, 814 (10th Cir.2010) (internal quotation marks omitted). "Only when government penalizes speech that a plaintiff utters 'as a citizen' must the court consider the balance of public and private interests, along with the other questions posed by *Pickering* and its successors…." *Id.* at 647-48. The Court also takes "a broad view of the meaning of speech that is pursuant to an employee's

official duties" and has described the first step as a "heavy burden." *Id. See also, Casey v. West Las Vegas Independent Sch. Dist.*, 473 F.3d 1323, 1331 (10th Cir.2007). The Tenth Circuit applies a "case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience" in evaluating an employee's speech. *Id.*

Tenth Circuit decisions have described speech that is made pursuant to an employee's official duties as: (1) speech concerning "activities [that] stemmed from and were the type of activities that [the employee] was paid to do," *Green v. Board of County Com'rs*, 472 F.3d 794, 801 (10th Cir.2007); (2) the "types of communications that would be attributable to the [employer]," *Id.*; (3) speech "[i]n compliance with" or "in accordance with" an employee's job, *Casey*, 473 F.3d at 1330 (quoting Black's Law Dictionary); and (4) speech that "reasonably contributes to or facilitates the employee's performance of the official duty." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 (10th Cir.2007).

Ultimately, "the proper focus remains whether the speech involved the type of activities the employee was paid to do." *Pead v. Ephraim City*, Case No. 2:17-cv-1313, 2018 WL 6573128, *4 (D.Utah Dec. 13, 2018). This focus on the capacity of the speaker recognizes the basic truth that speech by public employees undertaken in the course of their job duties will frequently involve matters of vital concern to the public, without giving those employees a First Amendment right to dictate to the state how they will do their jobs. Thus, "the court must ask whether the employee was performing the task they were paid to perform when they spoke. If so, the speech was therefore commissioned by his [or her] employer, and it enjoys no First Amendment protection." *Id.* at *3 (quotations and citations omitted); *see also Hesse v. Town of Jackson*, 541 F.3d 1240, 1249 (10th Cir.2008) ("While employees retain the prospect of

constitutional protection for their contributions to the civic discourse, they do not have First Amendment protection for statements made pursuant to employment responsibilities.").

The undisputed evidence here points to only one conclusion, and that is that when Plaintiff is calling on, addressing, or otherwise referring to students within his role as a professor, teacher, and faculty member of SUU, his speech is "commissioned" by the University and "made" or "compelled" pursuant to his official job duties. Plaintiff is a professor at SUU.[89] Plaintiff is paid to teach acting classes in the Department.[90] He typically teaches three major classes and one general education class per semester.[91]

Likewise, the undisputed events which led to Plaintiff's sanctions establish that he did, in fact, address, refer to, or call on students in his class. On September 9, 2021, the first day of Acting 4 class, Plaintiff asked C1 to perform a monologue. While doing so, Plaintiff referred to C1 using gender-specific pronouns at least two times, despite students correcting him.[92] At the end of this class, C1 specifically asked Plaintiff to use "they/them" when referring to them.[93] Plaintiff refused, stating he would refer to C1 by name but would not use gender-neutral pronouns because this was a "political act."[94] Thus, from this record, it is also unrefuted that Plaintiff was physically at his workplace (classroom) during work hours (first day of class) and the statements at issue were made to the intended audience of his workplace (students). That an

---

[89] Doc. 42, 3d Amend. Comp. ¶¶ 7, 29; Doc. 43, Ans. ¶¶ 7, 29.
[90] *Id.* ¶ 29; Doc. 43, Ans. ¶ 29.
[91] Ex. 2, Written Determination, Ex. D13 D18-D19.
[92] Doc. 42, 3d Amend. Comp. ¶ 38; Ex. 1, Hearing Tr. 21:14-20:1, 77:8-24, 185:6-186:22, 202:2-206:21, 230:13-232:24, 245:21-249:4, 262:14-264:21; Ex. 2, Written Determination, p. 5 & Ex. D13, D53.
[93] Doc. 42, 3d Amend. Comp. ¶ 30; Ex.1, Hearing Tr. 77:8-24, 88:25-89:9, 106:17-107:21, 185:6-186:22, 202:2-206:21, 230:13-232:24, 245:21-249:4, 260:21-261:14, 262:14-264:21; 267:18-269:13.
[94] Doc. 42, 3d Amend Comp. ¶ 37; Ex. 1, Hearing Tr. 64:13-21, 68:1-5, 77:8-24, 88:25-89:22, 90:1-5, 98:12-21, 106-17-108:4, 186:1-8, 187:20-190:20, 198:21-199:10, 221:1-14, 232:2-10, 237:23-238:5, 246:5-20, 263:9-13; Ex.2, Written Determination, pp. 6, 8 & Ex. D11, D13, D53.

employee expresses his views "inside his office, rather than publicly, is not dispositive." *Derochers v. City of San Bernardino*, 572 F.3d 703, 714 (9th Cir.2009). A "limited audience," however, "weighs against a claim of protected speech." *Id.* Finally, Plaintiff concedes that when he "articulated his position regarding the use of plural pronouns for addressing single individuals" and "refused to use the demanded pronouns," he was expressing his position "as an educator."[95]

The Department's student handbook and the undisputed testimony of the leadership reinforce that faculty are expected as a part of their official duties to not only engage with students, which necessarily entails addressing, calling on or referring to them, but also to create a space that promotes learning. The handbook states:

> **Gender Identify Announcement.** Students have the right to express their gender identity freely. The faculty are committed to creating a safe positive learning environment for each and every student. If a student would prefer that we use a specific gender pronoun, please let faculty know during class introductions, office hours, or by email.[96]

Per the testimony of Dean Mendini, Plaintiff has been aware since Fall 2018 (due to a similar incident) of "the importance of honoring student exchange, student preferences, [and] that this is something that is extremely critical."[97] Dean Mendini has also reinforced the expectation their faculty, including Plaintiff, "help students feel safe and, and secure in this – in their university experiences." [98] While there is a dispute as to the context in which Dean Mendini said that Plaintiff could use student names in lieu of gender-neutral pronouns, it is unrefuted that she and

---

[95] Doc. 42, 3d Amend. Comp. ¶ 62.
[96] Ex. 2, Written Determination, Ex. D63 (bold in original).
[97] Ex. 1, Hearing Tr. 134:3-9; Ex. 4, Mendini Decl. ¶¶ 1-13.
[98] Ex. 1, Hearing Tr. 134:23-25; Ex. 4, Mendini Decl. ¶¶ 1-13.

