Jerome H. Mooney (UT SBN: 2303)
jerrym@mooneylaw.com
Weston, Garrou & Mooney

G. Randall Garrou
(Admitted *Pro hac vice*)
randygarrou@wgdlaw.com
Of Counsel to Weston, Garrou & Mooney

12121 Wilshire Boulevard, Suite 525
Los Angeles, California 90025-1176
Telephone: (310) 442-0072
Facsimile: (310) 442-0899

Attorneys for Plaintiff Richard Bugg

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| RICHARD BUGG, an individual, | ) Case No. 4:22-cv-62-DN |
| | ) |
| Plaintiff, | ) |
| | ) **RESPONSE IN OPPOSITION TO** |
| v. | ) **DEFENDANTS' MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| MINDY BENSON, etc., et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED
     MATERIAL FACTS ................................................................................ 1

PLAINTIFF'S ADDITIONAL UNDISPUTED MATERIAL FACTS ....................................... 4

    Facts Specific to the Parties' Status ...................................................................... 4

    Facts Preceding the 2021 Controversy .................................................................. 6

    Facts Regarding the 2021 Controversy .................................................................. 7

    Post-Class Events ................................................................................................. 9

    The Relevant Legal Standards ............................................................................. 10

    Facts Regarding the Findings of the Administrative Proceeding ......................... 10

    The Sanction Orders ........................................................................................... 11

    Plaintiff's Positions ............................................................................................ 12

ARGUMENT .................................................................................................................... 15

I     DEFENDANTS' RIPENESS CHALLENGES TO PLAINTIFF'S
     STANDING ARE FLATLY REFUTED BY THE SUPREME COURT'S
     MOST RECENT DECISION ON THIS SUBJECT IN A VERY SIMILAR
     CIRCUMSTANCE ........................................................................................ 15

II    DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT
     PLAINTIFF CANNOT PREVAIL ON CAUSE OF ACTION NO. 1 .............................. 17

    A.    Contrary to Defendants' assertions, *Garcetti* has no application here. ........................ 19

    B.    Contrary to Defendants' assertions, their sanction orders do not survive under
        the tests of *Pickering* and *Connick*. .............................................................. 24

        1.    As a preliminary matter, Defendants' assertion that Plaintiff has somehow
            waived his speech rights regarding pronouns is utter nonsense. ...................... 24

        2.    Defendants' attempted distinguishing of this case from those involving the
            Free Exercise Clause is unavailing. .............................................................. 25

        4.    The tests applicable to Plaintiff's claims of prior restraint and compelled
            expression are those established in *Pickering* and *Connick* and, under those
            tests, Plaintiff should prevail. ...................................................................... 26

    a.    The requirements of *Pickering/Connick* ...................................................... 26

    b.    Defendants are wrong in contending that the compelled use of preferred pronouns by college professors is not a matter of significant public concern. ......................................................................... 26

    c.    Defendants are also wrong in concluding that they should prevail under the *Pickering/Connick* balancing test. ............................................... 29

        i.    Contrary to Defendant's assertions, their sanctions were not required by Title IX. .............................................................. 29

        ii.    Defendant's claimed loss of efficiency is of its own making............... 31

        iii.    Plaintiff's interests against compelled expression and prior restraint outweigh Defendants' interests ............................... 32

III    DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT PLAINTIFF CANNOT PREVAIL ON CAUSE OF ACTION NO. 2 ............................. 35

    A.    The Sanction Orders violate the First and Fourteenth Amendments for overbreadth as Plaintiff must comply with demands for unique pronouns made even by individuals who do not suffer from any gender ambiguity and the number of pronouns Plaintiff could be required to use is unlimited.......................... 35

    B.    The sanctions also violate the First and Fourteenth Amendments due to their vagueness because there are no standards limiting the types or number of pronouns that any students may demand the Plaintiff use in referring to them.......... 37

IV    DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT PLAINTIFF CANNOT PREVAIL ON CAUSE OF ACTION NO. 4 ............................. 39

    A.    Defendants' assertion that COA4 should be denied under the 11th Amendment due to lack of a claim for injunctive relief is not well taken....................................... 39

        1.    A complaint does not need to explicitly state that it seeks injunctive relief if it provides the factual basis for such relief since the Court has discretion to afford all relief supported by the complaint. .................................................. 39

        2.    In any event the Fourth cause of action sufficiently put Defendants on notice that Plaintiff is seeking injunctive relief because both the title and the prayer so inform them................................................................... 42

    B.    Defendants' assertion that COA4 is not "actionable" because it does not "implicate" any violation of federal law is also not well-taken because they have enforced an unconstitutional and erroneous interpretation of the school's own policies. ................................................................................................................ 43

V    CONTRARY TO THE ALLEGATIONS IN DEFENDANT'S MOTION,
     PLAINTIFF'S CAUSE OF ACTION NO. 5 IS NOW CURRENTLY RIPE
     FOR REVIEW AND NOW ALSO WARRANTS INJUNCTIVE RELIEF. ..................... 46

VI   DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT
     PLAINTIFF CANNOT PREVAIL ON CAUSE OF ACTION NO. 6 .............................. 47

VII  SUBJECT TO DEFENDANTS' ACCEPTANCE OF A CONDITION,
     PLAINTIFF WILL NOT OPPOSE THE DISMISSAL OF HIS CLAIM AS
     TO DEFENDANT BENSON. .......................................................................................... 48

CONCLUSION ....................................................................................................................... 48

# TABLE OF AUTHORITIES

## U.S. SUPREME COURT

*303 Creative LLC v. Elenis*, ___ U.S. ___, 143 S.Ct. 2298 (2023) .................................... 1, 16, 34

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 42

*Bostock v. Clayton County,* ___ U.S. ___, 140 S.Ct. 1731 (2020) ............................... 30

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) .............................................................. 36

*Connick v. Myers,* 461 U.S. 138 (1983) .............................................................. *passim*

*Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629 (1999) .................................... 10, 45

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ......................................................... *passim*

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .............................................................. 20, 23

*Healy v. James,* 408 U.S. 169 (1972) ....................................................................... 20

*Hill v. Colorado*, 530 U.S. 703 (2000) ...................................................................... 37

*Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515
      U. S. 557 (1995) .................................................................................................. 34

*Janus v. AFSCME,* ___ U.S. ___, 138 S.Ct. 2448 (2018) ................................. 18, 23, 34

*Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407 (2022) ........................................ 25

*Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407 [2022] ........................................ 25

*Keyishian v. Bd. of Regents,* 385 U.S. 589 (1967) .......................................... 20, 23, 35

*Larkin v. Grendel's Den*, 459 U.S. 116 (1982) ................................................ 37, 38, 39

*Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974) .............................. 34

*Minneapolis Star & Tribune v. Minnesota*, 460 U.S. 575, (1983) ............................. 18

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) .................................................. 44

*Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968) .................................................. *passim*

*Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008) ..................... 40

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) .................................................. 20, 23

*Vlaming v. West Point School Bd.*, 895 S.E.2d 705 (Va. 2023) ............................. *passim*

*West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943) ........................................ 34

*Wooley* v. *Maynard*, 430 U. S. 705 (1977) .......................................................... 34

*Zwickler v. Koota*, 389 U.S. 241 (1967) ............................................................ 36


**U.S. COURT OF APPEALS**

*Adams v. Trs. of Univ. of N.C.-Wilmington,* 640 F.3d 550 (4th Cir. 2011) ............................ 21, 22

*Bartholomew v. Fischl*, 782 F.2d 1148 (3d Cir. 1986) ................................................ 44

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019) ................................................ 22

*cf. Lee v. York Cnty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007) ...................................... 22

*Demers v. Austin,* 746 F.3d 402 (9th Cir 2014) ...................................................... 21, 22

*Dixon v. Kirkpatrick*, 553 F.3d 1294 (10th Cir. 2009) ............................................... 21

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) ............................................... 44

*Escue v. Northern OK College,* 450 F.3d 1146 (10th Cir. 2006) ...................................... 29

*Evans-Marshall v. Bd. of Ed. of Tipp City Extended Village Sch. Dist.*, 624 F.3d
   332 (6th Cir. 2010); ........................................................................... 22

*Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945 (10th Cir. 1980) ............................... 40

*Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448 (2d Cir. 1991) ......................... 38, 39

*Guillen v. Kuykendall*, 470 F.2d 745 (5th Cir. 1972) ............................................... 41

*Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011) ................................. 22

*Joritz v. Gray-Little*, 822 F. App'x 731 (10th Cir. 2020) .......................................... 21

*Jurgensen v. Fairfax Cty.*, 745 F.2d 868 (4th Cir. 1984) ........................................... 33

*Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir. 1970) .................................................. 40, 41

*Kaszuk v. Bakery & Confectionery Union*, 791 F.2d 548 (7th Cir. 1986) .............................. 41

*Mayer v. Monroe Cnty. Comm. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) .............................. 22

*Meriwether v. Hartop,* 992 F.3d 492 (6th Cir. 2021) ............................................ *passim*

*Peterson v. Williams*, No. 20-4059, U.S. App. LEXIS 12141 (10th Cir. May 5,

2022) (unpublished) ....................................................................................... 21

*Scutieri v. Paige*, 808 F.2d 785 (11th Cir. 1987) ........................................................ 41

*Simek v. J.P. King Auction Co.*, 160 Fed. Appx. 675 (10th Cir. 2005) ........................ 41

*Singh v. Cordle*, 936 F.3d 1022 (10th Cir. 2019) ....................................................... 21

*Soltys v. Costello*, 520 F.3d 737 (7th Cir. 2008) ........................................................ 40

*Southwestern Inv. Co. v. Cactus Motor Co.*, 355 F.2d 674 (10th Cir. 1966) ........................ 40, 41

*Stanko v. Davis*, 297 Fed. Appx. 746 (10th Cir. 2008) ................................................. 42

*United States use of Bergen Point Iron Works v. Maryland Casualty Co.*, 384 F.2d 303 (2d Cir. 1967) ................................................................................................. 41

## U.S. DISTRICT COURTS

*Chavez v. Stomp*, 2014 U.S. Dist. LEXIS 206016 (D.N.M., 2014) ................................. 42

*Davenport v. Williams*, no. 2:17-CV-15-CW, 2017 U.S. Dist. Lexis 193027 (D. Ut. 2017) (unpublished) ......................................................................................... 22

*Local 8027 v. Edelblut*, 651 F. Supp. 3d 444 (D.N.H. 2023) ........................... 22, 23, 39

*Maddonna v. United States HHS*, 567 F. Supp. 3d 688 (D.S.C. 2020) ........................ 38

*Martin v. Stites*, 31 F. Supp. 2d 926 (D. Kan. 1998) .................................................. 40

*Willey v. Sweetwater Cnty. Sch. Dist.*, no. 23-CV-69 SWS, 2023 Lexis 113818 (D. Wyo. 2023) ........................................................................................................ 16, 25

*Willey v. Sweetwater Cnty. Sch. Dist.*, no. 23-CV-69 SWS, 2023 Lexis 113818 (D. Wyo. 2023) (unpublished) ...................................................................................... 16

## CONSTITUTIONAL PROVISIONS

First Amendment ................................................................................................. *passim*

Fourteenth Amendment ............................................................................ 36, 37, 47

## SUU POLICY

Policy 5.27 ......................................................................................................... *passim*

Policy 5.60 ......................................................................................................... *passim*

## STATUTES

Fla. Stat. § 1000.071 ................................................................................................ 28

H.B. 261 .................................................................................................................. 27

H.B. 303 .................................................................................................................. 28

Title IX ............................................................................................................... *passim*

UCA §53B-1-118-(3) (b) ......................................................................................... 28

# INTRODUCTION

The essence of Defendants' argument is that federal law (Title IX) requires them to prevent sexual harassment and discrimination but that they have essentially unlimited discretion in choosing how to *implement* that requirement, as well as in how they determine what does and does not *constitute* sexual harassment and/or discrimination. While it is true that they have discretion, that discretion is not unlimited and may not go so far as to deprive others of fundamental constitutional rights.  In this case the sanction orders Defendants imposed on Plaintiff went too far, both in terms of interpreting the requirements of their own policies and of Title IX, and as a result, infringing on Plaintiff's fundamental rights.