Chair Swanson made clear to Plaintiff in Spring 2019 that honoring students' gender identity is a component of providing an environment conducive to learning.[99]

In sum, the totality of undisputed evidence establishes that the speech Plaintiff is being directed to make by virtue of the sanctions imposed upon him, which require him to make good faith efforts to use preferred pronouns in a way that treats binary and non-binary students equally when addressing students in the context of his work at SUU,[100] can only be said to describe matters "commissioned" by SUU in that they directly relate to Plaintiff's job duties as a teacher and faculty member of the Department. Plaintiff's speech is thus unprotected, and all his speech-based claims (COA1, 2, 3, 6) therefore fail on this basis alone without further inquiry.

### B.  Plaintiffs' Speech Is Not a Matter of Public Concern

Even if Plaintiff could show that there is a genuine dispute regarding whether his speech is pursuant to his job duties, in order to be constitutionally protected, his speech must also be a matter of public concern. *Couch v. Bd. of Trustees of Mem. Hosp. of Carbon Co.*, 587 F.3d 1223, 1235 (10th Cir.2009). Plaintiff makes much of the fact that he perceives speech relating to the use of gender-neutral pronouns as grammatically incorrect and political, a view he argues is shared by others. However, just because speech is perceived to be incorrect or controversial does not mean that it is a matter of public concern. "[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." *David v. City and Co. of Denver*, 101 F.3d 1344, 1355 (10th Cir.1996). *See also Woodward v. City of Worland*, 977 F.2d 1392, 1403-04 (10th Cir. 1992). In *David* and *Woodward*, the courts

---

[99] Ex. 1, Hearing Tr. 135:1-12, 143:20-23; Ex. 2, Written Determination, Ex. 57. *See also* Ex. D17-19; Ex. 4, Mendini Dec. ¶¶ 1-13; Ex. 5, Swanson Decl. ¶¶ 1-9.
[100] Ex. 3, 12/21/2022 Ltr.

concluded that the plaintiffs' complaints about discrimination and retaliation did not address matters of public concern because they "focused exclusively on the conditions of the complainants' own employment." *David*, at 1357. As such, they were mere personal grievances and were not protected. Plaintiff's speech is similar.

Here, the only pronouns at issue and requested as preferred pronouns were "they/them," as applied to a nonbinary student as part of their gender identity.[101] There is also no dispute that the sanctions that arose out of Plaintiff's refusal to use those pronouns only apply in the context of Plaintiff's job. As clarified by Price and Provost Anderson:

> Last, on a related but different note, the entire matter in which the University evaluated your conduct under Policy 5.60 was related to your employment. Your conduct that the University evaluated under its policies was happening in the context of your job duties. (Facts 11, 19) The sanctions apply only in this same context. The University has never applied or purported to apply the sanctions outside this context. Any misconstruing of this context is unfounded, as evidenced by the record and the absence of such a claim in your Policy 5.60 appeal.[102]

While it may be said that issues surrounding gender identity can be of political, social, or other concern to the community, the "content, form, and context" of Plaintiff's actual speech in this case does not give rise to matters of public concern. *See Connick v. Myers*, 461 U.S. 138, 148-49 (1983) (The public concern "must be determined by the content, form, and context of a given statement."). The purpose of the sanctions here is to bring Plaintiff's work-related conduct towards binary students in line with his work-related conduct towards nonbinary students; that is, to treat them equally when addressing them.[103] The sanctions do not require that Plaintiff speak generally regarding gender identity or that he convey any large-scale messages to his students

---

[101] Doc. 42, 3d Amend. Comp. ¶ 30; Ex.1, Hearing Tr. 77:8-24, 88:25-89:9, 106:17-107:21, 185:6-186:22, 202:2-206:21, 230:13-232:24, 245:21-249:4, 260:21-261:14, 262:14-264:21; 267:18-269:13.
[102] Ex. 3, 12/21/2022 Ltr.
[103] *Id.*

regarding gender-neutral rights. Likewise, by his own admissions, his objection to using gender-neutral pronouns is <u>not</u> religious or made pursuant to a request for religious accommodation.[104] Thus, unlike other cases addressing this issue, Plaintiff's compelled speech or sanction does not butt up against a competing constitutional interest like the Free Exercise Clause.

Moreover, in determining whether speech is on a matter of public concern it is not enough that its *subject matter* could in certain circumstances be the topic of general interest. What is actually said on the topic must itself be of public concern. *Melton v. City of Oklahoma City*, 879 F.2d 706, 713-14 (10th Cir.1989).

> In deciding whether an employee's speech touches on a matter of public concern, or constitutes a personal grievance, courts look at the content, form and context of a given statement, as revealed by the whole record. They also consider the motive of the speaker—was the speech calculated to redress personal grievances or [did it have] a broader public purpose [?]

*Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir.2003) (internal citations omitted) (alterations in original); *see also Lighton*, 209 F.3d at 1224–25. Further, the Tenth Circuit has confirmed that not only is it not enough that the public interest was part of the employee's motivation, "the relevant legal question [is] whether the employee's *primary* purpose was to raise a matter of public concern." *Singh v. Cordle*, 936 F.3d 1022, 1035 (10th Cir.2019) (emphasis added).

Here, there are several contextual and very practical reasons that Plaintiff's speech in this context cannot be a matter of public concern.

First, Plaintiff's testimony and other admissions make clear that his speech is primarily focused on the conditions of his own employment, not a public concern. Significantly, Plaintiff

---

[104] Ex. 1, Hearing Tr. 102:17-104:7, 110:14-114:3.

states that he does not oppose others' use of plural pronouns for a singular individual. He only

opposes having to use them in this context himself.

> Correct. Although I am not trying to prohibit anyone else from using those pronouns.
> I choose not to choose not to make a commitment that I see as political.
> . . .
> I'm not trying to curtail their use by anyone else. But it—it's a free speech issue for
> me to be forced to say it when I don't yet want to make a choice about the political
> meaning of it all. And so I'm not trying to prohibit its use. I'm just saying I shouldn't
> be coerced into using it.[105]

Second, how an individual person is referred to—i.e., their names and pronouns—cannot

be a matter of public concern. It is about an interaction, within a classroom where the professor

is paid to teach and carry out the university's educational mission to educate those students,

between two people. Referring to an individual is fundamentally distinct from a discussion,

debate, or opinions about gender identity or other topics. Any tangential connection, even if it

existed, is insufficient to turn how an individual is referred to into a matter of public concern.