Surprisingly, and as will be discussed *infra*, Defendants have omitted any reference to two leading cases that govern the core issues in this case: i.e., *303 Creative LLC v. Elenis, ____ U.S. ____, 143 S.Ct. 2298 (2023)* (the leading and most recent case on the issues of compelled expression and standing, and even more specifically in cases challenging rules against discrimination based on sexual orientation) and *Meriwether v. Hartop, 992 F.3d 492 (6th Cir. 2021)* (although from a different Circuit, still the leading case analyzing whether and how the tests of *Garcetti v. Ceballos, 547 U.S. 410 (2006)* and *Pickering v. Bd. of Educ., 391 U.S. 563 (1968)* apply to university professors who assert a First Amendment right to decline using preferred pronouns.  These cases alone compel rejection of most of Defendants' arguments.

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Only the following statements in Defendants' statement of Material Undisputed Facts[1]) are in dispute or require further elaboration (Plaintiff will adopt the numbering used by Defendants in referencing those asserted facts):

---

[1] "DMUF" will be used hereafter to reference the numbered paragraphs in Defendants' Summary Judgment Motion, Doc. 60, under the heading "Defendant's Material Undisputed Facts."

"22.     After reading the Class Philosophy, Plaintiff asked C1 to perform a monologue and misgendered C1, at least two times, referring to them using gender-specific pronouns such as "she" and "her" despite being corrected to say 'they' and 'them.'"

Plaintiff does not agree that he "misgendered" C1 but does agree that, on two occasions out of approximately a dozen times referencing C1, he accidentally slipped and referred to C1 by a feminine pronoun.

"26.     C1 had a strong negative response to Plaintiff's refusal to use "they/them" pronouns such that they did not think staying in Acting 4 would be good for their mental health."

Plaintiff agrees that C1 had a strong negative response and that C1 *said* that C1 did not think staying in his class would be good for C1's mental health.  Plaintiff has no way to know whether C1 truly believed that or was simply saying it in order to achieve C1's political aim of getting Plaintiff fired for refusing to use they/them pronouns.[2]  There is no independent support for any mental health issue.  The closest the facts come is the report of a friend of C-1 (S-3) that C-1 was crying after the class. TR[3] 199.

"27.     Other students in Acting 4 had negative responses to Plaintiff's refusal to use 'they/them' pronouns that were strong enough that they were reluctant to stay in the class as they believed they could not find equity, respect or a conducive learning space there."

Plaintiff agrees that other students transferred to another class, but that the record does not support what motivated a majority of those students to leave his class, given that the record is clear that C1 heavily lobbied C1's classmates to leave the class.

"31.     Plaintiff has a strong personal belief that gender-neutral pronouns should not be used when referring to an individual. His belief is not religious in nature but is based on his personal view that this it is grammatically incorrect and a political act."

---

[2] *See* Administrative Record, Doc. 60-1, p. 107 (ECF p. 108).

[3] "TR" is used herein to refer to any of the three volumes of the Hearing Transcript (filed by Defendants as Doc. nos. 60-2, 60-3 and 60-4).

There are many bases for Plaintiff's belief, *including* his religion.  However, Plaintiff agrees that he makes no claim in this case based upon his constitutional right to free exercise of religion.

"36.    Plaintiff admits that the issue of whether gender-neutral pronouns should be used when referring to an individual is not relevant to the subject matter of his classes."

Plaintiff admits that a discussion of whether gender-neutral pronouns should be used is not relevant to the subject matter of his classes, but does not agree, as Defendants state at p 3 of Defendant's Motion for Summary Judgment ("DMSJ") (Doc. 60), that it is his position that the use of pronouns is irrelevant to acting, the subject matter of his classes.

"38.    In 2018, Dean Shauna Mendini spoke to Plaintiff about a Title IX complaint that had been made against him, which Dean Mendini was able to deescalate by providing supportive measures in the form of transferring the student to a different professor's class. At that time, Dean Mendini talked with Plaintiff about the importance of honoring student exchange, student preferences, and that it is something that is extremely critical to create a welcoming and accepting learning environment."

Plaintiff admits this allegation but points out that it leaves out a critical detail.  Specifically, in that same conversation, Dean Mendini informed Plaintiff that she thought it would be sufficient, in the future, to merely use a student's name in lieu of a preferred pronoun.

"55.    The sanctions were clarified on December 21, 2022, as follows:

"a.  Plaintiff can meet the sanction requirement that he align his syllabus by removing his "Class Philosophy" statement.

"b.  Plaintiff can comply with the sanction requirement that he make a good faith effort to use students' preferred pronouns by treating nonbinary and binary students the same in using (or not using) names and/or pronouns that align with their gender identity.

"c.  The sanctions apply only in the context of Plaintiff's job duties."

Plaintiff agrees that Defendants sent him the December 21, 2022, letter rejecting his request to use new language in his proposed class syllabi, and that it proposed the three potential "solutions" as stated in Defendants asserted fact 55.   However, Plaintiff disagrees with any inference from asserted fact 56 (below) that the offer to meet with Defendant Price after an incident has already occurred consists of any type of viable option for him, because of the chilling effect of potentially violating the sanctions *prior* to speaking to Defendant Price. There is no guarantee the Defendant Price will agree with his on-the-spot in-class determinations, and if he guesses wrong, he could have other sanctions imposed on him, including being fired.

"56.    The clarification reiterated that if Plaintiff has "concerns about the reasonableness of a future request by a student as related to use of preferred names or pronouns," he could direct those concerns to Defendant Price, who remains available to work with Plaintiff on a solution."

(See response to no. 55 above.)

## PLAINTIFF'S ADDITIONAL UNDISPUTED MATERIAL FACTS

Plaintiff submits the following as Plaintiff's Additional Undisputed Material Facts ("PAUMF"):

### Facts Specific to the Parties' Status

1. Plaintiff Richard Bugg is a 62-year-old resident of Cedar City Utah. BD1[4] ¶1-2

2. Plaintiff has been a professor in the College of Performing and Visual Arts at Southern Utah University ("SUU") for 33 years and is tenured. BD1 ¶2

3. Plaintiff has raised five children and currently has 12 grandchildren. BD1 ¶3

4. Plaintiff is the Founder and Executive Producer of The Neil Simon Festival (now called SimonFest Theatre Company), now in its 21st season. SimonFest is a repertory theatre company that produces a Summer season in Cedar City, as well as off-season shows in the Fall and Winter.

---

[4] "BD1" shall be used herein to refer to the previously filed Declaration of Richard Bugg (originally filed as Doc. 61-3) and reproduced as Exhibit 2 of Plaintiff's Appendix of Evidence in Opposition to SUU's Motion for Summary Judgment.

He also travels with some of its shows to other theaters in his region and has had national tours of one of its shows for 8 years. BD1 ¶4

5.  Plaintiff served on the Regional board of the Kennedy Center American College Theater Festival for 12 years and was Chair of that region for 3 years. BD1 ¶5

6.  Plaintiff has acted professionally on both stage and screen. His screen credits include mostly television movies and series. BD1 ¶6

7.  Plaintiff teaches acting at SUU, including classes entitled Acting 1:  Introduction to Acting and Directing and Introduction to Film. BD1 ¶9

8.  Plaintiff's career is dedicated to helping students in ways that prepare them for the demanding and difficult rigors of professional life as a performer. BD1 ¶9

9.  Defendant Price's authority and powers included deciding and setting disciplinary sanctions in this matter. A3[5] ¶17

10.  Defendant Price had the authority and power to both determine and implement the challenged disciplinary sanctions against Plaintiff. A3 ¶17

11.  Shauna Mendini is, and was at all times relevant to this Complaint, the Dean of the College of Performing and Visual Arts at SUU. A2[6] ¶11

12.  Ms. Mendini has responsibility for University-sponsored programs under the College of Performing and Visual Arts. A2 ¶12

13.  Jake Johnson is, and was at all times relevant to this Complaint, the Title IX Coordinator at SUU. A2 ¶17

14.  Mr. Johnson is the Director of the Office of Equal Opportunity at SUU. A2 ¶18

15.  Mr. Johnson is SUU's designated and authorized employee to coordinate efforts for compliance with Title IX. A2 ¶19

---

[5] "A3" is use herein to refer to Defendants' Answer to the Third Amended Complaint (i.e., Doc. 43).

[6]  "A2" is use herein to refer to Defendants' Answer to the Second Amended Complaint (i.e., Doc. 37).

## Facts Preceding the 2021 Controversy

16.   C1's first encounter with Plaintiff was as a student in Plaintiff's Fall 2018 Acting 1 Class. C1 "had announced [C1's] use of they/them pronouns" and was offended when, even though Plaintiff said nothing, it appeared to C1 that Plaintiff had "scoffed" at that announcement. C1 then transferred out of Plaintiff's class without attending even another day. AR[7] 98; TR 269-272

17.   In 2018 there was an incident where a student (not C1) had filed a Title IX complaint after Plaintiff had sent an email declining that student's request to be referenced by plural pronouns.  Plaintiff's email said the following:

> Dear (Redacted),
>
>  I am happy to use your chosen nickname.
>
> However, I believe that an important part of acting training involves analyzing and recognizing the inherent differences between men and women. I would find it counterproductive to refer to you as though you were a plural and had no gender. I also think that such references to you in class would draw undue and inappropriate attention to you.
>
>  I hope you take no offense, since none is offered.
>
>  I also hope to see you in class, but if you feel you have to drop my course, I will take no offense.
>
>  All my best,
>
>  Richard Bugg

AR 143

18.   Dean Shauna Mendini described the email in the prior fact as "very kind". TR 317

19.   In response to that Title IX complaint, Dean Shauna Mendini informed Plaintiff that "he could use nonbinary student's names as an alternative to their personal pronouns." TR 220

20.   At no point prior to the initiation of proceedings against him did any SUU official

---

[7] "AR" is used herein to refer to the Administrative Record (filed by Defendants as Doc. 60-1). Note that because the ECF-filed version of Defendants' Administrative Record has a cover page, the AR page numbers (which are the ones shown in this brief) will always be one less than the ECF page number on which they are actually found.

inform Plaintiff that he *must* use a student's preferred pronouns.  BD1 ¶ 37.

21.   In semesters prior to his Fall semester 2021 classes, Plaintiff had experienced the following types of problems in his classes which appeared to Plaintiff to be politically driven: (1) expressed intolerance of fellow students who had made positive references regarding police; (2) expressed intolerance toward a fellow student for defining in a positive way the masculine traits of a character he or she was working on; and (3) the use—or not—of so-called "gender-neutral" pronouns as a way of shutting down other students. TR 289

22.   Because of the concerns above, Plaintiff prepared the following language for inclusion in his syllabi for his classes for the Fall semester, 2021:

> This is a class dedicated to teaching the craft of acting. It is not a forum for social justice causes, nor a microcosm for political action movements. The discussion of all philosophies is welcome here, so long as it is part of our efforts to understand the craft and further the development of the acting characters we are creating. Please do not demand of your classmates any political or social compliance to your particular philosophy. The class will be a safe space in this definition only: We will attempt to create an atmosphere in which each student feels safe to risk failure in creating a character, expressing that character's motivations, and fighting against that character's obstacles – both physical and emotional. Please don't expect to be 'safe' from exposure to ideas or expressions that might be counter to your own views. You will best be served if you approach this class experience with an open mind and a loving respect for freedom of thought and speech.

AR 7

23.   Plaintiff "included the Syllabus Statement to keep the Class apolitical and focused on learning about acting." AR 7

24.   Plaintiff's principles and beliefs are "informed and influenced" by his religion. TR 288-289

### Facts Regarding the 2021 Controversy

25.   The Classical Acting 1 class is a small class with no more than 20 students. TR 318

26.   To address the concerns above, and in hopes of pre-empting them, near the beginning of Plaintiff's Fall Classical Acting class Plaintiff read the above-quoted portion (fact 22 above) of

his class syllabus aloud to his students. BD1 ¶15

27. C1 had expressed concern about things happening throughout the Country and stated: "I believe my entire community is under direct attack." TR 276

28. Plaintiff's Classical Acting I class typically proceeds by selecting one student to act out a selected role and the student's performance is then critiqued by Plaintiff followed by an open discussion of the student's performance with the entire class. BD1 ¶17

29. Because Plaintiff did not want C1 to feel discriminated against or feel denied of any educational opportunity, he selected C1 to give the initial performance. BD1 ¶17

30. During the critique and discussion of C1's performance, Plaintiff referenced C1 more than a dozen times. In all but approximately two of those times Plaintiff primarily referred to C1 by C1's preferred nickname. BD1 ¶18; TR 427; TR 416

31. During the critique, Plaintiff complimented C1's performance. TR 389; TR 405

32. C1 was of slight build and C1's voice, facial features and stature outwardly appeared to Plaintiff to be female. BD1 ¶11

33. Each of the two or three times Plaintiff accidentally used female pronouns to refer to C1, one or more students interrupted to inform him that C1 used they/them pronouns and/or should not be referred to by female pronouns. AR 92; TR 433

34. C1 found Plaintiff's offer to use C1's name but not plural pronouns "not acceptable." TR 275

35. According to the memory of S1, another student in Plaintiff's class, Plaintiff "called C1 up to do a monologue, …, and then after C1 had finished with the monologue, Professor Bugg was giving some feedback, and in doing so referred to C1 as ["]she["], kind of in the course of another thought."