Third, the University must maintain authority over the general parameters of conduct in

the classroom to deliver its educational services effectively and efficiently. A university

professor does not have authority to call students whatever the professor desires or based on

what the professor assumes about the person or based on the professor's political beliefs. A

ruling that this was a matter of public concern, and putting it potentially outside the University's

authority to regulate, would create an untenable situation for all universities. For example, if a

professor was not addressing one or more students respectfully and appropriately by name or

otherwise (and disrupting their learning environment), the university may need to tell them to

call students by their chosen names. Similarly, if a professor assumed all his students were dumb

---

[105] Ex. 1, Hearing Tr. 108:1-4 and 109:22-110:3; *see also* 100:25-102:16, 106:17-108:4, 109:8-111:21.

and referred to them accordingly instead of using their chosen names, the University has to have the ability to step in to remedy that situation to preserve its educational environment. To rule this as a matter of public concern would diminish the University's legitimate interest "in promoting the efficiency of the public services it performs through its employees" and exercising control over what it, the University, has commissioned or created. *Garcetti*, 547 U.S. at 417 (quoting *Pickering*, 391 U.S. at 568).

Fourth, there is nothing in Plaintiff's stated objection to the compelled speech indicating that his statements about use of gender-neutral pronouns when referring to an individual are motivated, even partially, by a desire to raise a matter of public concern. Rather, Plaintiff's objections are purely personal, based on his personal beliefs. His stated reason that he disagrees with using "them/they" on a grammar basis[106] within a classroom (teaching acting, not grammar) is in no sense a matter of public concern. If speech directed to one individual related to proper grammar were a matter of public concern, then this would turn on its head the Court's previous rulings that internal workplace matters are not matters of public concern. Grammar is a common workplace topic and one on which employees are frequently given direction.

Last, that Plaintiff now argues that he personally perceives this as is a political speech does not support the public concern prong. This cannot be an accurate argument because an Acting class is not a pulpit for a professor's private citizen political speech. The University does not pay professors to espouse political speech through how they name and refer to the individual students in the classroom (and in particular, when admittedly, there is no connection to the

---

[106] Doc. 42, 3d Amend. Comp. ¶¶ 36-37, 48; Ex. 1, Hearing Tr. 68:1-5, 77:8-24, 100:25-, 102:5, 106-17-108, 114:22-115:24; Ex 2, Written Determination, pp. 6, 8 & Ex. D12-15, D53, D55, D61, D81-82.

subject matter of the course). That makes no practical sense. And even Plaintiff himself, in the syllabus at issue here, stated that the course at issue (Acting 4) was not a place for "social justice causes, nor a microcosm for political action movements."[107] This includes his own personal political ideas, so that speech cannot be a matter of public concern in this context.

These demonstrate why Plaintiff's speech does not implicate a matter of public concern from a practical view and as applied under the case law. At most, the facts here are in a context that does not amount to public concern speech. If Plaintiff were on his own time spouting his beliefs on gender identity, that could be a fundamentally different situation. But what he does or does not call a student in a classroom is a purely personal employment matter. "[S]peech that simply airs grievances of a purely personal nature typically does not involve matters of public concern." *Brammer*-Hoelter, 492 F.3d at 1205.[108]   Plaintiff's speech is not on a matter of public concern, and therefore, not protected. His speech-related claims (COA1, 2, 3 & 6) all fail.

## C. SUU's Interest In Promoting Efficient Public Educational Services Outweighs Any Interest Plaintiff Has In Speech in How He Refers to an Individual.

Even if the Court were to find that Plaintiff's speech passes the first two prongs, the material undisputed evidence shows that Plaintiff cannot satisfy the third prong of the

---

[107] Ex. 2, Written Determination, Ex. D51.

[108] *See also Rogers v. Riggs,* 71 F.4th 1256 (10th Cir.2022) (finding employee's petition criticizing treatment of jail employees was not a matter of public concern, even though petition was signed by 45 individuals and submitted to county commissioners, where employee's main purpose was to air internal workplace grievances); *Gardetto v. Mason*, 100 F.3d 803, 814 (10th Cir. 1998)(" The "controversial character of a statement is irrelevant to the question [of] whether it deals with a matter of public concern," *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987), because the focus is on the motive of the speaker."); *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 368 (4th Cir.1998)(drama teacher's professed disagreement with the play, part of the school's curriculum, both as a parent and as a Christian, is a matter of personal, rather than public concern.); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1530 (11th Cir. 1997)(complaint of discrimination was merely a personal grievance and not of public concern because "it does not refer to any practice or course of conduct ... beyond Holbrook and does not seek redress beyond improving Holbrook's personal employment situation.")

*Garcetti/Pickering* analysis. The court in step three decides "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Brammer–Hoelter*, 492 F.3d at 1203. This is a pure question of law. *Thompson v. Administrative Office of Courts*, No. 2:04-CV-461TC, 2009 WL 961167, *10 (D. Utah Apr. 8, 2009). Here, the U.S. Supreme Court provides precedence:

> Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged. Courts balance the First Amendment interest of the employee against the interest of the State as an employer, in promoting the efficiency of the public services it performs through its employees.

*Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2493 (2011). In weighing these interests, the court does not consider the speech in a vacuum. *Flanagan v. Munger*, 890 F.2d 1557, 1564–65 (10th Cir.1989). "The manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id*. at 1304 (citing *Gardetto v. Mason*, 100 F.3d 803, 815 (10th Cir.1996).

It is uncontroverted that Plaintiff's speech did cause a "significant actual disruption" and interference with students' education—namely, attending Acting 4, which is a required course for theatre majors. But that was not the only disruption. As an institution of higher education, SUU's core function and mission is educating students, and it must carry that out through its employees in an environment in which all students have the opportunity to learn. Here, Plaintiff's conduct also interfered with his ability to perform his teaching duties. Both his refusal

and his stated reasons for his refusal to address students by their pronouns hindered student

learning. Chair Swanson stated that almost every major level class Plaintiff taught was required

for students to meet graduation requirements.[109] Thus, it would be almost impossible for a

student to completely avoid classes taught by Plaintiff and still graduate.[110] Yet, here, Plaintiff's

conduct was so offensive, not only to C1, but also to other students in the class (both binary and

nonbinary) that all but one dropped the class or transferred to the additional section that SUU

provided so as to ensure that students who needed the course to graduate had another option that

did not detract from their learning environment.[111]

Also, word of this in-class exchange reached other students in the Department. As a

result, they viewed participating in Plaintiff's classes as potentially disruptive to their learning.