> And that happened one more time during the … feedback session, kind of the same sort of thing. I think more of the class corrected Professor Bugg the second time.
>
> And then the rest—that was about halfway through class, I would say, and then at the end of class Professor Bugg asked for feedback, concerns, any questions,

anything anybody had, and C1 at that point … said something about not having their identity be questioned or something like that … and Professor Bugg responded that he wasn't trying to do that." "And so C1 and a couple other students started to say, well you know, you have to use the right pronouns with C1, and Professor Bugg … said something along the lines of, ["]I'm not comfortable using they/them, but I will use C1's name. I apologize. I'm trying to do better["], or something like that. I'm probably paraphrasing a little bit, but that's what I … remember.

TR 416-17

36. SUU investigators concluded that C1 was "traumatized" because C1 (subjectively) felt that Plaintiff's refusal to use gender-neutral pronouns was the same thing as Plaintiff communicating that C1 is "not worthy of the most basic human respect." AR 8

37. C1 was named SUU's Outstanding Theater Graduate. TR 470

38. Plaintiff's feelings on the forced use of preferred pronouns are sincere. TR 248

**Post-Class Events**

39. According to S2, another student in Plaintiff's class:

After the end of class, all the students talked about it and felt passionate about the issue. There were split opinions in the class, and debate was heated and political. During the discussion C1 stated they wanted to get [Plaintiff] fired. C1 messaged all the students letting them know they were making a complaint to Title IX and asked everyone for their support. AR 107

40. Thereafter C1 and some other students complained to faculty within the College of Performing Visual Arts and C1 filed a formal complaint to SUU's Title IX office. TR 204

41. According to SUU's summary of its investigator's interview with S2, S2 further stated that "she did not like things that were being said in the department. S2 said she disagreed with C1 trying to get everyone together to get [Plaintiff] fired. S2 added there was a lot of bullying going on towards students who were on the fence about leaving or staying in Richard's class. It was assumed if you didn't go to the new section, you didn't support C1." AR 108

42. SUU's subsequent investigation determined that "some students had motivations for leaving [Plaintiff's] class other than being offended by [Plaintiff's] statements on September 9th." Two students "identified reasons other than being offended that played a role in their and possibly

other students' decisions to leave [Plaintiff's] class once an alternative was provided." These "included peer pressure, support for C1, faculty preference, and not knowing if [Plaintiff's] class would continue." TR 217

### The Relevant Legal Standards

43.   SUU's Policy 5.60 IV-N establishes the policies used in determining whether there has been "sexual harassment." Doc. 42-4 at pp. 5-6.

44.   Under SUU's Policy 5.60 IV-N (2), conduct does not constitute "sexual harassment" unless it constitutes "unwelcome conduct determined by a reasonable person" to meet all four of the following criteria:  It must be "so [1] *severe*, [2] *pervasive* and [3] *objectively offensive*" that it "[4] *effectively* denies a person equal access to [a] University education program or activity." Doc. 42-4 at p. 6.

45.   The SUU Policy above is consistent with *Davis v. Monroe County Bd. of Ed.*, 526 U.S.629, 649-50 (1999), where the Supreme Court held conduct is actionable as "sexual harassment" under Title IX only if it is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.  The only significant difference in these standards is that Policy 5.60 uses the words "effectively denies" instead of "can be said to deprive."

46.   The potential sanctions for a professor who violates Policy 5.60 are provided in its subdivision XVIII (Sanctions and Remedies), A-1) and include, *inter alia*, "verbal counseling, written warning, probation, reassignment, transfer, demotion, reduction in pay, suspension [and] termination of employment."

47.   SUU's Policy 5.27.3 A and B respectively define "discrimination" and "harassment." Under Policy 5.27, it is not an element of either "discrimination" or "harassment" that the accused can be said to have deprived the victim of access to the educational opportunities or benefits provided by the school.

### Facts Regarding the Findings of the Administrative Proceeding

48.   The Hearing Officer found that "[Plaintiff]'s refusal to use Gender-Neutral Pronouns

. . . was 'severe' as that term is used [sic] Policy 5.27." AR 14

49.  The Hearing Officer also found that "[Plaintiff's] refusal to use Gender-Neutral Pronouns has occurred repeatedly over a period of time, has had the effect of interfering with his work and SUU students' academic performance and has created a hostile environment" and is therefore "pervasive." AR 15

50.  The Hearing Officer found that "[Plaintiff]'s refusal to use Gender-Neutral Pronouns was extremely offensive to many reasonable people, including C1, other SUU students and at least one other professor in the College" and was "objectively offensive." AR 16

51.  The Hearing Officer did *not* find that Plaintiff necessarily had effectively denied anyone the ability to participate in an SUU program or activity.  Instead, he found only that Plaintiff *either* denied *or* limited C1 and other students' participation in an SUU program.  AR 16 (last line).

52.  During the administrative proceedings Plaintiff had offered, as a compromise, to use the preferred names of students in lieu of referring to them by gender-neutral pronouns. AR 16

53.  The Hearing Officer took the position that Plaintiff's offer to utilize the name of gender-neutral students rather than their preferred pronouns was not acceptable because it treated gender-neutral students differently than other students in that the cis-gender students could be addressed *either* by their name or pronouns. AR 14

**The Sanction Orders**

54.  On December 14, 2022, Plaintiff proposed to SUU revised language for inclusion in his course syllabi as follows:

> "Policy on Pronouns:
>
> "I am happy to address any student by the male or female pronouns of the student's choice, regardless of the student's biological sex. If you prefer, I will also address you exclusively by your name if you prefer that no gender be assigned to your pronouns. Please advise me prior to class and I will do my best to honor any such request. However, I will not honor any request to be addressed by they/them pronouns or any other pronouns not specifically designated by the University."

11

BD1 Ex. A, B and C

55.  On December 21, 2022, Defendants Price and Anderson responded to Plaintiff's request to include the above language in his class syllabi in a letter saying, *inter alia*:

> Provost Anderson included a sanction that only required you to align your syllabus with guidance from the Department of Theatre, Dance, and Arts Administration. The context for that was your syllabus statement at issue titled "Class Philosophy." In that, you stated that your class was "not a forum for social justice causes, nor a microcosm for political action movements," among other statements. You then responded to the student, who identifies as nonbinary and requested that you use they/them pronouns for them, that using the gender-neutral pronouns for the individual was a political issue and not to be discussed in class. The syllabus statement was, in essence, applied in a way to contradict the departmental statement to students that students have the right to express their gender identity freely. Due to this context, Provost Anderson required that you align the syllabus with departmental guidance.

BD1 Ex. C

**Plaintiff's Positions**

56.  At the Administrative Hearing, Professor Bugg never said that pronoun use is not relevant to the subject matter of his classes. The actual comment from the hearing which Defendants reference at DMSJ 2 is found at pp. 107:22-108:18 of the Hearing Transcript and pertained to his syllabus language for the Fall 2021 Acting classes (which indicated that he didn't want the course to drift into political discussion), and was as follows:

> "PROF. BUGG: I do believe that's a political discussion going on that I -- I don't want to have to commit to.
>
> THE HEARING EXAMINER: Right. And so that's -- those are the kind of things you want to keep out of the class because they're not relevant to what you're trying to teach, correct?
>
> PROF. BUGG: Correct. Although I'm not trying to prohibit anyone else from using those pronouns. I just choose not to make a commitment that I see as political."

BD2[8] p. 2

57.  Professor Bugg contends that his use of pronouns is absolutely relevant to the subject matter of his classes, and they are particularly relevant in classes teaching acting where pronouns are used to refer not only to students, but also to the characters they or others may be portraying. Very often a student of one gender will be acting out the role of a character of a different gender. Unlike a class in, *e.g.*, calculus or physics, the use of third-party pronouns is integral to the discipline of acting and its teaching.  BD2 p. 2

58.  The sanction orders do not allow for a "good faith effort" to avoid what Defendants call "misgendering," i.e., referring to a student by any gender-based pronouns with which that student does not identify.

59.  Plaintiff is prepared to redouble his good faith efforts to avoid using any gender-specific pronouns to which a student objects and would not oppose an order which required him to make a good faith effort to not use any gender-specific pronouns to which a student objects.  He believes that with practice, he could fully succeed at this.  However, the sanction orders do not provide a safe-harbor for any "good-faith" efforts. BD2 p. 3

60.  To the extent Defendants are now saying (at p. 41 of their Motion) that Professor Bugg may avoid using preferred pronouns if he "use names only as long as [I] do so with all [my] students," he categorically rejects this option.  He does not believe his right to call a student by that student's own requested preferred and chosen name can be eliminated by superimposing on it the obligation to refrain from using any pronouns whatsoever in referring to any other students. Particularly in an acting class, where persons portray characters often including characters of a different gender from their own, this is just an absurdly difficult burden to put on what he believes is his First Amendment right to have the option to call someone by the very name they have chosen for themself. BD2 p. 3

61.  Whenever Professor Bugg address a student directly, it is his practice not to call them

---

[8] "BD2" is used herein to refer to the Supplemental Bugg Declaration which will appear as Exhibit 3 of Plaintiff's Appendix of Evidence in Opposition to SUU's Motion for Summary Judgment filed contemporaneously herein.

by a gender-identifying word like, e.g., "Ms. Smith" or "Mr. Jones." Instead, he will call them by, e.g., "William" or "Mary." If he refers to a scene in which William and Mary performed, he would ask his class, e.g., "what do you think of their performance?" If he has, e.g., a non-binary student performing with a binary student, he will still say, e.g., "what do you think of their performance." But if the two of them are performing and he wants to ask the class only about the performance of the non-binary student, Professor Bugg would not ask "what did you think of their performance" because it would then cause confusion as to whether he was asking about the performance of both of them or only one. Instead, he would say, e.g., "what did you think of William's performance." And if William, in this example a non-binary student, was performing with Mary, a cis-gender student, he may well follow up his question about William's performance by then quickly saying something like, e.g., "and when Mary responded to William what did you think of her response?," as that might seem natural in the moment. (In that sentence he would be using both a name and a pronoun for Mary.) While Professor Bugg is willing to use names instead of pronouns for any student who requests it, he does not believe he should be required to use names exclusively nor that it is the role of the University to dictate how he must address every student in every situation. Plaintiff's practice and commitment is to use names for all students and may use traditional gender-based pronouns for any students who have no objection but will make a good faith effort to avoid using such pronouns with respect to any person who finds such use objectionable. BD2 p. 3

62.  Professor Bugg also believes that it is his job, as a university professor, to prepare his students for life outside the protected walls of academia. He believes he will not be helping them if he furthers their belief that someone who calls them by their name rather than an unnatural pronoun, means them any type of harm or disrespect. Fostering such an attitude on their part, he believes, will only make their path through life less successful. The orthodoxy which they may want to be imposed on their professors is not something they will be able to insist upon once they pursue careers or other endeavors as they go through life. BD2 p. 4

63.  Under the Sanction Orders, Plaintiff is compelled to use any student's "preferred pronouns," and he is in violation the moment he refuses any such request (and regardless of

whether made by a non-binary student or a cis-gender one, and regardless of what the requested pronouns may be).  Although Defendants have offered to meet with him after a situation arises in connection with a violation of the preferred pronoun requirement, he has no guarantee that he will be absolved from that violation after the fact by any later-offered meeting with Defendant Price.  Consequently, he has no choice but to comply with the demanded pronoun request due to the possibility of being fired if he guesses wrong.  BD2 p. 4

## ARGUMENT

### I

### DEFENDANTS' RIPENESS CHALLENGES TO PLAINTIFF'S STANDING ARE FLATLY REFUTED BY THE SUPREME COURT'S MOST RECENT DECISION ON THIS SUBJECT IN A VERY SIMILAR CIRCUMSTANCE

Because a federal court has an independent obligation to address issues of standing in order to assure its jurisdiction, Plaintiff responds first to an argument Defendants made ostensibly only with respect to Plaintiff's Fifth Cause of Action ("COA" 5), but which, if valid, would affect the Court's jurisdiction over most or all of Plaintiff's claims.  Specifically, at DMSJ pp. 55-56, Defendants assert that Plaintiff's complaints of a chilling effect on his expression are not ripe for review because "this court can only speculate as to the facts that might give rise to future complaints, whether they will even come to fruition or be pursued through formal channels within the University, and if so, the outcome of any investigation or internal evidentiary hearing that may be had." _Id._ at 55.  They further argue that "Plaintiff's purported 'fears' do not present a live controversy in a 'clean-cut and concrete form." _Id._  Indeed, in an attempt to further buttress their ripeness challenge, Defendants even say that the effect of Plaintiff having removed from his syllabus his statement barring political topics in class because of Defendants' sanction order is to render his challenge unripe because it is unlikely to recur in the future. _Id._ at 56.  In other words, they are saying that the chilling effect they imposed on Plaintiff has been so successful that Plaintiff's claim of that chilling effect has been rendered moot!  That is indeed a strange logic.