The day following the incident, Dean Mendini received an email from a student in another class

of Plaintiff's expressing concern about sharing her nonbinary identity with anyone for "fear that

simply living as who [they are] will make [their] professor lose respect for [them] and misgender

[them] in class."[112] This was followed by another email that expressed discomfort remaining in a

course taught by Plaintiff.[113] Chair Swanson added that there were students delaying taking

Acting I, currently taught by Plaintiff, in the hopes another instructor would become available

later in their academic career.[114] In short, an emerging pattern showed that, for students impacted

by Plaintiff's refusal to use pronouns consistent with students' gender identity, actual changes to

---

[109] Ex. 2, Written Determination, Ex. D19; Ex. 5, Swanson Decl. ¶¶ 1-9.
[110] *Id.*
[111] Ex. 1, Hearing Tr. 44:15-45:13, 77:25-81:25, 92:14-98:4, 147:24-148:9, 151:17-23, 171:3-15, 186:6-194:14, 199:17-24, 205:3-11, 208:20-209:10, 214:17-216:25, 218:21-25, 226: 9-25, 233:18-235:2, 249:22-257:19, 269:14-270:6; Ex. 2, Written Determination, p. 6 & Ex. D4-D5, D11, D12, D15-D16, D21, D23-D24, D49-D50.
[112] Ex. 2, Written Determination, Ex. D64; *see also* D17-D18.
[113] *Id.* at Ex. D49-D50.
[114] *Id.* at Ex. D65-D66; *see also* D18-D19; Ex. 5, Swanson Decl. ¶¶ 1-9.

that learning environment were made. Students self-selected out of Plaintiff's courses, if they could, or they asked the University to make changes for them in the form of independent study, course substitution, or the like to avoid a similar experience.

This pattern also indicates, as already alluded to in the public concern argument, that if not corrected, Plaintiff's conduct would continue to significantly impair the University's ability to meet its mission of delivering its educational services effectively and efficiently and meet its obligations to students who were paying tuition to obtain a degree in the Department. Chair Swanson stated that Plaintiff typically instructed three major level courses with an average of 16-24 students each and a general education class with around 60 students per semester. It would be extremely difficult for the Department to create a schedule which would allow for impacted students to attend alternate classes every semester,[115] and even then, that would not address SUU's inability to utilize Plaintiff for the very task (teaching) that it was paying him to do.

Additionally, within days of the incident, formal complaints were made to SUU's Office of Equal Opportunity regarding Plaintiff's misgendering and refusal to use "they/them" pronouns when referring to a nonbinary student. SUU is legally obligated to address those complaints under Title IX and other state and federal antidiscrimination laws. Otherwise, the University risks liability for its deliberate indifference in failing to reasonably respond in light of known circumstances. *See e.g. Escue v. Northern OK College*, 450 F.3d 1146, 1152 (10th Cir.2006) (Title IX liability is imposed if school remains deliberately indifferent to acts of sex-based harassment of which it has actual knowledge). Specifically, Title IX's implementing regulations

---

[115] *Id.* at Ex. D18-D19; Ex. 5, Swanson Decl., ¶¶ 1-9.

require that schools receiving federal funds, of which SUU is one,[116] adopt grievance procedures that provide for the "prompt and equitable" resolution of student and employee sexual harassment complaints.[117] Further, on June 22, 2021, OCR published a Notice of Interpretation to state explicitly that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of gender identity, consistent with the Supreme Court's reasoning in *Bostock*.[118] These considerations are part of the reason SUU enacted Policy 5.60, and why the complaints against Plaintiff were processed under the investigation, disciplinary, and due process procedures for addressing reported violations of that policy. And, importantly, Plaintiff was sanctioned *only after* the outcome of such process found he engaged in harassment and discrimination on the basis of gender identity in violation of SUU Policy 5.60.

Under such circumstances, the *Garcetti/Pickering* balance clearly tips in favor of Defendants. Even viewing the record in the light most favorable to Plaintiff, he fails to show that his purely personal interest in not being required to speak in a way that treats binary and non-binary students equally, only while performing his job duties, outweighs Defendants' interests and responsibilities to address discriminatory and harassing behavior of which it becomes aware and efficiently and effectively provide its students with a classroom environment conducive to learning and free from sex-based discrimination and harassment. Plaintiff's speech is not protected by the First Amendment, and all his speech-related claims (COA1, 2, 3 & 6) must fail.

---

[116] Doc. 42, 3d Amend. Comp. ¶ 25; Doc. 43, Ans. ¶ 25.
[117] 34 C.F.R. § 106.8 (designation of coordinator, dissemination of policy, and adoption of grievance procedures).
[118] 2021 Bostock Notice of Interpretation, https://www.govinfo.gov/content/pkg/FR-2021-06-22/pdf/2021-13058.pdf.

## V.  THE SANCTIONS AND POLICIES ARE NOT OVERBROAD OR VAGUE

Plaintiff 's second cause of action (COA2) alleges that the sanction requiring him to use student preferred pronouns and SUU's policies, in combination with the student handbook on pronoun use, are vague and overbroad because they do not provide a fixed list of optional pronouns which a professor must be compelled to use.[119] He also claims that the sanctions are overbroad because it is unclear what contexts SUU will deem within "the context of his employment" when he is outside the classroom or off campus.[120]

First, the evidence is undisputed that Plaintiff's sanctions are not based on any violation of the student handbook. They are based on Plaintiff's violation of SUU Policy 5.60, informed by SUU Policy 5.27, which together proscribe harassment and discrimination based on gender identity. While the sanctions do align with the guidance in the student handbook, the sanctions do not stem from any violation of such handbook. This was clarified by Price and Provost Anderson. Plaintiff can comply with the requirement that he make a good faith effort to use students' preferred pronouns by treating nonbinary and binary students the same in using (or not using) names and/or pronouns that align with their gender identity.[121] In other words, Plaintiff can use names only as long as he does so with all his students. The sanctions also permit Plaintiff to address questions or "concerns about the reasonableness of a future request by a student as related to the use of preferred names or pronouns" with Price, who "remains available to work with Plaintiff on a solution."[122] To date, Plaintiff has never brought such a concern to Price.[123]

---

[119] Doc. 42, 3d Amend. Comp. ¶¶ 67-77 (COA3).
[120] Id. ¶¶ 106-108 (COA6).
[121] Ex. 3, 12/21/2022 Letter.
[122] Id.; Doc. 42-1.
[123] Ex. 6, Price Decl., ¶¶ 4-6.