In reaching this strange position, Defendants also omitted from their analysis any mention of the leading, recent, and controlling Supreme Court case on exactly this type of ripeness issue, *i.e., 303 Creative.*

In *303 Creative,* decided just last term, the plaintiff had announced her intent to develop a wedding-related website which would specialize in describing and promoting the unique features of her future engaged clients. However, the plaintiff had a strong personal objection to same-sex weddings and did not want to be forced to create any words or other expression on her website to promote the marriage of any same-sex couples. Because Colorado had a law which forbade businesses from denying services to any members of the public based on their sexual orientation, she was fearful that if she turned down any such future request, she could successfully be sued for violation of the state's anti-discrimination law. Accordingly, she brought a pre-enforcement challenge seeking an order that she could not be compelled to create websites promoting same-sex weddings.

Even though the *303 Creative* plaintiff did not then have clients making a demand for such services (and therefore, of course, the Court could not know the exact parameters of any such future demands), the Court nonetheless upheld her standing to seek injunctive relief based on fact that the state's policy was already clearly established and it was likely that some would seek to avail themselves of her services in the future (even if only to create the basis for a lawsuit against her should she deny requested work). *Accord, Willey v. Sweetwater Cnty. Sch. Dist.*, no. 23-CV-69 SWS, 2023 Lexis 113818 at *16-18 (D. Wyo. 2023) (unpublished) (finding that a teacher had standing to challenge a school district's pronoun policy even though she didn't then have a student making such a request). Those circumstances are remarkably similar to the circumstances of the present case except that here, the Plaintiff has *already* been subjected to discipline for violating SUU's announced policy. And he will prospectively be subject to further, more Draconian, discipline should he refuse to use the speech SUU has compelled him to employ (*e.g., whatever* pronouns are demanded by *any* student). Additionally, the likelihood of his being faced with future such requests for non-traditional pronouns is particularly high given that the record already shows

that there have now been *three* students who wanted to be described by non-traditional pronouns. *See* AR 105, describing such a request by a student in 2018; AR 104, noting that a second student (S-3) in Plaintiff's Fall 2021 Classical Acting I class "uses she/they" pronouns, even though she dropped Plaintiff's class before making any demand; and, of course, the demand of C1 herein (*see* PAUMF Fact no. 17, DMUF no. 23 and BD1, ¶ 10.[9])

Plaintiff's claims are also ripe to the extent he is challenging the restrictions on his *syllabus* language because he is chilled and deterred from *affirmatively* engaging in speech of his choosing on a matter of public and educational concern. He had proposed language to include in his Winter 2022 syllabus articulating his "policy on pronouns" (reproduced in PAUMF 54 and in BD1, Exhibit A), but his request to use that language was turned down by SUU. Likewise, Defendants admit that their Sanction Orders also prohibit Plaintiff from reproducing the syllabus language he proposed for his Fall 2021 classes. *See* DMSJ 56 ("this statement barring political topics is no longer a part of Plaintiff's class syllabus, in part due to Provost Anderson's added sanction, finding such a statement inappropriate for a syllabus").

For each and all of these reasons, any suggestion that Plaintiff's claims are not ripe for review is utterly meritless, and has now been rejected by controlling Supreme Court precedent.

Lastly, Defendants argue that Plaintiff's standing is defeated because they did not name the Hearing Officer as a defendant. DMSJ 4. This is a frivolous argument since it is uncontested that Defendants are the ones who reviewed the Hearing Officer's Written Determination and who issued and prospectively enforce the challenged sanctions.

## II
## DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT PLAINTIFF CANNOT PREVAIL ON CAUSE OF ACTION NO. 1

---

[9] The term "Bugg Declaration 1" (hereafter "BD1") refers to the Declaration of Richard Bugg contemporaneously filed as Exhibit 2 of Plaintiff's Appendix of Evidence in Opposition to Defendant's Motion for Partial Summary Judgment. (It is a reproduction of his prior declaration filed in support of his own previously filed Motion for Partial Summary Judgment, Doc. 61-3.)

Plaintiff's first cause of action alleges that Defendants' sanction orders have violated his First Amendment right against compelled expression and that they also prohibit him from affirmatively exercising his First Amendment rights in the future.[10]  The former allegation asserts Plaintiff's right not to be forced to say words he strongly disagrees with.  The latter allegation protects him against prior restraints which would prevent him prospectively from using lawful speech of his own choosing (*e.g*., the language in his syllabi, as well as even speaking the *names* of his students).  In other words, Defendants' actions interfere with the two types of First Amendment rights that the courts have traditionally subjected to the *highest* degree of judicial protection.  *See, e.g., Janus v. AFSCME, ___ U.S. ___, 138 S.Ct. 2448, 2464 (2018)*, saying the following on compelled expression:

> Free speech serves many ends. It is essential to our democratic form of government [citations omitted].  Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends.

> When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence.

and, as stated in *Minneapolis Star & Tribune v. Minnesota, 460 U.S. 575, 585, n.6 (1983)* "Prior restraints … clearly strike to the core of the Framers' concerns, leading this Court to treat them as particularly suspect".

Defendants do not dispute that they are compelling Plaintiff's speech and limiting what speech he is allowed to use in the future.  Their response is the assertion that both aspects of Plaintiff's speech lack First Amendment protection because he was in the employ of the University ("SUU") and his speech is contrary to SUU policy.  They assert that such speech may be barred under *Garcetti* and *Pickering*. Neither contention has merit.

---

[10] Third Amended Complaint ("TAC") (Doc. 42) at ¶ 65.

### A.  Contrary to Defendants' assertions, *Garcetti* has no application here.

Defendants cite *Garcetti* for the asserted proposition that Plaintiff has no First Amendment rights when he is teaching in his classroom to the extent he fails to follow the official policies dictated by the University (or, in this case, the *interpretation* of those policies by University officials, albeit after the fact).   *Garcetti* held that "public employees" surrender their First Amendment rights while engaged in the jobs for which they have been employed, but, in response to a concern expressed by Justice Souter that this might also apply to university professors, the majority *expressly* stated that its ruling should *not* be considered as addressing the rights of those engaged in "speech related to scholarship and teaching."  547 U.S. at 425.

Justice Souter's concerns are directly addressed by the 6th Circuit in *Meriwether v. Hartop,* the leading appellate case nationwide on the application of *Garcetti* to suits such as the present one, brought by a university professor who challenged school rules which compelled him to use "preferred pronouns."  Professor Meriwether asserted that the school's requirement that he use preferred pronouns violated his rights under both the Free Exercise and Free Speech clauses of the First Amendment.  In that case the complaining party was not non-binary, but, rather, was a transgender student born male and appearing to be a male, but who nonetheless *identified* as a female and wanted to be addressed by female pronouns.  *Id.* at 499.

The professor offered to address the student by the student's last name, rather than by female pronouns, but the school insisted that wasn't sufficient.  *Id.* at 510-511.

The Sixth Circuit decided the case primarily under the First Amendment's Free Speech clause[11] (though later in the opinion concluded that the school's policy also violated the professor's Free Exercise rights[12]), holding that the school's policy violated Meriwether's fundamental First

---

[11] 992 F.3d at 503.

[12] 992 F.3d at 512.

Amendment right against compelled expression.  In arriving at that conclusion, it held that the *Garcetti* test is wholly inapplicable in such circumstances: [13]

In concluding that *Garcetti* was inapplicable, *Meriwether* cited, *inter alia,* the landmark case of <u>*Keyishian v. Bd. of Regents,* 385 U.S. 589, 603 (1967)</u>, which, *Meriwether* noted:

> characterized academic freedom as a 'special concern of the First Amendment' and said that the First Amendment 'does not tolerate laws that cast a pall of orthodoxy over the classroom.' [*Keyishian, id.*] After all, the classroom is 'peculiarly the "marketplace of ideas". [*Id.*] And when the state *stifles a professor's viewpoint on a matter of public import*, much more than the professor's rights are at stake. Our nation's future 'depends upon leaders trained through wide exposure to [the] robust exchange of ideas'—not through the 'authoritative' compulsion of orthodox speech.

<u>*Meriwether*, 992 F.3d at 504-505</u>, (emphasis added).

Here, as in *Meriwether,* SUU has stifled "a professor's viewpoint on a matter of public import."  Whether persons, and especially our educators, are compelled to use this new orthodoxy of "preferred pronouns" is unquestionably a matter of *significant* public import and concern.

*Meriwether* then (<u>*id.* at 504-506</u>) analyzed numerous potentially relevant Supreme Court and court of appeals decisions attesting to the greater free speech rights accorded to college professors, including <u>*Grutter v. Bollinger*, 539 U.S. 306 (2003)</u>, <u>*Sweezy v. New Hampshire*, 354 U.S. 234 (1957)</u>, and <u>*Healy v. James,* 408 U.S. 169, 180-81 (1972),</u> as well as pointing out that three other "sister circuits" – the Fourth, Fifth and Ninth – had likewise concluded that *Garcetti* could not be extended to apply to bar First Amendment free speech claims by professors at public universities. <u>992 F.3d at 505</u>.

Based on this authority, *Meriwether* concluded that *Garcetti* could *not* be extended to bar speech claims by college professors who face discipline for failing to use preferred pronouns while teaching. <u>*Id.* at 507</u>.

---

[13] After rejecting the application of *Garcetti, Meriwether* then proceeded to analyze the school's requirement under the less rigid balancing tests of <u>*Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968)</u> and <u>*Connick v. Myers,* 461 U.S. 138 (1983).</u>   Plaintiff will discuss *Meriwether*'s analysis under those less-rigid tests, *infra*.

Consistent with *Meriwether,* and since the decision in *Garcetti,* the federal appellate courts have *unanimously* held that Garcetti's holding does not apply to university professors when they are engaged in either *scholarship* or *teaching. See, e.g., Adams v. Trs. of Univ. of N.C.-Wilmington, 640 F.3d 550, 562-564 (4th Cir. 2011)* (holding that *Garcetti* does not apply to bar *either* a university professor's in-class speech *or* his academic writing) and *Demers v. Austin,746 F.3d 402, 411-412 (9th Cir 2014)* ("We conclude that if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court.").

Defendants, however, cite a number of Tenth Circuit appellate decisions implying that they have addressed this issue of whether *Garcetti* deprives university professors of First Amendment protection for their scholarship and teaching, and ruled favorably to the employer.[14]  However, those cases did nothing of the sort.  Defendants assert, entirely incorrectly, that "The Tenth Circuit does not treat professors any differently than other public employees, applying the *Garcetti/Pickering* framework to determine if their speech is protected by the First Amendment." DMSJ at 26.