Second, Plaintiff can point to nothing but his unsupported and speculative allegations, which are insufficient on summary judgment, to support his claim that the phrase "within the context of his employment" means anything but that the sanctions apply only when he is performing his job duties. Indeed, there is nothing in the evidence showing that anything but Plaintiff's work-related conduct has ever been evaluated. Moreover, Plaintiff's assertions directly contradict the unrefuted clarification that Plaintiff received from Price and Provost Anderson:

> Last, on a related but different note, the entire matter in which the University evaluated your conduct under Policy 5.60 was related to your employment. Your conduct that the University evaluated under its policies was happening in the context of your job duties. (Facts 11, 19) The sanctions apply only in this same context. The University has never applied or purported to apply the sanctions outside this context. Any misconstruing of this context is unfounded, as evidenced by the record and the absence of such a claim in your Policy 5.60 appeal.[124]

Plaintiff is a professor and his work responsibilities encompass more than just classroom teaching. This is the only reason the sanctions are not limited to the classroom. Also, there is no evidence of an intent to apply the sanctions beyond his employment, which is where they arose.

These undisputed facts are fatal to Plaintiff's overbreadth and vagueness claims. But there are also other reasons Plaintiff's claims have no merit.

### A. Not Overbroad

The doctrines of "overbreadth" and "vagueness" are independent, though related, categories of First Amendment analysis. *Parker v. Levy*, 417 U.S. 733, 756, (1974); L. Tribe, American Constitutional Law at 1033. Indeed, in a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. *Village of Hoffman Estates v. Flipside,*

---

[124] Ex. 3, 12/21/2022 Letter.

*Hoffman Estates, Inc.*, 455 U.S. 489, 494–95 (1982). Here, that means the Court must first differentiate between "unprotected speech" and "protected speech." In the absence of any protected speech, the overbreadth challenge must fail.

As established above, Plaintiff's speech is not protected by the First Amendment and can therefore be directed and required by SUU. Plaintiff's overbreadth claim (COA2) fails.

### B. Not Vague

A government policy that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process. To succeed, however, Plaintiff must demonstrate that the law is impermissibly vague in all of its applications. *Id.* This Plaintiff cannot do.

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). Moreover, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates*, 455 U.S. at 498. Less specificity is allowed for school standards because of the need to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the education process. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d

1358, 1368 (10th Cir.), cert. denied, 531 U.S. 825 (2000). Finally, our analysis must turn on the "particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (cleaned up).

### 1. The Sanction and Policies Provide Adequate Notice

The policies do provide adequate notice of what conduct is prohibited and when. Indeed, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). The language used in SUU's policies is not incomprehensible for a person of ordinary intelligence. Nor is it unusual. SUU's statement in Policy 5.60 regarding prohibition on sex discrimination, sexual harassment and retaliation lists "gender identity" as protected classes.[125] Section IV.N.2 of Policy 5.60 defines sexual harassment as "conduct based on sex" that is "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to University Education Program or Activity."[126] The version of SUU Policy 5.60 at issue here has been in place since August 7, 2020. Section 3.C.2.d of Policy 5.27 states that "a hostile environment includes but is not limited to one in which a reasonable person can establish that he or she is the target of conduct by a supervisor, co-worker, faculty member, staff member, volunteer, campus contractor, or student that is sufficiently severe or pervasive to alter the conditions of his or her employment or education."[127] Section 3.A of Policy 5.27 defines discrimination as intentionally dealing with a person, either preferentially or

---

[125] Doc. 42-4, SUU Policy 5.60, Section V; *see also* Section IV.E.
[126] Doc. 42-4.
[127] Doc. 42-3.

detrimentally, because of that person's sex (gender), sexual orientation, or other legally protected status.[128] The version of SUU Policy 5.27 at issue here had been in place since August 26, 2010. Additionally, on June 22, 2021, a month before the events that led to Plaintiff's sanctions, OCR clarified that a person's gender identity is legally protected under Title IX.[129] These definitions are not vague, but instead, are based on established law that requires prohibition of such conduct under state and federal anti-discrimination laws. State and Federal laws employ the same or similar language.[130]

Furthermore, the policies at issue are written specifically for the University context where the prohibited conduct is measured, in part, by its impact on the rights of others. With the inclusion of qualifiers, particularly the "objective" and "reasonable person" components in SUU's definitions of the terms "sexual harassment," "discrimination," "severe," and "pervasive"[131] the policies give fair notice in this context. *Cf. Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972) (prohibited disturbances "easily measured by their impact on the normal activities of the school"); *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1159 (10th Cir. 2006) (distinguishing between laws "with flexible and reasonably broad terms that still provide the necessary guidance" versus "laws lacking any standard of conduct whatsoever"). Finally, Plaintiff had actual prior notice that his conduct towards gender diverse students could implicate

---

[128] *Id.*

[129] 2021 Bostock Notice of Interpretation, https://www.govinfo.gov/content/pkg/FR-2021-06-22/pdf/2021-13058.pdf.

[130] *See, e.g.,* 34 C.F.R. § 106.30 (defining sexual harassment to mean "conduct on the basis of sex that satisfies one or more of the following: … [u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity"); 29 C.F.R. § 1604.11(a) (defining harassment on the basis of sex in a Title VII action as: "Unwelcome ... verbal or physical conduct of a sexual nature [where] ... such conduct has a purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment"); UADA, Utah Code 34A-5-106(1) (describing discriminatory or prohibitory employment practices).

[131] Doc. 42-3.

prohibited discrimination and create a disruptive educational environment. Indeed, in 2018, Dean Mendini told Plaintiff that a Title IX complaint had been filed against him for the very same kind of conduct at issue here, and that it was only through her intervention (accommodating the student by transferring them to another class) that it was not pursued.[132] Thus, since Plaintiff was on notice that his conduct could be considered discriminatory, he may not challenge the policies at issue here for vagueness. *See Parker v. Levy*, 417 U.S. 733, 755–56 (1974).