What Defendants have failed to mention is that *none* of those Tenth Circuit decisions applying or citing *Garcetti* involved "scholarship or teaching" activities by university professors. Thus, academic freedom was not implicated.  *See, e.g., Joritz v. Gray-Little*, 822 F. App'x 731 (10th Cir. 2020) (speech that was critical of, and entirely centered on, a faulty review process was not protected); *Singh v. Cordle*, 936 F.3d 1022 (10th Cir. 2019) (same); *Peterson v. Williams*, No. 20-4059, 2022 U.S. App. LEXIS 12141 (10th Cir. May 5, 2022) (same)).  Accordingly, these cases do not support the asserted principle that *Garcetti* applies to the *teaching* of college professors. Moreover, the case of *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009), which Defendants cite at DMSJ 26 as supplying the controlling test for applying *Garcetti*, did not even *involve* a teacher (must less a university professor). Nor did any of the numerous cases Defendants

---

[14] Defendant's Motion for Summary Judgment (DMSJ) (Doc. 60) at pp. 26-28.

cited at DMSJ 28.  *But see Davenport v. Williams*, 2017 U.S. Dist. Lexis 193027; 2017 Westlaw 5633109 (D.Ut. 2017), the only case cited by Defendants applying *Garcetti* to teaching by a college professor.  Plaintiff submits *Davenport* was simply wrongly decided, a lone District Court decision in contradiction to the weight of authority in concluding that *Garcetti* does not apply to the teaching of college professors.

Another significant federal case concurring with *Meriwether* on the inapplicability of *Garcetti* to university professors is *Local 8027 v. Edelblut*, 651 F. Supp. 3d 444 (D.N.H. 2023). That case involved a suit brought by K-12 public school teachers challenging the State Attorney General's interpretation of a new state statute authorizing suits (and other sanctions) against K-12 teachers who advocate concepts which are contrary to the State's view on various types of discrimination.  While agreeing with the Defendants that the *K-12 public school teacher plaintiffs'* Free Speech claims were precluded by *Garcetti, Edelblut* nonetheless agreed with *Meriwether* in emphasizing that *Garcetti* can *not* be applied to the teaching of *university*-level teachers or professors:

> In *Garcetti's* wake, several circuit courts have recognized that public college and university professors retain substantial academic freedom under the First Amendment while engaged in teaching and scholarship. *See, e.g., Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021); *Buchanan v. Alexander*, 919 F.3d 847, 852-53 (5th Cir. 2019); *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 564-65 (4th Cir. 2011).

> But the circuits that have considered whether public primary and secondary school teachers enjoy similar freedom to determine what they will teach have concluded that their curricular speech is not protected by the First Amendment. *See Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966-70 (9th Cir. 2011); *Evans-Marshall v. Bd. of Ed. of Tipp City Extended Village Sch. Dist.*, 624 F.3d 332, 342 (6th Cir. 2010); *Mayer v. Monroe Cnty. Comm. Sch. Corp.*, 474 F.3d 477, 479-80 (7th Cir. 2007); *cf. Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11, 700 (4th Cir. 2007) (declining to apply *Garcetti* but concluding under *Pickering* and *Connick* that a teacher's speech was not protected by the First Amendment).

> The reasons for treating curricular speech by college and university faculty differently from similar speech by primary and secondary school teachers are compelling. The Supreme Court has long recognized that "universities occupy a

special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 249-55 (1957) (plurality opinion); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (recognizing that a university "classroom is peculiarly the 'marketplace of ideas'").

In such environments, "academic freedom . . . is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603. In short, academic freedom concerns are paramount on college and university campuses.

Public primary and secondary school teachers, by contrast, are hired to teach the curriculum developed by the politically accountable branches of state and local government. Individual primary and secondary school teachers simply aren't given the latitude to teach whatever they believe students need to hear.

651 F. Supp. 3d at 451-52 (citations omitted).

Finally, in *Vlaming v. West Point School Bd.*, 895 S.E.2d 705 (Va. 2023), the Virginia Supreme Court likewise categorically rejected any application of the absolute bar of *Garcetti* where a college professor, like Plaintiff here, challenged a university policy requiring professors to use preferred pronouns demanded by a non-binary student. In arriving at the portion of its decision rejecting application of *Garcetti*, it stated:

For several reasons, we reject the School Board's view that *Garcetti* should govern Vlaming's case. To begin with, *Garcetti* was not a compelled-speech case. *Garcetti* applied the official-duties doctrine to "expressions employ-yees *make* pursuant to their professional duties," *id.* at 426 (emphasis added), not expressions employees *refuse to make*. Punishing a government employee for improper speech may or may not be constitutionally violative, but it is "not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree," *Janus [v. AFSCME, Council 31]*, 138 S. Ct. [2448], at 2473 [(2018)]. This distinction undermines the School Board's argument that *Garcetti*'s official-duties doctrine warrants the dismissal of Vlaming's compelled-speech claim. His factual situation is wholly unlike that of the prosecutor in *Garcetti*. Vlaming claims that he was fired for what he would not say — unlike the deputy prosecutor, who was disciplined for what he did say.

Equally important, the punished speech in *Garcetti* was merely a prosecutor's legal opinion on a routine topic in criminal law that was rejected by his superiors and ultimately rejected by the trial court presiding over the criminal proceeding. In contrast, the compelled speech in Vlaming's case involves an ideological topic that has engendered fierce public debate. "From courts to

schoolrooms this controversy continues." *Meriwether*, 992 F.3d at 508. Because "the use of gender-specific titles and pronouns has produced a passionate political and social debate," it is obvious that "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* "Never before have titles and pronouns been scrutinized as closely as they are today for their power to validate — or invalidate — someone's perceived sex or gender identity." *Id.* at 509.

For these reasons, we find *Garcetti*'s official-duties doctrine inapplicable to the allegations in Vlaming's complaint.

*Accord, Vlaming*, 895 S.E.2d at 741-42.

For all the reasons above, Defendants' assertion that *Garcetti* has any application to this case whatsoever is clearly without merit.

## B. Contrary to Defendants' assertions, their sanction orders do not survive under the tests of *Pickering* and *Connick*.

### 1. As a preliminary matter, Defendants' assertion that Plaintiff has somehow waived his speech rights regarding pronouns is utter nonsense.

Preliminary to their discussion of the application of the *Pickering* test, and in support of their asserted Point III that there is no unique First Amendment protection for academic speech, Defendants assert that Plaintiff's First Amendment-protected academic freedom is not even involved in this case because, so they say, Plaintiff "conceded that whether gender-neutral pronouns should be used when referring to an individual is not relevant to the subject matter of his classes." DMSJ 22. He said nothing of the sort. As explained in BD2 at ¶¶ 2-3, that is a gross misstatement of Bugg's actual comment which is found at pp. 107:22-108:18 of the Hearing Transcript and reproduced verbatim in BD2 at ¶ 2. Rather, as he explained to the Hearing Examiner, and consistent with the statement in his Fall 2021 Syllabus (PAUMF 22), all he was saying is that he thought that *political discussions* of the use of preferred pronouns are irrelevant to the subject matter of his classes.

Merely because political discussions of gender-neutral pronouns are not part of the subject matter of Plaintiff's classes does not, by any stretch of the imagination, mean that the actual *use*

of pronouns is irrelevant in his classes, nor that his use of traditional pronouns in the normal course of his teaching is somehow not part of his course matter.

Rather, as Plaintiff explains at BD2, ¶ 3, the use of pronouns is an integral part of the teaching experience in a language arts course such as the teaching of acting.

### 2. Defendants' attempted distinguishing of this case from those involving the Free Exercise Clause is unavailing.

At DMSJ 33, Defendants' assert that "unlike other cases addressing this issue, Plaintiff's compelled speech or sanction does not butt up against a competing constitutional interest, like the Free Exercise Clause." There are two simple responses to this incorrect statement.

First, there are now multiple cases which recognize that requirements for professors to use "preferred pronouns" violate the First Amendment's Free Speech Clause independent of whether they also may violate the Free Exercise Clause. *See, e.g., Meriwether, supra,* 992 F.3d at 498-512 (finding that a requirement to use preferred pronouns violated the First Amendment's Free Speech clause even though later in its opinion it independently found that it also violated the Free Exercise clause) and *Vlaming, supra,* (finding that a preferred pronouns requirement for a college professor violated both the free speech and free exercise provisions of the parallel guarantees under the Virginia Constitution, relying on federal First Amendment jurisprudence to arrive at that conclusion).

Second, Defendants imply, but do not support, the argument that Plaintiff would have lesser First Amendment protections proceeding under its Free Speech Clause than its Free Exercise Clause. They cite no case for this proposition. However, this proposition has been expressly considered and rejected by at least one federal court. *See Willey v. Sweetwater Cnty. Schl. Dist.,* 2023 Lexis 113818, 2023 WL 4297186 (D. Wyo. June 30, 2023) (unpublished), noting that:

> Given the Supreme Court's admonition that one clause of the First Amendment should not "trump the other two" and there is no sound reason to prefer one constitutional guarantee over another, *Kennedy* [*v. Bremerton Sch. Dist.*], 142 S.Ct. [2407] at 2432 [2022], it is hard to imagine why a public employee's free exercise rights would warrant *more* protection than their Free Speech rights.

### 3.   Defendants also err in asserting that this case is only about "plural" pronouns.

Defendants try to characterize this as a case involving only the compelled use of *plural* pronouns since that was the only request made by C1 in this case.  *See* DMSJ at 32 ("Here, the only pronouns at issue and requested as preferred pronouns were 'they/them'."  However, their Sanction Orders are not so limited, nor have any of their post-order letters or comments reduced the broad scope of their Sanction Orders that Plaintiff must prospectively use *any* student's "preferred pronouns."  These sanctions have no application to C1 since C1 has already graduated. They are relevant now because of the broad orders compelling all of Plaintiff's *future* speech, none of which will be limited merely to requests to use only plural pronouns.

### 4.   The tests applicable to Plaintiff's claims of prior restraint and compelled expression are those established in *Pickering* and *Connick* and, under those tests, Plaintiff should prevail.

#### a.   The requirements of *Pickering/Connick*

The parties are at least in agreement on the tests which apply if *Garcetti* is *not* applicable: these are the tests of *Pickering* and *Connick v. Myers,* 461 U.S. 138 (1983)*.* Under those tests, as noted by *Meriwether*, "we ask two questions: First, was [the professor] speaking on 'a matter of public concern' ... [a]nd second, was his interest in doing so greater than the university's interest in 'promoting the efficiency of the public services it performs through him?" 992 F.3d at 508. (Note, Defendants' MSJ refers to these two tests under points B and C of its brief, starting at pp. 31 and 36, respectively.)

#### b.   Defendants are wrong in contending that the compelled use of preferred pronouns by college professors is not a matter of significant public concern.

Defendants expend six pages attempting to argue that the choices a college professor makes in the use or non-use of pronouns to address his students is not a matter of significant public concern within the meaning of the *Pickering/Connick* tests.  DMSJ at 31-36.  Defendants

somewhat astonishingly assert that the choices college professors make in using or not using pronouns preferred by their students are of no interest to the general public, but are of interest only to the involved professor, because they "focus[] exclusively on the conditions of the complainants' own employment." DMSJ at 32.

However, as recognized by several courts, the general public has an *intense* interest in whether publicly-funded schools may compel their staff to use the pronouns preferred by their students.  *See, e.g., Meriwether, supra,* which presented the following focused discussion of exactly this issue:

> When speech relates "to any matter of political, social, or other concern to the community," it addresses a matter of public concern. [*Connick,* 461 U.S.] at 146. Thus a teacher's in-class speech about "race, gender, and power conflicts" addresses matters of public concern. . . . The linchpin of the inquiry is, thus, for both public concern and academic freedom, the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives. [Citation omitted.]
>
> Meriwether did just that in refusing to use gender-identity-based pronouns. And the "*point* of his speech" (or his refusal to speak in a particular manner) was to convey a message. … Taken in context, his speech "concerns a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes." … That is, his mode of address *was* the message. It reflected his conviction that one's sex cannot be changed, a topic which has been in the news on many occasions and "has become an issue of contentious political debate."

*Meriwether,* 992 F.3d at 508 (emphasis in original).

Another case reaching the same, seemingly obvious, conclusion is *Vlaming, supra,* 895 S.E.2d at 741-42 (quoting with complete accord *Meriwether's* discussion, above, of the "public concern" element under *Pickering/Connick* in its application to a requirement for teachers to use preferred pronouns).

Finally, additional evidence suggesting that a professor's policy on pronouns is a matter of great public concern, certainly to the extent mentioned in his or her class syllabus, is supplied by a bill recently enacted by the State of Utah (signed by the Governor on January 30, 2024) (H.B. 261).  The bill addresses the propriety of steps an institution of higher learning might take to reduce

discrimination  based on, *inter alia,* gender identity, and, among other things, that bill enacts new UCA §53B-1-118-(3) (b) (*see* lines 249-251 of the Bill) which, in the context of a bill involving, *inter alia*, gender identity issues, requires an institution of higher learning to "publish the titles and syllabi of all … classes … on the institution's website in an online database readily searchable by the public."  Whichever way the Bill would cut, it is clear that gender identity issues on college campuses are issues of significant public concern that have drawn the Legislature's full attention.