### 2. The Sanction and Policies Do Not Permit Arbitrary Enforcement

The University's sanctions and policies are not arbitrarily enforced, nor can they be. Although "borderline conduct may prompt disagreement about whether the policy applies in a given case, the mere fact that enforcement requires the exercise of a reasonable degree of judgment does not make the policy impermissibly vague." *Grayned*, 408 U.S. at 114; *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) ("whether gender oriented conduct rises to the level of actionable harassment... depends on a constellation of surrounding circumstances, expectations, and relationships"). Here, again, the sanctions as further elucidated by Price and Provost Anderson make clear both the conduct expected of Plaintiff—that he "treat nonbinary and binary students equally in [his] use (or non-use) of pronouns"—and the application of when those sanctions apply—that is, that this expectation applies only "in the context of his employment."[133]

Likewise, SUU policies do not impermissibly delegate basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis. "Speculation and hyper

---

[132] Ex. 1, Hearing Tr. 130:9-146:25, Ex. 2, Written Determination, Ex. D17-D18, D55-D56.
[133] Ex. 3, 12/21/2022 Ltr.

technical theories as to what the statute covers cannot create vagueness, especially when the statute is surely valid in the vast majority of intended applications." *Faustin v. Denver*, 423 F.3d 1192, 1202 (10th Cir.2005) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2002) (quotations marks omitted)). In *Faustin,* the Tenth Circuit addressed the constitutionality of an unwritten city policy which banned signs and banners on overpasses. The Tenth Circuit held that such a policy was not unconstitutionally vague even though it was unwritten and it could not be agreed upon what the policy actually prohibited. *Id.* at 1202 & n. 12. Thus, if an unwritten, undetermined policy is not unconstitutionally vague, then written and published policies containing flexible but reasonably understood definitions of prohibited conduct—based on state and federal requirements—and an express statement within the policies indicating that the policies cover "gender identity" as a protected class, are not unconstitutionally vague merely because each potential sanction is not expressly listed in detail, such as not including each and every name or pronoun that might be at issue in a given matter.

This Court should reject Plaintiff's strained attempt to import vagueness into the phrase "context of employment" when it is clear and understandable. The words "context" and "employment" are terms of everyday use, with a well understood and accepted meaning. The Miriam-Webster defines "employment" as "activity in which one engages or is employed." It also lists as synonyms the words "work," "occupation," and "business." [134] The Cambridge Dictionary defines "employment" as "the fact of someone being paid to work for a company or organization." [135] Further, Miriam-Webster defines the term "context" to mean "the interrelated

---

[134] *Employment,* Merriam-Webster.com, https://www.merriam-webster.com/dictionary/employment. The synonyms match a definition in dictionary.com, https://www.dictionary.com/browse/employment (both visited Feb. 12, 2023).
[135] *Employment,* dictionary.cambridge.org, https://dictionary.cambridge.org/us/dictionary/english/employment (last visited Feb. 12, 2023).

conditions in which something exists or occurs: ENVIRONMENT, SETTING."[136] The Tenth

Circuit holds that the use of a commonly understood word or phrase will not render a

government policy, or sanction, void for vagueness just because it does not provide specific

examples. "Courts should remain ever mindful that 'general statements of the law are not

inherently incapable of giving fair and clear warning.' " "[A]ll that is required is that the

language 'conveys sufficiently definite warning as to the proscribed conduct when measured by

common understanding and practices....' " *U.S. v. Hunter,* 663 F.3d 1136, 1142 (10th Cir. 2011)

(applying to a traffic regulation statute). In short, the phrase "context of [Plaintiff's]

employment" is not a phrase subject to differing or subjective interpretations. Plaintiff's

vagueness claim (COA2) fails.

## VI.  PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS

Plaintiff's equal protection claim (COA3) is premised on the same facts as his First

Amendment claim (COA1)—expression of views on the same topic. For this reason, it must be

analyzed in that context. Meaning that the two claims rise and fall together. *See e.g. Gilmore v.

Beveridge*, Case No. 2:22-cv-02032-HLT-RES, 2002 WL 17082681, *3 (D. Kan.2022). As

applied here, where Plaintiff's speech is not protected by the First Amendment, that also means

that the restrictions on Plaintiff's speech do not give rise to a constitutional claim of unequal

protection because, again, SUU may direct the speech of its employees when they act within the

scope of their official duties.

---

[136] *Context,* Merriam-Webster.com, https://www.merriam-webster.com/dictionary/context (capitals in original) (last visited Feb. 12, 2023).

But even if the Court disagrees, Plaintiff's equal protection claim still fails. "Equal protection of the laws doesn't guarantee equal results for all." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012) (internal quotation marks omitted). Instead, the Equal Protection Clause "seeks to ensure that any classifications the law makes are made without respect to persons, that like cases are treated alike, that those who appear similarly situated are not treated differently without, at the very least, a rational reason for the difference." *Id.* (internal quotation marks omitted); *see also Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109-10 (10th Cir. 2008).

Because Plaintiff claims he was treated differently as an individual, his equal protection claim must be analyzed through the so-called "class of one" doctrinal prism. *Shifrin v. Toll*, 483 F. App'x 446, 449 (10th Cir.2012). The classic "class of one" case is one in which a public official inflicts or imposes a burden of some sort on one person without imposing the same burden on other similarly situated persons. *See Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir.2005). The Tenth Circuit explains:

> To prevail on [the class-of-one] theory, a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently. A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was "irrational and abusive" and "wholly unrelated to any legitimate state activity," This standard is objective-if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations.

*Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1211 (10th Cir.2006) (internal citations omitted). *See also Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir.2011). Therefore, in a class-of-one claim, "[t]he allegation that a plaintiff was treated differently from those similarly situated is an essential element of an equal protection action." *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1257 (10th Cir.1998). This is because "it is

exceedingly difficult to demonstrate that any difference in treatment is not attributable to a quirk of the plaintiff or even to the fallibility of administrators whose inconsistency is as random as it is inevitable." *Jicarilla Apache Nation*, 440 F.3d at 1213.