Additional evidence on the public concern in Utah generated by the issue of what pronouns are used in public schools comes from the recent pendency in the Utah House of HB 303 (https://le.utah.gov/~2024/bills/static/HB0303.html).  (As noted in a February 12, 2024 article in the Utah Dispatch (https://utahnewsdispatch.com/2024/02/12/utah-bill-requires-teachers-be-politically-neutral/), the motivation for the bill arose when "some parents expressed concerns about a teacher talking about pronouns and gender identity with young students."  Regardless of whether this bill passes, the very existence of this bill demonstrates that it is indeed an indisputable matter of great current public concern how public teachers deal with pronoun issues, among other things.

The public concern with pronouns usage or non-usage in public schools is also nation-wide.  For the most obvious example, Florida recently passed a law that prohibits K-12 teachers from informing their students if the teacher has any preferred pronouns by which the teacher would like to be addressed.  *See, e.g.,* §1000.071(3), Florida Statutes (2023), which mandates that "[a]n employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her sex."

The notion that pronoun preferences in public schools is not a matter of public concern is clearly untenable.

### c. Defendants are also wrong in concluding that they should prevail under the *Pickering/Connick* balancing test.

The likely controlling element on Plaintiff's entitlement to relief under his First Cause of Action will be application of the balancing test required by *Pickering/Connick*. For each of the reasons below, Defendants' sanction orders do not survive under that test.

### i. Contrary to Defendant's assertions, their sanctions were not required by Title IX.

At DMSJ 39-40, Defendants attempt to support their argument that their interests outweigh Plaintiff's by the assertion that "SUU is legally obligated to address those complaints under Title IX …. Otherwise, the University risks liability for its deliberate indifference and failing to reasonably respond." DMSJ 39.

But this defense is only valid support for sanctions that go no further than that required to comply with Title IX. Defendants cite *no* case holding that a school violates Title IX if it allows a university-level professor (or, frankly, even a K-12 teacher) to use the chosen name of a non-binary student in lieu of using the student's requested plural pronouns and, a fortiori, in lieu of using any of the potentially infinite number of newly invented "preferred" pronouns. Instead, it cites only to *Escue v. Northern OK College,* 450 F.3d 1146, 1152 (10th Cir. 2006), which merely holds that one requirement for a school to be subject to Title IX liability is if it is "deliberately indifferent" to acts of sex-based harassment of which it has actual knowledge and it concluded that the school in that case was not deliberately indifferent. That case does not remotely suggest that a professor's offers to use a non-binary student's chosen name in lieu of plural or preferred pronouns constitutes a Title IX violation.

Indeed, even though the Department of Education now takes the position that Title IX's prohibition of discrimination based upon sex extends to include discrimination based upon

gender identity, something Congress surely never considered,[15] not even the Department of Education has suggested that a professor violates Title IX by using a student's chosen name in lieu of using plural or preferred pronouns.

Additionally, Defendants cannot rely on Title IX as a defense because the Written Determination upon which the sanctions were based failed to include a finding as to all the elements necessary to show a Title IX violation.  Specifically, as stated in PAUMF 44, three of the four elements for a violation of policy 5.60 IV-N (2), which are essentially the same as the four elements of a Title IX violation (*see* PAUMF 45) include: "conduct determined by a reasonable person" to be "so [1] *severe*, … and [3] *objectively offensive*" that it "[4] *effectively* denies a person equal access to [a] University education program or activity."  Plaintiff does not believe his conduct met *any* of those three requirements,[16] but, more importantly, as to element 4, the Hearing Examiner did not even make a finding *at all* [17] and, as a result, the sanctions cannot be justified based upon a need to comply with Title IX.  Specifically, the fourth element requires that the student has been effectively denied equal access to a university education program. However, the Hearing Examiner made no such finding.  Instead, the relevant finding, found at the bottom of AR 17 (p. 14 of the Written Determination), was only that Plaintiff's conduct "had the effect of denying *or limiting* C-1 and other students' participation in an SUU program."  This means that there was no necessary finding that any of these students were effectively denied

---

[15] Solely for record purposes, it is Plaintiff's position that the Department of Education erred not only in interpreting the scope of Title IX to include gender identity protection, but also in interpreting and applying the holding of *Bostock v. Clayton County*, ___ U.S. ___, 140 S.Ct. 1731 (2020) (a Title *VII* case), to all potential cases under Title *IX*.  While the "Chevron Doctrine" requires courts to defer to interpretations rendered by administrative agencies, it is not clear that doctrine will survive the Supreme Court's decision later this year in two pending cases involving the National Marines Fisheries Service.  *See* https://www.scotusblog.com/2024/01/supreme-court-likely-to-discard-chevron/#:~:text=The%20plea%20to%20overturn%20the,of%20observers%20on%20fishing%20boats.

[16] *See* PAUMF 48-50.  Element 2 is "pervasiveness" (*see* PAUMF 49).  Plaintiff does not dispute that his position has been consistent (and thus "pervasive").

[17] *See* PAUMF 51

equal access.  Instead, the only finding he *necessarily* made was that their access was in some way *limited*.  That does not meet the required criteria for a Title IX violation.

Nor were any of the students denied, or effectively denied access to Bugg's class.  He has consistently made it clear that: (1) all are welcome to attend his classes; (2) he would make a good faith effort not to refer to any student by a pronoun the student found offensive; and (3) he is willing to use any student's preferred *name,* even if not matching the student's apparent gender.  He only refuses to use plural or other preferred pronouns.  That is a far cry from denying or effectively denying anyone access to his class.

And even apart from this lack of a *required* finding, even as to the findings actually made of "severity" (PAUMF 48) and "objective offensiveness" (PAUMF 50), they were based on facts inadequate to show a violation of Title IX.  As to "severity," Plaintiff submits that an offer to use a student's requested name, even though differing from the student's apparent gender, rather than using plural or preferred pronouns, is hardly conduct a reasonable person would think of as "severe".

As to "objective offensiveness," Defendants rely on the fact that several of C-1's fellow students joined C-1's boycott of Plaintiff's class, as if that proved the objective reasonableness of the offense taken by C-1 and that another professor was upset.  The evidence is clear that C-1 employed significant peer pressure on C-1's fellow students motivating them to join the boycott for fear of offending C-1 rather than that any of the students (or certainly, many of the students) were themselves so offended by Plaintiff's unwillingness to use plural pronouns that they were effectively denied access to his class.

For all these reasons, Defendants' assertion that their need to comply with Title IX warrants tipping the scales of the *Pickering/Connick* balance in their favor is not well taken.

### ii.   Defendant's claimed loss of efficiency is of its own making.

SUU had and has the tools at its disposal to resolve any "efficiency" problem.  SUU's Undergraduate Student Handbook says:

> **Gender Identify Announcement.** Students have the right to express their gender identity freely. The faculty are committed to creating a safe positive learning environment for each and every student. If a student would prefer that we use a specific gender pronoun, please let faculty know during class introductions, office hours, or by email.

[DMUF 37]

While Plaintiff has no objection to the University Student Handbook notifying students that they have a right to express their gender identity freely and to notify faculty of their pronoun preferences, in order to balance the school's legitimate interests against a professor's First Amendment rights, the Handbook should be modified to add the proviso that professors will use a student's preferred name of choice, regardless of gender, and are encouraged, *but not required*, to honor any specific pronoun requests.  If this modification is made to the Handbook, no expectations like those experienced by C-1 could reasonably have been created.  That would signal a university-confirmed respect for a student's choice of name and gender identity, though, at the same time teaching the important life-lesson that one must also tolerate different views, even those they find upsetting, and cannot compel others how to address them.

Had SUU expressed in its Student Handbook the policy modification described above, so that all students (and faculty) had, in advance, a clear understanding of a neutral toleration policy on pronouns, it is far less likely that there would be any interruptions in the school's functioning comparable to what occurred here.

Moreover, to the extent that other students joined the "shadow class," there is no clear evidence that any of them other than C-2 did so other than to show solidarity with C1.  ([PAUMF 41-42].)  More importantly, with the suggested revised policy being clearly stated in the Handbook, it is highly unlikely there would be any future boycotts which would impact the school's interest in efficiency.

> ### iii.   Plaintiff's interests against compelled expression and prior restraint outweigh Defendants' interests

Importantly, under the *Pickering/Connick* test, First Amendment rights are not

automatically lost, even if an employer can show some inefficiency.  Rather, that must be balanced against the extent of the employee's First Amendment rights.  Even more importantly, case law teaches that when the government employee is a *university professor*, the balance is not an even one, but is weighed more heavily in favor of the employee's speech rights:

> In considering the second part of the *Pickering-Connick* test, courts must give weight to the nature of the employee's job in assessing the possible effect of his action on employee morale, discipline or efficiency. In so doing, it must be recognized that such effect may vary with the job occupied by the employee. In analyzing the weight to be given a particular job in this connection "nonpolicymaking" employees can be arrayed on a spectrum, *from university professors at one end to policemen at the other. State inhibition of academic freedom is strongly disfavored.*

*Jurgensen v. Fairfax Cty.*, 745 F.2d 868, 880 (4th Cir. 1984) (emphasis added).

*Meriwether* concluded that the First Amendment-based interest of the professor there in not deferring to the student's demand for preferred pronouns was substantially greater than the university's interest in promoting the efficiency of the public services it performs though him (*id. at 509-510*).  This Court should reach the same conclusion.

Another important factor in this analysis is that there is no compelled attendance for university level students.  Unlike what the situation may be for K-12 schools, one of the primary functions of a university level education is to challenge one's viewpoints with countering viewpoints, even if (perhaps especially) one may find them offensive.  While individuals such as C-1 would certainly like to live in a world where everyone is compelled to use their preferred pronouns, in the real world that would be an unrealistic and unenforceable expectation.  By agreeing to use C-1's chosen masculine name, regardless of C-1's apparent feminine gender, C-1 was afforded a level of respect by Plaintiff that C-1 may or may not receive after leaving academia.

Plaintiff did not single out C-1 for any intentional harassment and wished nothing but the greatest success for C-1 in his class.  This is not the type of conduct that any case has identified as sexual harassment.  Rather, as a university level instructor preparing his students for success once

33

they leave academia, Plaintiff believed the position he took in class was the one which would best prepare C-1 for future success.

In any event, as the case law previously discussed makes clear, solely from Plaintiff's own view, the First Amendment absolutely protects his right to not have to speak words with which he fundamentally disagrees and which are contrary to both his deeply held personal convictions as well as his concept of the best way to teach his classes.  Again, *see 303 Creative* which observed:

> "Here, Colorado does not seek to impose an incidental burden on speech. It seeks to force an individual to 'utter what is not in [her] mind' about a question of political and religious significance. [*West Va. Bd. of Ed. v.*] *Barnette*, 319 U. S. [624], at 634 [(1943)]. And that ... is something the First Amendment does not tolerate."

*303 Creative,* ___ U.S. ___, 143 S.Ct. at 2318.

We feel compelled here to return to the previously quoted language from *Janus,* 138 S.Ct. at 2464, about compelled expression:

> Free speech serves many ends. It is essential to our democratic form of government [citations omitted].  Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends.

> When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence.

To the same effect, *see Wooley* v. *Maynard*, 430 U. S. 705, 714 (1977); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943); *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995); and *see also Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, 256 (1974).

Lastly, *see Meriwether*, the leading case so far specifically addressing the application of the *Pickering/Connick* test to *college professors* required to use preferred pronouns.  *Meriwether*

relied on the landmark case of *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603 (1967), which, it noted:

> characterized academic freedom as a 'special concern of the First Amendment' and said that the First Amendment 'does not tolerate laws that cast a pall of orthodoxy over the classroom.' [*Keyishian, id.*] After all, the classroom is 'peculiarly the "marketplace of ideas". [*Id.*] And when the state stifles a professor's viewpoint on a matter of public import, much more than the professor's rights are at stake. Our nation's future 'depends upon leaders trained through wide exposure to [the] robust exchange of ideas'—*not through the 'authoritative' compulsion of orthodox speech.*

*Meriwether,* 992 F.3d at 504-505, (emphasis added).