Here, Plaintiff has not come forth with any evidence that he and Professor Sham were similarly situated in every material respect, nor can he. Critically, only Plaintiff had a syllabus statement barring political speech. Only Plaintiff equated use of gender-neutral pronouns with a "political act". Only Plaintiff was the subject of complaints due to his misgendering and refusal to use requested pronouns "they/them". And only Plaintiff was found via an evidentiary hearing to have engaged in gender-based discrimination and harassment in violation of SUU Policy 5.60. Under these undisputed facts, Plaintiff cannot prevail on his equal protection claim. *See Hennigh, supra* (holding plaintiff failed to state an equal protection claim where he did not assert how he was treated differently from others similarly situated, i.e., those accused of sexual harassment).

## VII.  PLAINTIFF'S FOURTH AND FIFTH COA REQUIRE DISMISSAL.

### A.  COA4 & 5 Only Seek Declaratory Relief and so They Are Barred

Plaintiff's fifth cause of action (COA5) must be dismissed as Plaintiff seeks only declaratory relief that his actions did not violate Title IX. He makes no request for permissible prospective injunctive relief. Plaintiff's fourth cause of action (COA4) suffers from a similar problem. Although styled as a request for declaratory and injunctive relief, it is really only a request for declaratory retroactive relief. Declaratory judgments are construed as retroactive relief when "[t]here is no claimed continuing violation of federal law, and therefore no occasion to issue an injunction." *Green v. Mansour*, 474 U.S. 64, 73 (1985).

Although the Eleventh Amendment does not prohibit a suit brought in federal court to prospectively enjoin a state official from violating federal law, *see Ex parte Young*, 209 U.S. 123, 159–60 (1908), declaratory relief is not the type of remedy designed to prevent ongoing violations of federal law. The Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past." *Meiners v. Univ. of Kan.*, 239 F.Supp.2d 1175, 1198 (D.Kan.2002), *aff'd*, 359 F.3d 1222, 1232–33 (10th Cir.2004); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). Indeed, the *Ex parte Young* doctrine applies only to ongoing violations—not suits seeking to redress retroactive or compensatory wrongs. *Papasan v. Allain*, 478 U.S. 265, 277-78 (1986) ("*Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past").

The Tenth Circuit has adopted the following factors to determine whether the doctrine applies: (1) whether the action is against the state officials or the state itself; (2) whether the alleged conduct by the state officials constitutes a violation of federal law as opposed to tortious interference with a plaintiff's property right; (3) whether the relief sought is permissible prospective relief or analogous to a retroactive award of damages; and (4) whether the suit implicates "special sovereignty interests" and is the "functional equivalent" of a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment. *Elephant Butte Irr. Dist. v. Dept. of Interior*, 160 F.3d 602, 609 (10th Cir.1998) (citations omitted) cert. denied, 526 U.S. 1019 (1999).

Here, Plaintiffs claims are brought against the individual Defendants in their official capacities. Thus, the first factor is met. But neither the fourth or fifth claim alleges any ongoing

conduct by the state officials, let alone conduct which would constitute a violation of federal law; nor do they truly seek injunctive relief. Indeed, such a request is conspicuously absent from COA5. There, Plaintiff only seeks "a declaration" from this Court that *his own* conduct, the same conduct that ultimately led to his sanctions, did not violate Title IX.[137] He expressly states: "Plaintiff reasonably fears that, *absent a declaration from this Court that his conduct did not violate Title IX*, he will be forced to defend himself from a succession of future Title IX complaints ...."[138] Likewise, COA4 only looks backward, asking this Court to undue and substitute its judgment for that of the hearing officer and declare that "Defendants erred in construing" Plaintiff's conduct as discrimination or harassment based on gender identity in violation of SUU Policy 5.60 or SUU Policy 5.27.[139] This is improper because the Policy 5.60 proceeding that culminated in the Written Determination that found Plaintiff to be in violation of such policy is no longer ongoing. That proceeding is finished, and it is only the sanctions designed to end the prohibited conduct and prevent further violation of SUU polices that are ongoing. In this regard, these claims do not satisfy the second or third factors.

Additionally, COA4 is not actionable because Plaintiff does not allege any action that constitutes *a violation of federal law*. To state a claim under § 1983, Plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States ..." *Dodds v. Richardson*, 614 F.3d 1185, 1193 (quoting *West v Atkins,* 487 U.S. 42, 48 (1988) (emphasis added). Here, Plaintiff's COA4 would have this court render a declaration that his actions did not violate SUU policies. But since no federal law is implicated, Plaintiff has no § 1983 claim.

---

[137] Doc. 42, 3d Amend Compl., COA5 & ¶¶ 92-98. *See also* Doc. 42-1; Ex. 2, Written Determination.
[138] Doc. 42, 3d Amend. Compl. ¶ 97.
[139] *Id*. ¶¶ 86-88.

### B.  COA5 Amounts to An Improper Request for an Advisory Opinion

Because Plaintiff's future harm is predicated on his own future actions, Plaintiff is seeking an improper advisory opinion. "Article III has long been interpreted as forbidding federal courts from rendering advisory opinions*." Columbian Financial Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011). "The Court made clear that generally one cannot bring a declaratory judgment action just to resolve one isolated issue in a possible controversy. A declaratory judgement that would not have practical consequences without later additional litigation is not proper." *Id.* at 1381 (citing *Pub. Serv. Comm. of Utah v. Wycoff*, 344 U.S. 237, 245–46). The Tenth Circuit summed it up: "When the request is not for ultimate determination of rights but for preliminary findings and conclusions intended to fortify the litigant against future regulation, it would be a rare case in which the relief should be granted." *Id.*

Yet, that is exactly what Plaintiff seeks here. As stated in his complaint, "Plaintiff reasonably fears that, absent a declaration from this Court that his conduct did not violate Title IX, he will be forced to defend himself from a succession of future Title IX complaints filed by students with SUU's [Equal Opportunity Office] even if he wins his current challenges to the school's enforcement of its own policies."[140] At the outset, Defendants clarify that it is undisputed that no one concluded that Plaintiff violated Title IX. Instead, Plaintiff was found to have violated SUU Policy 5.60, which while put in place for SUU to comply with obligations under Title IX, and other state and federal laws, it is not, by a plain read, aimed at determining if an individual employee has violated Title IX. The Purpose and Policy statement reads:

> This policy defines and prohibits discrimination on the basis of sex, including sexual harassment, in education programs and activities; details how to report a violation of this

---

[140] Doc. 42, 3d Amend. Compl. ¶ 97.