Here, even though the political debate nationwide rages over the issue of compulsory pronouns and other gender identity issues, SUU nonetheless seeks to throttle any differing views by "the authoritative compulsion of orthodox speech." *Id.* That does not reflect the proper balance between a school's legitimate interests and the First Amendment-protected traditional and vital independence of college-level professors which, as noted above, is more heavily weighted in the balancing test than the First Amendment rights of most other types of public employees.

For all the reasons above, the weighted *Pickering/Connick* balancing test does not justify the extreme restrictions of Plaintiff's First Amendment rights against compelled expression and prior restraint imposed by Defendants' sanction orders herein.

### III
### DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT PLAINTIFF CANNOT PREVAIL ON CAUSE OF ACTION NO. 2

COA 2 alleges that Defendants' sanction orders are also invalid because they are both vague and also overbroad.

**A. The Sanction Orders violate the First and Fourteenth Amendments for overbreadth as Plaintiff must comply with demands for unique pronouns made even by individuals who do not suffer from any gender ambiguity and the number of pronouns Plaintiff could be required to use is unlimited.**

The Sanction Orders issued here additionally violate the First Amendment's prohibitions on speech restrictions which are *overbroad*. Notwithstanding Plaintiff's past and present willingness to make a good faith effort to not use pronouns to which a student objects, and to affirmatively use whatever nicknames or proper names his students wish, even if they do not conform with a student's apparent or birth gender, the Sanction Orders go beyond that to demand that he utilize whichever unlimited and undefined pronouns a student might select (currently more than 70 are in known usage),[18] and this even applies regardless of whether the requesting student is actually transgender[19].

While Plaintiff does not believe he should be compelled to use any pronoun to which he objects, the failure to define and limit the pronouns that a student may demand Plaintiff use, as well as the failure to articulate which types of students are entitled to make such demands,[20] renders the requirement to use "preferred pronouns" a speech restriction which is impermissibly overbroad in violation of the First and Fourteenth Amendments. A policy, "although lacking neither clarity nor precision, is void for 'overbreadth' [when] it offends the constitutional principle that a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Zwickler v. Koota*, 389 U.S. 241, 250 (1967) (citation omitted).

Additionally, a policy is unconstitutional where, as here, it is "substantially overbroad in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). There are more than 70 possible pronouns currently in use, and which *any* student may demand. Both of those factors make the Sanction Orders *substantially* overbroad.

---

[18] Thrun Decl., ¶ 2

[19] It is not fanciful to state the possibility that special pronouns might be demanded even by some cisgender students (*e.g*., heterosexuals or homosexuals who have no confusion about their gender) as an act of solidarity with a non-binary student.  The Sanction Orders compel Plaintiff to comply with *all* such requests.
[20] *E.g.,* the school could limit such demands to those who indicate that they are non-binary.

**B.   The sanctions also violate the First and Fourteenth Amendments due to their vagueness because there are no standards limiting the types or number of pronouns that any students may demand the Plaintiff use in referring to them.**

To the extent SUU may compel Plaintiff's speech, it certainly may not delegate the power of such compulsion to Plaintiff's students without first, at a minimum, clarifying and limiting the scope of that power, *i.e.*, at least specifying the pronouns that Plaintiff may be compelled to speak. The delegation to private persons of the unlimited power to control another private citizen's speech renders the sanctions violative of the First and Fourteenth Amendment's protections against vague and standardless speech requirements.

A policy can be unconstitutionally vague for one of two reasons: it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"; or it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). SUU's requirement for Plaintiff to use any and all "preferred pronouns" violates both aspects of the vagueness doctrine.

In *Larkin v. Grendel's Den*, 459 U.S. 116, 123 (1982), the Supreme Court struck down a Massachusetts statute giving churches an effective veto power over the issuance of liquor licenses to establishments within 500 feet of their premises. The Court found that the statute violated the Establishment Clause because the power delegated to the churches was "standardless, calling for no reasons, findings, or reasoned conclusions" and because there were no "effective means of guaranteeing that the delegated power w[ould] be used exclusively for secular, neutral, nonideological purposes." *Id.* at 125 (citation omitted).

The churches' power under the statute in *Larkin* was absolute and standardless, simply requiring the church to "object" to issuance of a liquor license. See *id.* at 125. The Massachusetts statute "substitute[d] the unilateral and absolute power of a church for the reasoned decision making of a public legislative body acting on evidence and guided by standards…" *Id.* at 127.

Courts construing *Larkin* have readily recognized that this lack of defined standards when delegating power to private persons naturally raises the overarching concern that "administrative

decision-making [will be] made potentially subservient to selfish or arbitrary motivations or the whims of local taste." *Young v. City of Simi Valley*, 216 F.3d 807, 820 (9th Cir. 2000) (citing *Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448, 1455 (2d Cir. 1991)).

Importantly, *Young* clarified that "[a]lthough the challenge in *Larkin* concerned the Establishment Clause rather than the Speech Clause, the underlying problem in both cases is the same." *Young*, 216 F.3d at 820.

Accordingly, *Young* held unconstitutional, on its face, a restrictive adult business zoning ordinance that delegated to private parties the ability to unilaterally defeat a "proposed adult business permit and effectuate a complete ban on certain protected forms of expression." *Id.* at 819. In explaining its ruling, it stated:

> It is, however, unconstitutional for a local government to impose a procedural requirement that delegates to certain favored private parties the unfettered power to veto, at any time prior to governmental approval and *without any standards* or reasons, another's right to engage in constitutionally protected freedom of expression.

*Id.* at 820 (emphasis added).[21]

At DMSJ 46, Defendants assert that "the university's sanctions and policies are not arbitrarily enforced, nor can they be." Yet they leave it up to the arbitrary decision of each and every student, cis-gender or otherwise, which of a nearly infinite number of pronouns they may demand be used. Their brief ignores this entirely.

The Sanction Orders here delegate to every student the standardless and unfettered power to dictate the unlimited words Plaintiff must use in addressing them, and this is so even if the motivation is simply to veto Plaintiff's reasonable choice to, instead, address them solely by their names. Notwithstanding the constitutional prohibition against standardless speech requirements,

---

[21] *See also* *Maddonna v. United States HHS*, 567 F. Supp. 3d 688, 717-18 (D.S.C. 2020) (citing *Larkin*, 459 U.S. at 125): "According to the Complaint, the system which Defendants' 'accommodation' have created 'does not by its terms require that [religiously affiliated CPAs'] power be used in a religiously neutral way.' Rather, under the Executive Order and the HHS Waiver, religiously-affiliated CPAs' power to accept or reject prospective foster parents is completely 'standardless, calling for no reasons, findings, or reasoned conclusions.'" *Id.*

this is precisely what SUU's Sanction Orders have established.  Pursuant to the Sanction Orders, the University has effectively empowered private parties with the ability to compel speech "without supplying standards to guide the private parties' discretion." *Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448, 1455 (2d Cir. 1991). This, as in *Simi Valley* and *Larkin*, naturally raises the concern that such decision-making will be subject to the arbitrary or ill-conceived motivations or whims of *any* of the Plaintiff's students (including not only non-binary students, but *any* students who make a pronoun request and for whatever reason, legitimate or otherwise). (*See Gen. Elec.* at 1455.)

At DMSJ 46, Defendants also argue that Plaintiff cannot challenge the policies at issue for vagueness because he was previously on notice that his conduct could be considered discriminatory.  However, as noted *supra,* that is not correct and is further refuted by Dean Mendini's prior statement that he *could* use names instead of pronouns.  PAUMF 19.

Finally, at DMSJ 43 Defendants erroneously assert that there is an absence of any protected speech (presumably on the theory that it is barred by *Garcetti* or *Pickering/Connick,*) and, as a result, Plaintiff's overbreadth and vagueness challenges must fail.  However, even if their postulate were true, it would not dispose of Plaintiff's claims of vagueness and overbreadth in COA 2.  *See Local 8027 v. Edelblut*, 651 F. Supp. 3d 444, 459 (D. N.H. 2023) (holding that K-12 teachers could challenge speech restrictions as impermissibly vague based, in part, on fact that it impacted their expression, even though holding that, as K-12 government employees, *Garcetti* restricted their rights and required them to speak consistent with the government's policies).

## IV
## DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT PLAINTIFF CANNOT PREVAIL ON CAUSE OF ACTION NO. 4

**A. Defendants' assertion that COA4 should be denied under the 11th Amendment due to lack of a claim for injunctive relief is not well taken.**

    **1. A complaint does not need to explicitly state that it seeks injunctive relief if it provides the factual basis for such relief since the Court has discretion to afford all relief supported by the complaint.**

Defendants argue that Plaintiff's Fourth cause of action should be dismissed solely because it makes no explicit claim for injunctive relief.  Contrary to Defendants' claim, this is of no consequence to the Court's analysis what relief should be afforded to Plaintiff. Indeed, "[t]he question is not whether plaintiff[] asked for the proper remedy but whether [he is] entitled to any remedy." *Martin v. Stites*, 31 F. Supp. 2d 926, 930 (D. Kan. 1998) (citation omitted)

Rule 54 provides that a party should be granted relief even if the party did not demand that relief in a pleading:

> (c) Demand for Judgment; Relief to Be Granted. A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. **Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.** (emphasis added)

Fed. R. Civ. P. 54(c); *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 352 (2008) (5-4 decision) (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) (observing that demand for one form of relief does not preclude another remedy not demanded in pleadings, under Rule 54(c)); *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 956-57 (10th Cir. 1980) (relying on Rule 54(c) in holding that the district court had authority to award appropriate relief dictated by the evidence although that relief was not demanded in the complaint.); *Southwestern Inv. Co. v. Cactus Motor Co.*, 355 F.2d 674, 678 (10th Cir. 1966) (relied on Rule 54(c)'s provision that the judgment should grant the relief to which the plaintiff is entitled despite failure to demand that relief in the pleadings.)

Many other Circuit Courts have recognized their statutory authority to award appropriate relief, as dictated by the evidence, although that relief was not demanded in the complaint. *See Soltys v. Costello*, 520 F.3d 737, 742 (7th Cir. 2008) ("the fundamental legal error in this case may have been the parties' and the district court's shared assumption that a prayer for punitive damages had to appear in the complaint in order to sustain an award of such damages."); *Kahan v. Rosenstiel*, 424 F.2d 161, 174 (3d Cir. 1970) ("Plaintiff's complaint does not specifically ask for

equitable relief; it contains only the general request for 'further relief as may be just.' Nonetheless, under Rule 54(c) of the Federal Rules of Civil Procedure, a court may have awarded any relief appropriate under the circumstances.); *United States use of Bergen Point Iron Works v. Maryland Casualty Co.*, 384 F.2d 303, 304 (2d Cir. 1967) ("There is of course no requirement that the plaintiff request in his complaint the specific relief which is eventually granted. F.R.Civ.P. 54(c)."); *Scutieri v. Paige*, 808 F.2d 785, 792 (11th Cir. 1987) ("If the complaint alleges conduct that would support a claim for punitive damages, and if evidence is presented creating a jury question on such relief, the judge commits reversible error in not instructing the jury on that issue."); *Guillen v. Kuykendall*, 470 F.2d 745, 748 (5th Cir. 1972) (relying on Rule 54(c), it was "not necessary to claim exemplary damages by specific denomination if the facts show" that plaintiff is entitled to such remedy.); *Simek v. J.P. King Auction Co.*, 160 Fed. Appx. 675, 683-84 (10th Cir. 2005) (suggesting that it agreed with *Scutieri* and *Guillen* that "Rule 54(c) may require instructing the jury on a remedy to which the plaintiff is entitled in light of the evidence presented at trial, even when the plaintiff limited his complaint to other forms of relief.")

This includes injunctive relief when appropriate, even when not specifically requested in the complaint. *see Kahan v. Rosenstiel*, 424 F.2d 161, 174 (3d Cir. 1970), *cert. denied*, 398 U.S. 950 (1970). For example, the Seventh Circuit cited *Southwestern Inv. Co.*, 355 F.2d at 678, in holding that the district court properly granted a late request for injunctive relief, which was not requested in the complaint, and even though the plaintiff never amended her complaint to request an injunction. The court relied on the principle that Rule 54(c) is liberally construed, "leaving no question that it is the court's duty to grant whatever relief is appropriate in the case." *Kaszuk v. Bakery & Confectionery Union*, 791 F.2d 548, 559-60 (7th Cir. 1986).