> policy, describes Southern Utah University resources and supportive measures to protect those involved in the process; and outlines investigation, disciplinary, and due process procedures for addressing reported violations of this policy.[141]

The Policy's content is consistent with this statement. Thus, this Court could only find that the decisions being made pursuant to this policy are limited to determining if there has been discrimination on the basis of sex, including sexual harassment, as defined in the Policy, or if there was compliance with the reporting, investigation, disciplinary, and due process procedures contained therein.[142]

That such an interpretation is the only possible construction is consistent with federal law, which holds that Title IX does not provide for a private cause of action against individuals, as it creates a right enforceable against educational institutions only. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("Title IX reaches institutions and programs that receive federal funds ... but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."). In short, Plaintiff misunderstands what conduct violates Title IX, and who can be held accountable, which makes his request all the more problematic because his proffered declaration misstates the law.

### C.  No Case or Controversy Over COA4 or COA5

However, even if this Court were to adopt Plaintiff's conflation of Title IX and SUU Policy 5.60, the outcome is still unchanged. There is no dispute that it was the Hearing Officer, Steve Gordon, after conducting an evidentiary hearing on the matter, who made the determination that Plaintiff violated SUU Policy 5.60, not Defendants.[143] But Gordon is not

---

[141] SUU Policy 5.60, Doc. 42-4, at I (Purpose & Policy Statement).

[142] Plaintiff has never contended that SUU Policy 5.60 was not followed, so the latter construction is immaterial.

[143] Ex. 1, Hearing Tr., cover & 8:3-6, 9:4-17.

named in this lawsuit. Thus, again, like with his claims against President Benson, Plaintiff's aim misses the mark. Plaintiff cannot satisfy the "case or controversy" requirement to invoke this Court's jurisdiction over COA4 or 5 because Plaintiff cannot trace or link this particular injury (i.e., finding him in violation of SUU policy) to any of the named Defendants or their conduct.

### D.  COA5 Is Not Ripe

Plaintiffs' concerns about future complaints are not yet ripe for adjudication. The doctrine of ripeness, "aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." *Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016, 1029 (10th Cir.2014) (quotation omitted). While the ripeness analysis is "relaxed somewhat" in the context of a First Amendment facial challenge because an unconstitutional law may chill free speech, *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir.1995), there are still three factors that must be met: "(1) hardship to the parties by withholding review; (2) the chilling effect the challenged law may have on First Amendment liberties; and (3) fitness of the controversy for judicial review." *Id.* at 1499–1500.

Plaintiff's claim (COA5) does not meet either the second or third prong. As described above, Plaintiff's speech here is not protected by the First Amendment. But, even if it were, this Court can only speculate as to the facts that might give rise to future complaints, whether they will even come to fruition or be pursued through formal channels within the University, and if so, the outcome of any investigation or internal evidentiary hearing that may be had. Indeed, Plaintiff's purported "fears" do not present a live controversy in a "clean-cut and concrete form," *see Renne v. Geary*, 501 U.S. 312, 322 (1991). Here, what might happen is unknown and rests upon several contingent future events that may not occur as anticipated, or even at all. The

factual backdrop which resulted in the finding here that Plaintiff engaged in sexually harassing conduct is unlikely to be repeated. Critical to the hearing officer's severity analysis was the fact that Plaintiff labeled the act of using "they/them" pronouns as "political". That labeling also came after Plaintiff had read aloud his Class Philosophy that barred political topics in his class.[144] But now this statement barring political topics is no longer a part of Plaintiff's class syllabus, in part due to Provost Anderson's added sanction, finding such a statement inappropriate for a syllabus,[145] and also because, as subsequently clarified by Anderson and Price, Plaintiff need not address pronouns at all in his syllabus to satisfy the sanctions.[146]

　　　　Additionally, Plaintiff's sanction was not a product of Plaintiff not being willing to use any of an unlimited number of potential pronouns that a student may identify with. The only concrete pronouns at issue were "they/them"—pronouns based on gender identity.  As for future requests, Defendants Price and Anderson have made clear that Plaintiff is free to address "concerns about the reasonableness of a future request by a student as related to the use of preferred names or pronouns" with Defendant Price, who "remains available to work with Plaintiff on a solution."[147] To date, Plaintiff has never brought a question or concern about the reasonableness of a student request related to preferred names or pronouns to Defendant Price.[148] This claim is not ripe for the Court's review and should be dismissed.

---

[144] Ex. 2, Written Determination, pp. 11-12.
[145] Doc. 42-2.
[146] Ex. 3, 12/21/2022 Ltr.
[147] *Id*.
[148] Ex. 6, Price Decl. ¶¶ 3-6.

**CONCLUSION**

For all the foregoing reasons, Defendant respectfully requests this Court grant

Defendants' Motion for Summary Judgment, in full, deny Plaintiff's requests for declaratory and

injunctive relief for failure to show actual success on the merits, and dismiss all Plaintiff's

complaint in its entirety, with prejudice.

Respectfully submitted this 16th day of February 2024.

OFFICE OF THE UTAH ATTORNEY GENERAL

*/s/ Jaqualin Friend Peterson*
JAQUALIN FRIEND PETERSON
SOPHIA KING
Assistant Utah Attorney General
*Attorney for Defendants*

JAQUALIN FRIEND PETERSON (6226)
SOPHIA KING (18448)
Assistant Utah Attorney General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: jfpeterson@agutah.gov
        sophiaking@agutah.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH, SOUTHERN DIVISION

| | |
|---|---|
| RICHARD BUGG,<br><br>Plaintiff,<br><br>v.<br><br>MINDY BENSON, KEVIN PRICE, JON ANDERSON, and DOES 1-25,<br><br>Defendants. | **APPENDIX OF EVIDENCE**<br><br>Case No. 4:22-cv-00062-DN-PK<br><br>Judge David Nuffer<br>Magistrate Judge Paul Kohler |

Exhibit 1.    SUU000001- SUU000185- Written Determination Redacted

Exhibit 2.    SUU000186-SUU000572- Transcript

Exhibit 3.    SUU000573-SUU000574- Letter

Exhibit 4.    Declaration Mendini

Exhibit 5.    Declaration Swanson

Exhibit 6.    Declaration Price

Exhibit 7.    Declaration Benson