Here, Plaintiff's Fourth cause of action succinctly lays out the requisite factual grounds to support injunctive relief. Specifically, it provides that "[n]either Policy 5.27 nor Policy 5.60, on its face, … requires that [p]rofessors must use plural pronouns (or any other pronouns) at the

request of students."[22] In addition, "[t]he Professor's conduct did not in fact constitute either 'discrimination' or 'harassment' based on gender identity pursuant to either of these two written policies… ."[23]  The Fourth cause of action then states that "…Defendants erred in construing [the policies] otherwise."[24]

Clearly, if Defendants are not enjoined from continuing to erroneously construe these relevant policies, Plaintiff remains in the untenable position of being repeatedly sanctioned for exercising his First Amendment rights.

### 2. In any event the Fourth cause of action sufficiently put Defendants on notice that Plaintiff is seeking injunctive relief because both the title and the prayer so inform them.

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Stanko v. Davis*, 297 Fed. Appx. 746, 748 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and ellipsis omitted)). "Rule 8 requires also that pleadings "'be construed so as to do justice.'" *Id*. (quoting Fed. R. Civ. P. 8(e)).  The most important underlying principles of these Rules are whether Defendants were given "fair notice" that Plaintiff was seeking injunctive relief and whether Defendants demonstrated any prejudice. *Chavez v. Stomp*, 2014 U.S. Dist. LEXIS 206016, *75 (D.N.M., 2014).  Indeed, "[t]he policy of the Rules is that pleading technicalities do not control what relief is ultimately awarded."  *Id.* at *75-76*.

Here, Defendants had ample notice that Plaintiff intended to seek injunctive relief: the very title of the Fourth cause of action so states and Plaintiff's prayer for relief specifically requests it.[25] Defendants' argument is strictly technical and lacks any indicia of prejudicial impact.

---

[22] Doc. 42, 3d Amend. Comp. ¶ 87.
[23] Doc. 42, 3d Amend. Comp. ¶ 88.
[24] *Id*.
[25] Doc. 42, 3d Amend. Comp. pp. 18 and 22.

**B.  Defendants' assertion that COA4 is not "actionable" because it does not "implicate" any violation of federal law is also not well-taken because they have enforced an unconstitutional and erroneous interpretation of the school's own policies.**

At DMSJ 52, Defendants incorrectly assert that "no federal law is implicated" by Plaintiff's allegations in COA 4, even though he alleged that they erred in their construction and application of their policies to him.  Defendants may not construe and apply a policy in violation of constitutional requirements, and such action entitles Plaintiff to prove his claim by showing that Defendants interpreted and/or enforced their policies in a manner which rendered them impermissibly vague and thus deprived him of constitutional rights.

To put this claim in focus relative to the rest of the Complaint, even if the Court were to find that Defendants' *sanction orders,* themselves, were neither unconstitutionally vague nor overbroad, and did not constitute either a prior restraint nor an impermissible compelling of expression (as alleged in COA1 and 2), it is still necessary to address the separate question raised by COA 4 of whether SUU's two written *policies* were rendered impermissibly vague as applied to Plaintiff, and particularly as their interpretation herein affects his rights of expression.  If so, he cannot be found to have violated them, and any such interpretations should be enjoined prospectively.

COA 4, ¶ 88 specifically alleges that "Defendants "erred in construing them otherwise" (*i.e.*, construing their policies as encompassing a requirement to honor a request for plural or preferred pronouns).  Accordingly, Plaintiff is entitled to assert that Defendants erred in their construction and application of these Policies.  That necessarily includes the argument that Defendants' application of these Policies not only rendered those policies violative of his rights against compelled expression and prior restraint, but also rendered those policies unconstitutionally vague as interpreted and applied herein.

The facts clearly demonstrate that Defendants' application of their policies to Plaintiff indeed rendered them impermissibly vague.  First, as stated in COA 4, ¶ 87, "[n]either Policy 5.27 nor Policy 5.60, on its face, specifically requires that Professors must use plural (or any other)

43

pronouns at the request of students."[26]  Second, it is an undisputed fact that no person at SUU had previously told Plaintiff he was *required* to use plural or preferred pronouns (PAUMF[27]20).  Third, Dean Mendini had expressly told him it would likely be okay to, instead, just use such students' *names.*  PAUMF 19.

The law is clear that even facially constitutional policies can violate federal law if their implementation or enforcement is unconstitutional.  *See, e.g., Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (which acknowledges a § 1983 claim where a defendant-supervisor "*implements*, or in some other way possesses responsibility for the continued operation of a policy the enforcement … of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution . . . .' ," emphasis added), and *Bartholomew v. Fischl*, 782 F.2d 1148, 1153 (3d Cir. 1986) ("an official policy that is not unconstitutional may provide the basis for municipal liability when an official interpretation of the policy is the proximate cause of a constitutional violation").

Indeed, it is "when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under § 1983."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("this case unquestionably involves official policy as the moving force of the constitutional violation…".) *id.*

The case law also supports Plaintiff's COA 4 on the vagueness question.  Under almost identical circumstances, the one court to have considered whether a school's application of its Title IX-mandated policies against sexual discrimination (a policy indistinguishable from the ones in this case) fairly included a requirement to use preferred or plural pronouns, concluded that the application of those policies to require such specific conduct rendered them impermissibly vague.  (*Vlaming v. West Point Sch. Bd.*, 895 S.E.2d 705, 743-746 (Va. 2023).  It also emphasized that restrictions challenged as vague are subject to higher standards of scrutiny where, as there (and

---

[26] Doc. 42, 3d Amend. Compl., COA4 & ¶ 87.
[27] "PAUMF" is used to reference the numbered paragraphs herein under the heading "Plaintiff's Additional Undisputed Material Facts."

here), they potentially impact the exercise of First Amendment rights.  *See* discussion and cases cited *id.* at 744.

Finally, the Defendants created further vagueness by relying on a finding that impermissibly conflated the elements of a Policy 5.60 violation with a Policy 5.27 violation. Specifically, the Hearing Examiner "issued a Written Determination finding Plaintiff violated SUU's Policy 5.60 (*informed by related definitions found in Policy 5.27*), in that he had engaged in harassment and discrimination on the basis of gender identity against a student."  (Emphasis added.)  *See* DMUF  47 (Doc. 60, p. 12).

However, these two policies have very different elements for proof of a violation and their mixing in the hodgepodge way done here rendered the policies impermissibly vague.  Specifically, "discrimination" and "harassment" are defined in Policy 5.27, §§ A and B, respectively, and neither requires proof that the accused's conduct deprived the complainant of access to the educational opportunities or benefits provided by the school.  Neither do they require proof that the conduct is "objectively offensive."  In contrast, "sexual harassment," a defined term in § IV-N of Policy 5.60, requires proof of those two elements, as well as the other two elements required for a finding of a Title IX violation, as articulated in *Davis v. Monroe Cty., supra*, and referenced in PAUMF 44.

Furthermore, there was no finding that element 4 under the tests of both Title IX and Policy 5.60 § IV-N was met.  That element requires proof that the offending conduct "effectively *denies* a person equal access to [a] university education program or activity."  (Emphasis added.)  But there was no finding that Plaintiff's conduct in fact denied any student access to an SUU educational program.  Instead it waffled, finding only that it either "limited *or* denied" such access (emphasis added). PAUMF 51.  Under these circumstances, conflating the standards of Policy 5.27 with those of Policy 5.60 unquestionably made it unclear exactly what test was applied against Plaintiff and allowed a standard short of what was required.

And, as noted above, further compounding the impermissibly vague application of these two policies, is that there exists no written or oral policy requiring a professor to honor a request

to use plural or other preferred pronouns.  Declaratory and injunctive relief is required to prevent future unconstitutional misapplications.

**V**

**CONTRARY TO THE ALLEGATIONS IN DEFENDANT'S MOTION, PLAINTIFF'S CAUSE OF ACTION NO. 5 IS <u>NOW</u> CURRENTLY RIPE FOR REVIEW AND NOW ALSO WARRANTS INJUNCTIVE RELIEF.**

Plaintiff's Fifth Cause of Action seeks a declaration that the sanctions imposed against him were not required by Title IX.  Prior to receiving Defendants' Motion for Summary Judgment, Plaintiff was prepared to concede that his claim was moot because, as Defendants said in opposing Plaintiff's motion for leave to amend his complaint, they had made no actual finding that their sanction orders were required by Title IX.

However, based upon the position Defendants have taken in their Motion for Summary Judgment, Plaintiff can no longer concede that point.  Specifically, in arguing that they should prevail under the *Pickering/Connick* balancing test, as noted *supra*, Defendants argued that their actions were needed to protect themselves from liability under Title IX.  *See* DMSJ 39.  That being the case, they have made clear that both declaratory relief and, now, injunctive relief, are required to protect Plaintiff against future enforcement of these sanctions because Defendants have now conceded what Plaintiff has suspected all along, *i.e.*, that Defendants believe these sanctions were needed to comply with Title IX.  Certainly, absent equitable relief from this Court, they will continue to enforce and impose such sanctions, based upon their Title IX concerns and their interpretation of what it requires.  To that extent, Plaintiff requests that the Court conform his pleading to the proof with respect to adding a request for injunctive relief to his claim for declaratory relief under COA5.

Other than their assertion of a lack of ripeness, the only argument Defendants have made against Plaintiff's COA 5 is their claim that there is no case or controversy over COA5 because it was the Hearing Officer, not the Defendants, who made the initial determination that Plaintiff

violated SUU Policy 5.60.  (DMSJ 54.)  However, since Defendants sit as the reviewing bodies, as well as the enforcers, in the administrative scheme, that assertion is clearly frivolous.

Given that Defendants have made no attempt to argue against the merits of Plaintiff's contention that their sanction orders went beyond those required by Title IX, Plaintiff will simply rely on his prior briefing of this issue in Point II-B-4-C-i of this brief, *supra*.  But should Defendants argue against the merits of COA5 for the first time in their reply brief, Plaintiff will request the opportunity to file a Sur Reply Brief limited to that point where he will have his first opportunity to respond to Defendants' argument on the merits of this point (should they in fact even present such an argument).

# VI
## DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT PLAINTIFF CANNOT PREVAIL ON CAUSE OF ACTION NO. 6

Plaintiff's Sixth Cause of Action ("COA 6") alleges that the sanction orders violated his First and 14th Amendment rights based on the additional ground that they were not limited to his in-class conduct.

He pointed out that he directs many of the productions of the SimonFest Theater Company which takes place at the Heritage Center Theater in Cedar City, and that it is not sponsored by the University.  TAC ¶¶ 100-102.  However, he also noted that many of the performers of that company come from the student body of the University TAC ¶ 103 and that it is not uncommon for students who are in his classes to encounter him either at that Heritage Center Theater, on campus but out of class, or in town.  TAC ¶¶ 105.

Because the sanction orders command that he use preferred pronouns whenever addressing his students, and are not limited to his in-class dealings, he challenged the orders on the additional grounds of First Amendment overbreadth.

Defendants have attempted to eliminate that claim by now interpreting the sanctions as applying only when he is "performing his job duties" (notwithstanding that no such limitation exists on the face of the sanction orders).  While Defendants' response is appreciated, it

**Case 4:22-cv-00062-DN-PK   Document 71   Filed 04/17/24   PageID.2282   Page 56 of 56**

unfortunately does not go far enough to erase the ambiguity of when it does or does not apply.  For example, if a student confronts Plaintiff, either on campus or at the Heritage Center theater, asking for some advice, it is not at all clear to Plaintiff whether that is something which would be within the scope of his "job duties."  For that reason, he still requires the relief requested in COA 6.

## VII
### SUBJECT TO DEFENDANTS' ACCEPTANCE OF A CONDITION, PLAINTIFF WILL NOT OPPOSE THE DISMISSAL OF HIS CLAIM AS TO DEFENDANT BENSON.

Plaintiff will agree that his claim against Defendant Benson, the University President, may be dismissed if Defendants will stipulate that: (1) she is not an indispensable party, and (2) that she not only has no power to modify or enforce the challenged sanctions, but that she also has no power to direct others to do so.

## CONCLUSION

For all the reasons above, Defendants' Motion for Summary Judgment should be denied and, since all issues have now been briefed, requests Summary Judgment on the entire case.

Respectfully submitted,

Jerome H. Mooney

**WESTON, GARROU & MOONEY**

G. Randall Garrou

Of Counsel to
**WESTON, GARROU & MOONEY**

By:     __ / s /  Jerome H. Mooney_____
          **Jerome H. Mooney**